**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
-------------------------------------------------------------------X

JOHN DOE[1],           :

               :   **Civil Action No:**

      **Plaintiff,**      :

               :

     **-against-**       :   **Jury Trial Demand**

               :

**WASHINGTON AND LEE UNIVERSITY,** :   <u>**VERIFIED COMPLAINT**</u>

               :

      **Defendant.**     :

-------------------------------------------------------------------X

   Plaintiff John Doe[1] ("Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint against Washington and Lee University ("W&L") respectfully alleges as follows:

<u>**THE NATURE OF THIS ACTION**</u>

   1.  This case arises out of the actions taken and procedures employed by Defendant Washington and Lee University ("Defendant W&L" or "W&L") concerning allegations made against Plaintiff, a male junior student at Washington and Lee as a result of false allegations of nonconsensual sex with fellow W&L sophomore student Jane Doe.

   2.  These allegations purportedly referred to what was clearly consensual sexual activity on or about February 8, 2014 (the "Incident").

   3.  On October 13, 2014, some eight (8) months later, Jane Doe contacted W&L's Title IX officer, and reported that the Incident was not consensual, but was not ready to file a complaint at that time. For reasons that will be explained later, Jane Doe's claim was false, as the contemporaneous statements and actions of Jane Doe are inconsistent with the claim that the encounter was non-consensual.

---

[1] Plaintiff has filed, contemporaneously with this Complaint, a Motion to proceed pseudonymously.

4.     After an investigation of at least nine other witnesses, ranging from student witnesses who observed Jane Doe in the hours, next day and month after the Incident to counselor witnesses opining on W&L held a hearing on November 20, 2014. That same evening, Plaintiff was informed that he was immediately being expelled from W&L.

5.     When W&L subjected Plaintiff to disciplinary action, it did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. W&L failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students. The decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached and removal ordered before any investigation even took place.

6.     Plaintiff has been greatly damaged by the actions of Defendant W&L: his academic future is severely damaged; the monies spent on obtaining a college education at Defendant lost; and the real sacrifices made by Plaintiff's family so that he could receive a quality education have been wasted. Plaintiff therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## THE PARTIES

7.     Plaintiff, is a natural person, citizen of the United States, and resident of the State of West Virginia. During the events described herein, Plaintiff was a student at Washington and Lee University and resided at the Pi Kappa Fraternity House at 201 East Washington Street (which is owned by W&L) while studying at Washington and Lee University.

8.     Upon information and belief, Defendant Washington and Lee University is a private, liberal arts college in the city of Lexington, Virginia, with an address of 204 West Washington St, Lexington, VA 24450.

9.     Plaintiff and Defendant Washington and Lee are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

10.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) Plaintiff states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

11.     This Court has personal jurisdiction over Defendant Washington and Lee on the grounds that it is conducting business within the State of Virginia.

12.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Washington and Lee University is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### The First Time Plaintiff and Jane Doe Meet

13.     On Saturday, February 8, 2014 (during Winter Term 2014), Plaintiff and Jane Doe were at a party off campus. They talked, danced together and made out at the party. After the party ended they spent about thirty minutes talking on the porch at the party.

14. Jane Doe drank at the party, and claimed that her memory of that night was "fuzzy" although Jane Doe admits that she was not incapacitated.

15. At Plaintiff's invitation, Jane Doe accompanied him back to his room located at the Pi Kappa Phi fraternity, via Traveller.[2]

16. In Plaintiff's bedroom, there is a couch and two chairs. After they arrived at Plaintiff's bedroom, they each sat on a chair and engaged in conversation for about an hour. No kissing or sexual activity occurred during this time.

17. At one point, Jane Doe advised that she doesn't usually have sex with someone the first time she meets them, but remarked that Plaintiff seemed very interesting and continued to approach Plaintiff in his chair.

18. Jane Doe initiated kissing with Plaintiff while in his chair. She took off all of her clothing except her underwear. Jane Doe got into bed with Plaintiff. Plaintiff's clothes then came off. At no point did Jane Doe state that she "did not want to have sex."

19. As the two parties engaged in oral sex on each other, Plaintiff felt compelled to advise that he did not have a condom available. Instead of giving any verbal response, Jane Doe responded by pulling Plaintiff closer to her and continued to make out.

20. Jane Doe and Plaintiff started to engage in sexual intercourse, and at one point Jane Doe switched positions so that she was on top during sex. During this time, Jane Doe never asked Plaintiff to stop or advise him that she did not want to have sex. After they concluded, Jane Doe and Plaintiff made out and talked for a while before drifting off to sleep. Jane Doe spent the night in Plaintiff's room.

---

[2] Traveller is a transportation service that Defendant W&L provides to its students between 10:00 p.m. and 2:00 a.m.

21.     The next morning, Plaintiff asked Jane Doe if she would like to go out for brunch. Jane Doe declined, but acknowledged that she thought it was a nice gesture, and claimed she said no was because she did not have any other clothes besides for what she wore the night before.

22.     Plaintiff drove Jane Doe home, and as she got out of the car, they exchanged phone numbers.

**The Next Day, Month and Next Sexual Intercourse**

23.     The next day, Plaintiff texted Jane Doe but received no response. Since the time they first met, Plaintiff and Jane Doe had become Facebook friends. As such, on March 9, 2014, he sent her a message on Facebook saying "Hey ummm I don't how to approach this but idk if I have your right cell phone number because I've texted you but got no response but I felt like we had a pretty good connection. [(---) --- ----] is that you?"

24.     Jane Doe responded by saying "haha I thought we did as well. it is actually [(---) --- ----]. also, I lost my phone at Das Klub so when I get it back feel free to text me if you like. thanks for reaching out."

25.     The day after the Incident, Jane Doe spoke to a friend, Witness 3, about the incident. Jane Doe indicated that she had sex with Plaintiff, but never indicated that it was not consensual, in fact, Jane Doe said she "had a good time last night."

26.     One month later, in March 2014, Jane Doe met with Plaintiff and they engaged in consensual sexual intercourse again.

27.     During Winter Term 2014, Witness 2, saw Jane Doe and Plaintiff interact at parties at the fraternity house, but did not observe any indication that anything uncomfortable had occurred between Jane Doe and Plaintiff. He remarked that things looked very "normal."

28.    One of these parties was the Pi Kappa Phi St. Patrick's Day party, Plaintiff was kissing a female (who is now Plaintiff's current girlfriend), which was witnessed by Jane Doe and caused her to leave the party early. As of August 1, 2014 it has been public knowledge that Plaintiff has a girlfriend since they have been seen together publicly at parties and on campus.

**Eight Months Later, Jane Doe Re-Writes The Incident
As "Non-Consensual" With The Help Of Others**

29.    Following Winter Term 2014, Jane Doe spent her summer break working at a women's clinic that dealt with the sexual assault issues.

30.    Over the next several months, Jane Doe engaged in discussions with various individuals about the Incident.

31.    In July 2014, for the first time, Jane Doe told her friend that she was sexually assaulted, in complete contradiction to what she said contemporaneously with the incident.

32.    In September 2014, seven months after the Incident, Jane Doe visited a therapist and described "an evolution about how she felt about the incident," that she "felt confused" and that "she had a strong physical reaction" to seeing Plaintiff's name on the Nepal program acceptance list, which prompted her to "proceed to a [disciplinary] hearing."

33.    On October 13, 2014, eight months after the Incident, Jane Doe first contacted the Lauren Kozak, the Title IX officer for W&L to report that she was "sexually assaulted." She indicated that she did not want anything further to occur.

34.    As it turns out, Jane Doe's complaint came just days after Ms. Kozak made her October 5, 2014 presentation for SPEAK, a student organization that advocates against sexual assault. During her October 5, 2014 presentation, Ms. Kozak introduced an article, "Is it Possible That There Is Something In Between Consensual Sex And Rape…And That It Happens To Almost Every Girl Out There?" <u>See</u> Total Sorority Move, *available at*

http://totalsororitymove.com/is-it-possible-that-there-is-something-in-between-consensual-sex-and-rape-and-that-it-happens-to-almost-every-girl-out-there/ (last visited December 8, 2014). Ms. Kozak introduced and discussed the article with the members of SPEAK to make her point that "regret equals rape," and went on to state her belief that this point was a new idea everyone is starting to agree with.

35. Upon information and belief, Jane Doe is a member of SPEAK and was present for the October 5, 2014 presentation by Ms. Kozak.

36. Both Plaintiff and Jane Doe each independently applied to take a semester to study in Nepal.

37. On October 30, 2014, both Plaintiff and Jane Doe learned that they were accepted to the Nepal program.

38. The next day, Jane Doe decided that she wanted to move forward with an investigation of Plaintiff.

**Investigation of Jane Doe's Allegations**

39. Upon receiving a report of alleged sexual misconduct, W&L is required to conduct an "initial Title IX assessment" to consider whether to proceed with: (i) remedies-based resolution, which does not involve disciplinary action against a respondent; or (ii) initiate an investigation to determine if a Student Faculty Hearing Board hearing is warranted. Interim Sexual Harassment and Misconduct Policy, p. 33. A true copy of the policy is attached as *Exhibit A.*

40. As part of the assessment, W&L is required to, *inter alia*, assess the nature and circumstances of the allegation, address the immediate physical safety and emotional well-being, assess for pattern evidence or other similar conduct by respondent, and discuss the complainant's

expressed preference for manner of resolution and any barriers to proceeding. Interim Sexual Harassment and Misconduct Policy, p. 33-34.

41.     There is no indication that W&L made such an initial Title IX assessment or discussed a remedies-based approach with Jane Doe at all where: (i) the nature and circumstances of Jane Doe's allegation involved an event that occurred eight months prior; (ii) Jane Doe admitted to having voluntarily engaged in sexual intercourse with Plaintiff a month after the alleged sexual misconduct took place; (iii) Plaintiff had a clean disciplinary record; and (iv) there was no record that Jane Doe understood that she had alternative resolution options available other than proceeding with a Student Faculty Hearing Board, e.g. having Plaintiff withdraw from the Nepal program.

42.     As W&L's Title IX Coordinator, Lauren E. Kozak, immediately began the investigation into Jane Doe's allegations of sexual misconduct against Plaintiff. Ms. Kozak performed her investigation with the help of W&L's Associate Dean of Students Jason L. Rodocker.

43.     Under W&L policies, Ms. Kozak is required to be informed of all reports of sexual misconduct and will oversee the University's review, investigation, and resolution of those reports to ensure the University's compliance with Title IX and other applicable laws. See Interim Sexual Harassment and Misconduct Policy, p. 5.

44.     Additionally, she is required to be "knowledgeable and trained in University policies and procedures and relevant state and federal laws" and ensure that all conduct board members receive proper training. See Interim Sexual Harassment and Misconduct Policy, p. 5.

45.     Given Ms. Kozak's October 5, 2014 presentation to SPEAK and her stated position that "regret equals rape," Ms. Kozak's involvement in Plaintiff's investigation was

highly improper and demonstrated an inherent bias and predetermination of guilt of Plaintiff as the male accused in such a similar scenario.

46. On or about November 3, 2014, Ms. Kozak first notified Plaintiff that he would need to meet with her and Dean Rodocker without any explanation of why and with less than six-hours notice. Plaintiff's request that Ms. Kozak advise on the subject-matter of the meeting went unanswered.

47. Once the meeting began, Ms. Kozak immediately interviewed him about his interaction with Jane Doe on the evening of February 8, 2014. Ms. Kozak did not show Plaintiff a copy of Jane Doe's written complaint. Instead, Ms. Kozak verbally explained that Plaintiff was being accused of rape by Jane Doe and that he was now under investigation. Still confused as to why he was being asked about an encounter which was completely consensual, and occurred nine months prior, Plaintiff described as such to Ms. Kozak. Plaintiff mentioned the lighthearted Facebook messages they exchanged the month after the incident where they discussed reconnecting again, and the fact that Jane Doe engaged in consensual sexual intercourse with Plaintiff a month following the incident. Ms. Kozak took notes of her interview with Plaintiff. Ms. Kozak's interview of Plaintiff was very quick. Ms. Kozak requested that Plaintiff sign a form agreeing not to discuss the investigation or retaliate against Jane Doe.

48. In sum, Plaintiff was completely caught off guard and ambushed by the meeting of November 3, 2014. Without any knowledge in advance of the purpose of the meeting, let alone the detailed allegations, Plaintiff had no time to prepare for same before Ms. Kozak questioned him about the matter for a response. Just as soon as he was notified of the nature of the meeting, Ms. Kozak advised Plaintiff that he was not allowed to discuss the matter with anyone but his parents. When Plaintiff asked if he was entitled to consult with a lawyer, he was

advised that "a lawyer can't help you here. We won't talk to them. This matter stays strictly within the school." The message was clear: Plaintiff was on his own.

49.     In addition to Plaintiff and Jane Doe, Ms. Kozak interviewed nine witnesses. Ms. Kozak and Dean Rodocker summarized each interview in writing as "witness statements" for presentment to the Student Faculty Hearing Board ("Hearing Board"). A true copy of the investigation report dated November 11, 2014 is attached as *Exhibit B*.

50.     During the interviews, the following witnesses observed Plaintiff and/or Jane Doe immediately after the incident during the Winter Term 2014[3]: (i) Plaintiff's roommate, Witness 1, stated that he was in the room shortly after the sexual intercourse ended and "nothing seemed abnormal," the next morning he woke up to hear them talking and the "tone of voices was normal and nothing indicated to [him] that anything strange had occurred between them," and he recalls that he "got a positive vibe from [Plaintiff] about the encounter" afterward; (ii) Plaintiff's acquaintance, Witness 2, stated that he saw Plaintiff and Jane Doe talking on the night of the Incident, learned that Plaintiff thought Jane Doe seemed really cool, was aware that Plaintiff and Jane Doe "hooked up again in March," and that Jane Doe has since attended parties at the fraternity house and been in the presence of Plaintiff where "there never seemed to be anything wrong. It seemed to be two people who got along well"; (iii) Jane Doe's friend, Witness 3, stated that the next day after the Incident, Jane Doe said she had sex with Plaintiff but "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," but that five months later, Jane Doe claimed that she had been "assaulted by Plaintiff during winter term," but that "at first she didn't see it as sexual misconduct and had been really confused"; (iv) Jane Doe's old roommate, Witness 4, stated the next morning after

---

[3] Washington and Lee University's Winter Term 2014 is January 6, 2014 to April 15, 2014.

the Incident, Jane Doe "seemed confused whether something was wrong about what had happened" and claimed she didn't want to have sex, but remarked that she was surprised to learn of the sexual misconduct allegations because Jane Doe "never told her that she thought of it as a sexual assault," and it was not until after Jane Doe had "worked at a women's clinic that dealt with the sexual assault issues" over the summer that Jane Doe said she was sexually assaulted.

51.     At least three witnesses observed Jane Doe several months after the incident after she had already begun to develop an alternative narrative for the consensual sexual encounter with Plaintiff: (i) Jane Doe's current roommate, Witness 5, stated that "shortly after the incident" Jane Doe framed the Incident as "concerning" and "wasn't sure how she felt about it," admitted that she "had consensual sex with him after that night" and that Jane Doe decided to go forward with the proceeding because she found out that both of them were going to go to the same Nepal program and she wanted to avoid him; (ii) Jane Doe's friend, Witness 6, stated that halfway through the winter term, Jane Doe mentioned that she had been sexually assaulted but didn't share specifics, and that following the summer break, in October 2014, Jane Doe cried when she saw that Plaintiff was accepted to the same Nepal program; and (iii) Jane Doe's resident advisor, Witness 7, during winter term observed Jane Doe around March/April and said she discussed the Incident but "didn't feel terrible when he was inside of her, so it made her confused," and that following summer break, Jane Doe felt panicked when she saw Plaintiff so he encouraged her to talk to the Title IX Coordinator.

52.     Two witnesses purported to be Jane Doe's therapists. The first therapist, Witness 8, stated that Jane Doe visited her twice in the Winter Term 2014 and described that she "had feelings for Plaintiff" and she "enjoyed the sexual intercourse with Plaintiff." The first therapist, however, "walked her through those feelings to discuss how her actions and feelings didn't

11

negate that it was a sexual assault." Jane Doe only visited this therapist twice during the Winter Term 2014. The second therapist, Witness 9, stated that Jane Doe came to visit her in September 2014 (seven months after the incident) and described "an evolution about how she felt about the incident," that she "felt confused" and that "she had a strong physical reaction" to seeing Plaintiff's name on the Nepal trip acceptance list, which prompted her to "proceed to a [disciplinary] hearing."

53.     Ms. Kozak and Dean Rodocker prepared an investigation report based on all of their interviews and the Facebook message evidence received by Plaintiff. The investigation report was made available to Plaintiff for his review on November 10, 2014.

54.     Upon review of the investigation report, Plaintiff noticed that Ms. Kozak's summary of his verbal account of the events was incomplete and did not include all facts. For example, he stated that when Jane Doe first became intimate with John Doe in his bedroom, she stated that she doesn't usually have sex with someone the first time she meets them, but remarked that Plaintiff seemed very interesting and continued to approach Plaintiff in his chair. Ms. Kozak left out the second part of John Doe's statement, "but remarked that Plaintiff seemed very interesting," which materially and prejudicially changed the context of Jane Doe's statement.  Plaintiff advised Ms. Kozak of this omission, but the change was never made.

55.     Based on the investigation, W&L apparently decided to hold a Student Faulty Hearing Board hearing ("Hearing") as it had already assigned Student Faulty Hearing Board Chairperson Tammi Simpson to reach out to Plaintiff to request a meeting on November 12, 2014 to discuss the investigation report and the next steps.

56.     There were no written transcripts of interviews or contemporaneous notes. Rather, Ms. Kozak made summaries of the interviews, which often contained multiple levels of hearsay.

57.     An investigation report was completed on November 11, 2014, and later amended on November 18, 2014 to include some, but not all, of Plaintiff's corrections to the original investigation report following his review of same. *Exhibit B.*

58.     Given Ms. Kozak's lack of accuracy or thoroughness in her summary of Plaintiff's account, there are no assurances that Ms. Kozak was any more thorough in her "summaries" of the other witnesses interviewed, and no way to challenge her accuracy because those witnesses were not produced at the hearing.

59.     According to W&L's policies, "consent" is defined as:

Consent is demonstrated through **mutually understandable words and/or actions that clearly indicate a willingness to engage freely in sexual activity**.

Additional Guidance about Consent:
- Consent to one form of sexual activity does not constitute consent to engage in all forms of sexual activity.

- Consent consists of an **outward demonstration indicating that an individual has freely chosen to engage in sexual activity**. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

- A verbal "no" is a clear demonstration of the lack of consent.

- Either party may withdraw consent at any time. **Withdrawal of consent should be outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity.** Once withdrawal of consent has been expressed, sexual activity must cease.

- Individuals with a previous or current intimate relationship do not automatically give either initial or continued consent to sexual activity. Even in the context of a relationship, there must be mutually understandable communication that clearly indicates a willingness to engage in sexual activity.

- **The responsibility of obtaining consent rests with the individual who initiates sexual activity**. Prior to engaging in sexual activity, each participant should ask himself or herself the question, 'Has the other person consented?" If the answer is "No" or "I'm not sure,' then consent

has not been demonstrated and does not exist. An individual who initiates sexual activity should be able to explain the basis for his/her belief that consent existed.

- Consent is not effective if it results from the use or threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise his or her own free will to choose whether or not to have sexual contact. See "Force" and "Coercion" for further discussion.

- An individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent. See "Incapacitation" for further discussion.

- In the Commonwealth of Virginia, the age of majority is 18. Under state law, consent cannot be given for any individual under the age of 18 to participate in sexual

See Interim Sexual Harassment and Misconduct Policy, pp. 15-16 (emphasis added).

60. Other than Jane Doe's say-so, the evidence gathered from the witnesses during the investigation failed to corroborate (independent of hearsay statements made by Jane Doe) Jane Doe's claim that she did not provide consent by actions or words to Plaintiff on the night of the Incident. There was no evidence to corroborate Jane Doe's claim that she failed to provide Plaintiff with an outward demonstration of consent, or that she outwardly demonstrated withdraw her consent *during the Incident*. All evidence going to consent, other than Jane Doe's say-so, was developed and recast after-the-fact.

61. Moreover, based on Jane Doe's own complaint, she admits that she "initiated making out," "took off her clothes except for her underwear and got into the bed. She took off her underwear in the bed. He also got naked. She was fine with all of that." Under W&L's policies, the "responsibility of obtaining consent rests with the individual who initiates sexual activity," and, by her own account, Jane Doe admits that she initiated the sexual activity. The

burden to establish "consent," or, in this case "lack of consent," should have been assigned to Jane Doe.

62.     Notwithstanding, on November 13, 2014, Plaintiff was informed that he would be charged with sexual misconduct and that a hearing would be held within 14 days. A true copy of the notice is attached as *Exhibit C*.

63.     The notice indicated that Plaintiff was not to attempt to discuss the case with anyone other than family and those necessary to obtain support. By preventing Plaintiff from communicating with anyone about it, Plaintiff was prevented from obtaining information necessary to disprove the false allegations against him.

**Hearing On Jane Doe's Allegations Of Sexual Misconduct**

64.     On November 20, 2014, a hearing was held before a panel of four individuals; two W&L professors and two W&L students.  All panelists were selected by Hearing Board Chairperson Dean Simpson.  However, all panelists possessed an inherent bias; the panel members have no incentive to render a decision that would be considered at odds with W&L's mandate of taking sexual assault "seriously" and would present a risk of retaliation on the part of the panel members who still maintained their respective positions at W&L.

65.     At the hearing, Jane Doe was physically separated from Plaintiff by a partition. Also, Plaintiff was not allowed to ask questions. Instead, he was required to submit written questions, which Hearing Board Chairperson Dean Simpson would first review for "relevancy" before passing them onto the Hearing Board. Notwithstanding, the Hearing Board only proceeded to ask questions if they deemed such questions to be appropriate. The Hearing Board largely failed to do so. There is no indication in the Interim Sexual Harassment and Misconduct Policy that the Hearing Board maintains such additional discretion to determine "relevancy"

once the Chairperson has made that determination. When the Hearing Board did pose questions submitted by Plaintiff, they often paraphrased the questions and did not ask them in the correct order. The manner and order in which the questions were posed to Jane Doe, combined with the fact that Jane Doe was not in plain view, precluded Plaintiff of any real right to confront his accuser.

66. At the hearing, Jane Doe's statements were repeatedly inconsistent with her prior statements to Title IX investigators during the investigation. For example, during the investigation, she claimed that she drank at the party but was not incapacitated. However, at the hearing, she stated that she was "considerably intoxicated." Also, in the investigation report Jane Doe claimed that she had no recollection of talking to Plaintiff for 20 minutes after the party on the porch. In the hearing, however, she remembered that 20-minute conversation on the porch very well after Plaintiff had answered the Hearing Board's questions about talking on the porch. Moreover, during the hearing she described Plaintiff as disrespectful, dishonorable, and treated her as though she was worthless. But when asked later on in the hearing about what kind of connection she had with Plaintiff, she said it was great and that Plaintiff was smart, interesting, sweet, and genuinely interested in her. The Hearing Board failed to question Jane Doe about her inconsistencies or ask her to explain the reason for her inconsistencies.

67. In fact, one panelist, a male W&L professor, questioned Jane Doe about how it was that she could recall her statements purporting to object to sexual intercourse so clearly, but could not recall other parts of the evening clearly. In response, Jane Doe stated, "I know I said it because I know I said it." The panel did not question Jane Doe further on this.

68.     The hearing was not recorded and there were no witnesses presented. Instead, the Board relied on the summary of witness statements that were prepared by the investigators and compiled in their investigation report.

69.     There was no direct testimony of witnesses or even statements made by witnesses. Rather, the Board simply reviewed summaries of witness statements.

70.     One cannot ask follow-up questions to a written summary, nor can one consider the tone and demeanor in evaluating the truthfulness of the witnesses.

71.     Moreover, there were no statements under oath.

72.     Every interview and summary was done by the same person, Lauren Kozak.

73.     Because she was the Title IX officer, this creates a susceptibility to bias.

74.     Because the Title IX officer's job is to prosecute sexual assault cases, it hardly makes her an unbiased witness to summarize witness statements.

75.     In addition, there were not recordings or records made of the proceedings.

76.     On November 21, 2014, Plaintiff was notified in writing that by a vote of 3-1, the hearing panel found him responsible for non-consensual sexual intercourse and he would be expelled from W&L University. A true copy of the notice is attached as *Exhibit D*. There was no written explanation for the basis of the decision. The decision indicated claimed the Board

> [t]horoughly reviewed the investigative report, appendices, asked follow-up questions of the investigators, and heard directly from the complainant and the respondent. The Board determined by a preponderance of the evidence that the Respondent did not have effective consent, and engaged in non-consensual sexual intercourse in violation of the Interim Sexual Misconduct Policy.

77.     No explanation was given as to how the Board reached the conclusion it did.

78.     The letter further indicated that he could file an appeal within 72 hours to Dean David Leonard. *Exhibit D*.

**There Was No Factual Basis to Conclude That Plaintiff Committed Sexual Assault**

79. The evidence makes clear that Jane Doe did not believe *at the time* that she was the victim of a sexual assault, *nor did she act in conformity therewith*. In fact, Jane Doe engaged in consensual sexual intercourse with Plaintiff a second time just one month after the Incident. However, over the next several months of engaging in after-the-fact discussions with various individuals, including a therapist who "walked her through those feelings to discuss how her actions and feelings didn't negate that it was a sexual assault," and after spending the summer break working at a women's clinic that dealt with the sexual assault issues, Jane Doe convinced herself that she must have been sexually assaulted.

80. In this case, Plaintiff, who was intoxicated himself, was punished for having consensual sexual intercourse with a woman who, on her own accord, was intoxicated but "not incapacitated," initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him. At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in consensual sexual intercourse *again* with Plaintiff. Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February 8 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's policies. In finding Plaintiff culpable of sexual misconduct, W&L afforded preferential treatment to Jane

Doe's evidence on the basis of her female gender and engaged in sex discrimination against Plaintiff in violation of W&L's policies.

81.     In W&L's policies, W&L states that it will not consider a complainant's *prior* sexual history with the accused student. However, nowhere does it preclude the consideration of the complainant's <u>post-incident</u> sexual history with the accused student:

> In general, a complainant's prior sexual history is not relevant and will not be admitted as evidence during an investigation. Where there is a current or ongoing relationship between the complainant and the respondent, and the respondent alleges consent, the prior sexual history between the parties may be relevant to assess the manner and nature of communications between the parties. As noted in other sections of this policy, however, the mere fact of a current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent. Any prior sexual history of the complainant with other individuals is typically not relevant and will not be permitted.

<u>See</u> Interim Sexual Harassment and Misconduct Policy, p. 45.

82.     Evidence of Jane Doe's sexual intercourse with Plaintiff one month *after* the alleged incident should have been considered as relevant evidence in contravention of her claims of sexual assault, but there is no indication that Ms. Kozak or the Hearing Board took this fact into consideration.

83.     Moreover, W&L was biased against the accused out of concern that a failure to find individuals accused of sexual misconduct responsible would cause the U.S. Department of Education's Office for Civil Rights to investigate it. Attached as *Exhibit E* is a June 9, 2014 letter from the President of W&L announcing the appointment of Lauren Kozak as Title IX Coordinator. The letter prominently mentioned the fact that "there are reports that as many as 60 colleges and universities are currently under investigation by the U.S. Department of Education's Office for Civil Rights for violations under Title IX." *Id*.

84. In the letter from the president of W&L dated June 9, 2014 announcing that Lauren Kozak was being appointed Title IX officer, he indicated that "[s]exual assault runs counter to our institution's fundamental values and has no place in our community." *Exhibit E.* One would hope that false claims of sexual assault also goes against the institution's fundamental values, although from the letter, this does not seem to be as much of a concern.

85. W&L's adoption of Jane Doe's after-the-fact re-created assumptions of what occurred on February 8, 2014 with Plaintiff, and overall dismissal of Plaintiff's own account of Jane Doe's words and actions demonstrating consent, namely, Jane Doe's statement that she usually doesn't have sex with someone the first time she meets them, but remarked that Plaintiff seemed very interesting and continued to approach Plaintiff in his chair and initiated making out, demonstrates W&L's reliance on gender stereotypes of who *should* be responsible for sexual assault. W&L engaged in blatant gender bias against Plaintiff as the male accused.

86. Just one day prior to W&L's November 20, 2014 decision finding Plaintiff responsible for sexual misconduct, Rolling Stone published its article on November 19, 2014, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" describing the (now debunked) harrowing tale of a young female victim of rape at University of Virginia ("UVA"), a Virginia institution located just an hour drive away from W&L. UVA experienced a surge of negative public scrutiny and backlash for the perception that it had failed to adequately address campus sexual assault.[4] Upon information and belief, the negative impact of the Rolling Stone article on UVA influenced W&L's decision to find Plaintiff responsible for sexual assault so as to avoid a similar fate.

---

[4] Rolling Stone has since retracted the article. See, http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119 (Last accessed December 10, 2014)

**Failure to Provide Plaintiff With A Meaningful Right of Appeal**

87.     On November 24, 2014, Plaintiff filed an appeal. A true copy of the appeal is attached as *Exhibit F*.

88.     Among the factors that the Student Handbook gives for ruling on the appeal is whether there is a reasonable basis for the appeal:

> The UBA may grant or reject a request for appeal based on one or more of the following grounds if it reasonably determines the ground(s) would more likely than not impact the underlying decision: (1) no reasonable basis/reasonable basis for sanction; (2) new relevant information/no new relevant information; (3) procedural defect or error/no procedural defect or error; or (4) extraordinary circumstances/no extraordinary circumstances. If the UBA decides to grant an appeal, it may decide the case based solely upon the record of the conduct body, the written appeal and other documents it deems relevant, or the UBA may determine to hold a hearing and seek additional information from: i) any person who provided first-hand information to the student conduct body; ii) any person who may have new, relevant information; and/or iii) the Chair of the conduct body, before reaching its final decision.

See Washington and Lee University Student Handbook 2014-2015, p. 54.

89.     Of course, without a factual record of the hearing, there is essentially nothing for the appeals board to review.

90.     It is not surprising, then, that on December 3, 2014, Plaintiff was notified that by a 2-1 vote, the appeal was denied. A true copy of the denial is attached as *Exhibit G*. The UBA failed to provide any detailed factual basis for its denial. *Id*.

**Plaintiff Entire Future is Severely Damaged by W&L's Actions**

91.     As a result of W&L's actions, Plaintiff's entire academic career is ruined and, without a college education, his overall economic future is completely compromised.

92.     Currently, Plaintiff's education is at a standstill as a result of W&L's decision to expel Plaintiff and brand him guilty of "sexual misconduct."

93.     Plaintiff has already completed substantially all of his class work for the past semester and just needs to take the finals.

94.     Plaintiff's academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by any transfer to another educational institution, including graduate studies.

95.     As a result of W&L's actions, Plaintiff's parents' financial resources used to provide Plaintiff with a good education have been squandered.

96.     As a result of W&L's actions, Plaintiff had to undergo psychological counseling at W&L. Since his expulsion, Plaintiff was required to cease his psychological treatment at W&L and is now seeking replacement psychological care.

97.     Any attempt to move on with his future in the face of W&L's arbitrary and capricious decision will be met with great resistance and little success; it is a known fact that the likelihood of his acceptance at a graduate school of the same caliber merited by Plaintiff's academic record have been significantly compromised, and the same outcome can be expected for Plaintiff's future graduate applications in light of high applicant numbers and stiff competition.

98.     Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff, with no end in sight. Plaintiff seeks redress from this Court to undo the wrongs occasioned by W&L on his education and future.

### AS AND FOR THE FIRST CAUSE OF ACTION
### <u>Violation of Title IX of the Education Amendments of 1972</u>

99.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

100.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

101.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

102.     Upon information and belief, W&L receives federal funding for research and development.

103.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[5]

104.     The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *accord[] due process to both parties involved...*"[6]

---

[5] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

[6] *Id.* at 22 (emphasis added).

105.     The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."[7]

106.     A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [8]

107.     Based on the foregoing, *supra,* at ¶¶ 38-91, W&L has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of W&L's guidelines and regulations.

108.     Based on the foregoing, *supra,* at ¶¶ 38-91, W&L conducted its investigation of the incident of February 8, 2014 and subsequent Hearing, in a manner that was biased against the male being accused. From the outset, Ms. Kozak's involvement in Plaintiff's investigation was highly improper and demonstrated an inherent bias and predetermination of guilt of Plaintiff as the male accused given her October 5, 2014 presentation to SPEAK and her stated position that "regret equals rape."

---

[7] *Id.* at 20.
[8] *Id.* at 21.

109.     Furthermore, the Hearing and Hearing Board were slanted in favor of Jane Doe and took her eight-month belated statements at face-value, which were contradictory to witness statements from the hours, next day and month after the incident belated. Absent from the Decision or the Sanction is the mention of any factual basis or rationale for its finding of "not [having] effective consent" on the evening of February 8, 2014.

110.     The Hearing Board's decision reflects its failure to consider the evidence or witness statements in support of Plaintiff's defense, and demonstrates W&L's favorable treatment of Jane Doe on the basis of her gender.

111.     W&L has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt. Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at W&L on the basis of his sex.

112.     In this case, Plaintiff, who was intoxicated himself, was punished for having consensual sexual intercourse with a woman who, on her own accord, was intoxicated but "not incapacitated," initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him. At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in consensual sexual intercourse *again* with Plaintiff. Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February

8 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's policies. In finding Plaintiff culpable of sexual misconduct, W&L afforded preferential treatment to Jane Doe's evidence on the basis of her female gender and engaged in sex discrimination against Plaintiff in violation of W&L's policies.

113.     W&L had no intention of following its own policies and procedures for Plaintiff as the male accused of sexual misconduct when it found Plaintiff responsible for sexual misconduct in the face of witness statements corroborating Plaintiff's account that the evening of February 8, 2014 was consensual.

114.     W&L's actions have demonstrated its gender bias against Plaintiff as the male accused of sexual assault.

115.     Based on the foregoing, the timing of W&L's decision on the heels of the Rolling Stone article about the perceived missteps by UVA in dealing with campus sexual assault influenced W&L's decision to avoid a similar fate for deciding in favor of Plaintiff as the male accused.

116.     Based on the foregoing, *supra,* at ¶¶ 38-91, W&L imposed the highest of five (5) possible sanctions for a charge of sexual misconduct, namely, expulsion, on Plaintiff without any consideration of his clean disciplinary record at W&L, and without providing any written summary for the basis therefor.

117.     Based on the foregoing, *supra,* at W&L, W&L's guidelines and regulations are set up to disproportionately affect the male student population of the W&L community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

118.     Based on the foregoing, *supra,* at ¶¶ 38-91, male respondents in sexual misconduct cases at W&L are discriminated against solely on the basis of sex. They are invariably found guilty, regardless of the evidence, or lack thereof.

119.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION
### Breach of Contract

120.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

121.     Based on the aforementioned facts and circumstances, W&L breached express and/or implied agreement(s) with Plaintiff.

122.     W&L committed several breaches of its agreements with Plaintiff, including, without limitation:

> In compliance with Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and all other applicable non-discrimination laws, Washington and Lee **does not discriminate on the basis of** race, color, religion, national or ethnic origin, **sex**, sexual orientation, age, disability, veteran's status, or genetic information in its educational programs and activities, admissions, and with regard to employment.

> **W&L does not discriminate on the basis of sex** in its educational, extracurricular, athletic, or other programs or in the context of employment.

See Interim Sexual Harassment and Misconduct Policy, p. 4 (emphasis added).

> The President has appointed Lauren E. Kozak to serve as the University's Title IX Coordinator. **She will be informed of all reports of sexual misconduct and will oversee the University's review, investigation, and resolution of those reports to ensure the University's compliance with Title IX and other applicable laws**, and the effective implementation of this policy.

> The Title IX Coordinator is:

- Responsible for the oversight of the resolution of all reports of sexual misconduct involving students, staff, and faculty as well as volunteers and third parties;
- **Knowledgeable and trained in University policies and procedures and relevant state and federal laws**;
- Available to advise any individual, including a complainant, a respondent, or a third party, about the courses of action available at the University, both informally and formally, and in the community;
- Available to provide assistance to any University employee regarding how to respond appropriately to a report of sexual misconduct;
- Responsible for monitoring compliance with all procedural requirements, record keeping and time frames outlined in this policy;
- **Responsible for overseeing training**, prevention and education efforts, and reviews of climate and culture; and
- Responsible for conducting or overseeing investigations of complaints against students.

See Interim Sexual Harassment and Misconduct Policy, p. 5 (emphasis added).

**The training of conduct board members, the hearing procedures that are tailored to address specific types of misconduct** and the overall structure of each conduct body are **designed to create a system that upholds the University's standards--honor, integrity and civility--while providing fair process and judgment for students and student organizations**.

See Washington and Lee University Student Handbook 2014-2015, p. 37 (emphasis added).

Although a report may arrive through many sources, the University is committed to ensuring that all reports are referred to the Title IX Coordinator, **who will ensure consistent application of the policy to all individuals and allow the University to respond promptly and equitably** to eliminate the harassment, prevent its recurrence, and eliminate its effects.

See Interim Sexual Harassment and Misconduct Policy, p. 32 (emphasis added).

Each member of the Panel must be **neutral and impartial**.

See Interim Sexual Harassment and Misconduct Policy, p. 40 (emphasis added).

Members of the Hearing Panel may question the complainant and respondent, question the investigators, **and examine related information and evidence**.

They shall **restrict their questions to matters that the Chair deems relevant** to the specific case.

See Interim Sexual Harassment and Misconduct Policy, p. 41 (emphasis added).

123.    In this case, Plaintiff, who was intoxicated himself, was punished for having consensual sexual intercourse with a woman who, on her own accord, was intoxicated but "not incapacitated," initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him. At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in consensual sexual intercourse *again* with Plaintiff. Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February 8 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's policies. In finding Plaintiff culpable of sexual misconduct, W&L afforded preferential treatment to Jane Doe's evidence on the basis of her female gender and engaged in sex discrimination against Plaintiff in violation of W&L's policies.

124.    In W&L's policies, W&L states that it will not consider a complainant's *prior* sexual history with the accused student. However, nowhere does it preclude the consideration of the complainant's post-incident sexual history with the accused student.

125.     W&L's failure to consider all relevant evidence, including evidence of Jane Doe's sexual intercourse with Plaintiff one month <u>after</u> the alleged incident, was in violation of its obligations to remain neutral and impartial, and examine related information and evidence.

126.     W&L's decision to find John Doe culpable of sexual misconduct in the face of evidence to the contrary demonstrates that W&L did not employ neutral, impartial or properly trained student conduct board members in violation of W&L's policies.

127.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

128.     Plaintiff is entitled to recover damages for W&L's breach of the express and/or implied contractual obligations described above.

129.     As a direct and proximate result of the above conduct, actions and inactions, Plaintiff has suffered physical, emotional and reputational damages, economic injuries and the loss of educational and athletic opportunities.

130.     Upon information and belief, W&L is currently under investigation by the U.S. Department of Education regarding its mishandling of sexual assault allegations.

131.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE THIRD CAUSE OF ACTION
### <u>Covenant of Good Faith and Fair Dealing</u>

132.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

133.     Based on the aforementioned facts and circumstances, W&L breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by finding Plaintiff culpable of sexual misconduct, notwithstanding the lack of evidence in support of Jane Doe's claim of sexual misconduct.

134.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

135.     Plaintiff is entitled to recover damages for W&L's breach of the express and/or implied contractual obligations described above.

136.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Estoppel and Reliance

137.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

138.     W&L's various policies constitute representations and promises that W&L should have reasonably expected to induce action or forbearance by Plaintiff.

139.     W&L expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that W&L would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff his procedural and contractual rights should he be accused of a violation of W&L's policies.

140. Plaintiff relied to his detriment on these express and implied promises and representations made by W&L.

141. Based on the foregoing, W&L is liable to Plaintiff based on Estoppel.

142. As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

143. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### <u>Negligence</u>

144. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

145. W&L owed duties of care to Plaintiff. Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of sexual misconduct against him.

146. W&L was negligent in finding Plaintiff culpable of sexual misconduct, in light of the record of evidence: Plaintiff and Jane Doe were both drinking, but not incapacitated, and engaged in consensual sexual intercourse. Jane Doe initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him. At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in

consensual sexual intercourse *again* with Plaintiff. Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February 8 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's policies.

147.     W&L was negligent in failing to employ neutral, impartial or properly trained student conduct board members to adjudicate allegations of the utmost serious nature, namely, sexual misconduct, being alleged against Plaintiff and leading to his expulsion.

148.     W&L breached its duties owed to Plaintiff.

149.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries and other direct and consequential damages.

150.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### Declaratory Judgment

151.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

152.     W&L has committed numerous violations of the Parties' contracts and of federal and state law.

153.     Plaintiff's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff's educational career and future employment prospects, with no end in sight.

154.     As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at W&L.

155.     By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by W&L at Plaintiff's Hearing be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion from W&L be removed from his education file; (v) any record of Plaintiff's Hearing be permanently destroyed; and (vi) W&L's rules, regulations and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against W&L as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by W&L at Plaintiff's Hearing be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion from W&L be removed from his education file; (v) any record of Plaintiff's Hearing be permanently destroyed; and (vi) W&L's rules, regulations and guidelines are unconstitutional as applied; and

(vii)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:    **Roanoke, Virginia**
        **December 13, 2014**

By: _____

**David G. Harrison, Esq.**
**(VSB #17590)**
**The Harrison Firm, PC**
**5305 Medmont Circle, SW**
**Roanoke, VA 24018-1120**
**(540) 777-7100**
**david@harrisonfirm.us**

-and-

**Andrew T. Miltenberg, Esq.**
**(NY Bar No. 2399582)**
**Kimberly C. Lau, Esq.**
**(NY Bar No. 4502241)**
**Nesenoff & Miltenberg, LLP**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**klau@nmllplaw.com**
**(*pro hac vice* to be applied for)**

***Attorneys for Plaintiff John Doe***

## **VERIFICATION**

I John Doe, declare under penalty of perjury that the foregoing Verified Complaint is true to the best of my knowledge and ability.

December _12_, 2014

_John Doe_
**John Doe**