IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

JOHN DOE,
        Plaintiff,

v.                                 Case No.:  6:14 – cv00052 - NKM

WASHINGTON AND LEE UNIVERSITY,
        Defendant.

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant, Washington and Lee University ("W&L"), by counsel, files this brief in opposition to plaintiff's application for a preliminary injunction ("PI"). Plaintiff was expelled from W&L on November 20, 2014. Complaint, ¶4. Plaintiff did not file this lawsuit until Saturday, December 13, 2014, filed a Motion for a Temporary Restraining Order and failed to schedule a hearing on the same, and now seeks a preliminary injunction to reverse W&L's decision to expel him, and to force his reinstatement during the pendency of the underlying action. Such relief is inequitable, inappropriate and contrary to the law.

Plaintiff is seeking a mandatory injunction to force W&L to reinstate him after it has been determined through substantial investigation, and hearing procedures that were developed to be consistent with Title IX regulations and U.S. Department of Education guidelines, that he was responsible for nonconsensual sexual intercourse with a female student. This is not an appropriate action for a court to take. It would require the court to usurp the judgment, authority and discretion of professional higher education administrators and authorized university officials who are specifically trained in Title IX compliance and investigation, and to assert its own

opinion in place of theirs. Plaintiff recognizes that courts have been reluctant to engage in such usurpation of authority, and so to bolster his arguments, he provides a verified complaint that is replete with factual misstatements that are contradicted even by the exhibits he attached to the complaint, and which defendant further corrects by the declaration of Lauren Kozak, W&L's Title IX Coordinator, which is attached hereto as Exhibit 1, and by the testimony of witnesses W&L will produce at the hearing scheduled in this matter. Further, plaintiff provides only a recitation of the evidence in his favor, ignoring the evidence before the Student Faculty Hearing Board ("SFHB") that led the SFHB to conclude that plaintiff was responsible for the acts of which he was charged.[1]

## FACTUAL BACKGROUND

This matter came to the attention of W&L administrators on October 13, 2014, when a complainant identified in plaintiff's complaint as Jane Doe contacted W&L's Title IX Coordinator, Lauren Kozak, to report that she had been sexually assaulted by plaintiff. Complaint, Exhibit B. She did not want to proceed with a formal investigation at the inception, just to bring the incident to the administration's attention. Id. On October 31, 2014, Jane Doe informed Ms. Kozak that she wanted to move forward with a formal investigation. Id. Ms. Kozak, a trained investigator,[2] along with Jason Rodocker, also a trained investigator, conducted the investigation into complainant's allegation. Id.

---

[1] W&L's Interim Sexual Harassment and Misconduct Policy uses the term "responsible" rather than "guilty" to reflect that these processes are administrative and disciplinary, not a criminal case, so using criminal law terminology would be inappropriate. See Complaint, Exhibit A, pps. 40-43.

[2] Contrary to allegations in plaintiff's complaint, Ms. Kozak has received extensive training regarding W&L's Interim Sexual Harassment and Misconduct Policy, other University policies and procedures relevant to sexual misconduct, and relevant state and federal laws. She has attended a sexual misconduct investigator certification course. She has participated in at least 12 additional formal trainings. She has read and continues to read numerous articles on best practices in investigation and Title IX Coordinator responsibilities. See Kozak Declaration, Exhibit 1, ¶8.

Jane Doe's charge against plaintiff was that he had engaged in sexual intercourse with her without effective consent. Id. That is defined under W&L's Interim Sexual Harassment and Misconduct Policy as "nonconsensual sexual intercourse." Id.

W&L has adopted a clear and thorough policy for investigating complaints alleging sexual misconduct. Complaint, Exhibit A. That policy complies with the regulations promulgated by the United States Department of Education in furtherance of Title IX, and was developed after extensive study. Kozak Declaration, ¶7.  The standard of proof for whether a student has violated W&L's Interim Sexual Harassment and Misconduct Policy is "preponderance of the evidence," again consistent with Department of Education requirements. Complaint, Exhibit A. It is not the criminal law standard of "beyond a reasonable doubt."

In accordance with W&L's Interim Sexual Harassment and Misconduct Policy, after Jane Doe's allegations were reported, Ms. Kozak and Mr. Rodocker conducted a thorough investigation that began with an interview with Jane Doe on October 31, 2014. Complaint, Exhibit B, pps 2-5.  The report reflects that Jane Doe stated to plaintiff on the night of the incident that "I thought I said I didn't want to have sex." Id.  Jane Doe went on to say that "… he just kept going and didn't make any kind of response to her question. When he didn't stop and continued to penetrate her, she told him 'Can you at least put on a condom?' He didn't put on a condom and didn't respond to that statement. She laid there silent while he finished. She didn't move or engage." Id.

Ms. Kozak's interview of complainant Jane Doe explains why it took complainant several months to process the events and come to the conclusion that she had been sexually assaulted, and to bring that complaint to University administration. Complaint, Exhibit B. During

that time, she engaged in counseling with two counselors and struggled with conflicting emotions about the event. Id. Mr. Rodocker and Ms. Kozak then interviewed the plaintiff on November 4, 2014. Id. Plaintiff's description of the events of the night in question was in many ways consistent with that of the complainant, although in his version of the events he stated "She didn't say anything during intercourse that suggested that she wanted to stop or wasn't into having sex. In contrast, the entire time she was really engaged." Id. They also explored the complainant and plaintiff's post-event interactions leading up to the time of the complaint. See, Interview with Respondent[3], Exhibit B, pp. 5-8.

The investigators then did a second interview of Jane Doe to determine whether she agreed with plaintiff's version of the events. Id. She denied a number of statements made by plaintiff, and she stated that "She told him that she didn't want to have sex with him." Id. She also stated that she did not remember specific things about that evening, but had a very clear memory about other things. Id. Credibility determinations were a part of the administrative process, and were necessary to attempt to develop a better understanding of the events.

Ms. Kozak and Mr. Rodocker went on to interview a number of witnesses identified by both parties in order to better gauge credibility and to collect all relevant facts. Id. They interviewed both counselors who had worked with Jane Doe, and conducted seven other interviews of students who had been identified as having relevant information by either of the parties. See Exhibit B, pp. 10-13.

Based upon their investigation, the investigators made the following findings of fact and analysis. Complaint, Exhibit B, pps. 14-15. They found that it was undisputed that penetration

---

[3] Plaintiff will also be referred to as "respondent" herein when he is identified in the context of the administrative hearing process.

occurred. Id. On the question of effective consent, they first noted that, "To find consent the Hearing Panel must determine whether there were mutually understandable words and/or actions that clearly indicated a willingness to engage freely in sexual activity." Id, They then noted that both parties had engaged in mutually agreed-upon sexual activity in the beginning of their encounter. Id. They noted that complainant agreed that she consented to everything leading up to penetration. Id. They noted that the issue is whether complainant consented to the act of penetration. Id. On that question, they noted that complainant's position is that she did not give consent for sexual intercourse. Id. They noted that "When respondent and complainant got back to his room she told him that she didn't want to have sex with him that night." Id. They further noted that when he started trying to have sex with her, she stated that she said to him, "I thought I said I didn't want to have sex." She stated that when penetration started she did not move or engage. She just laid there. He was on top the entire time during intercourse according to her. Id.

They also noted all of the reasons that plaintiff felt that he did have consent for sexual intercourse. Id. Recognizing the dispute of facts between the parties, their conclusion was that "The Hearing Panel will need to determine by preponderance of the evidence whether there was consent for sexual intercourse." Id at 15. They did not suggest or predetermine the answer to that question in that report, which was for the Hearing Panel to decide.

In accordance with W&L's Interim Sexual Harassment and Misconduct Policy, a Hearing Panel made up of members of the Student Faculty Hearing Board ("SFHB") was convened for November 21, 2014. Complaint, ¶ 64. Contrary to plaintiff's allegations in the complaint, W&L's Interim Sexual Harassment and Misconduct Policy expressly provides that each party may have an honor advocate or other member of the university community and/or a lawyer of his or her choice advise him or her at such a panel hearing. Complaint, Exhibit A. Honor advocates

are individuals trained to assist the parties with regard to procedural issues in these cases and are made available at no cost to the party. Plaintiff elected to use honor advocates to support him during this process and was told he could also have as his legal advisor outside counsel. Kozak Declaration. He did in fact have the support of several honor advocates and an outside attorney at the SFHB hearing. Id.

The SFHB at W&L is composed of four student members, four faculty members and one administrator. See Complaint, Exhibit A, p. 40. The administrator serves as Chair of the SFHB and is appointed by the Vice President for Student Affairs. Id. The Chair manages the SFHB, administers the hearing process and presides over the hearing, but does not participate in the deliberations and does not vote on matters before the SFHB. Id. All SFHB members are trained each fall and during each year on the university policy and procedures, including the need for absolute impartiality and equity throughout the process. Id. Following a Notice of Charge, the SFHB Chair selects and convenes a Hearing Panel composed of four SFHB members; two student members and two faculty members. Each member of the Panel must be neutral and impartial. Id.

W&L's Interim Sexual Harassment and Misconduct Policy requires that hearings be held in a timely manner. Id. Assuming no extraordinary circumstances, the hearing should take place within 14 calendar days of issuance of the charging document. Id. That timeline was complied with here.

At the hearing, the complainant and the respondent are both present, although a privacy screen is erected between the two unless both parties request otherwise. Complaint, ¶65 and Exhibit A. Members of the Hearing Panel are given the investigative report, may question the

complainant and the respondent, may question the investigators, and may examine any related information or evidence as presented by the parties. Complaint, Exhibit A. The Chair also may accept written questions from the respondent, complainant or advisors for consideration by the Hearing Panel.  Id.  That occurred here. Complaint, ¶65..

If the respondent is found "responsible," as occurred here, the Hearing Panel imposes a sanction designed to eliminate the misconduct and to remedy its defects. Complaint, Exhibit A. For non-consensual sexual intercourse, the only sanction permitted is dismissal. Complaint, Exhibit A, p. 42.

Written notice is given to the parties as soon as a finding is reached. Id. Either party may appeal the outcome of the matter to the University Board of Appeals within 72 hours of receipt of the written Hearing Panel report.  Id.

All procedures as set out in W&L's Interim Sexual Harassment and Misconduct Policy were followed to the letter. See, Declaration of Lauren Kozak and Complaint, Exhibit A.  The process afforded a prompt, thorough and fair procedure to reach an administrative decision on the question whether the plaintiff was responsible for the conduct alleged by the complainant. In this matter, the plaintiff was found responsible, unsuccessfully appealed to the University Board of Appeals, and now asks this Court to interpose its judgment and set aside the findings and actions of the W&L Student Faculty Hearing Board and University Board of Appeals.

<u>ARGUMENT</u>

The Court should not issue a preliminary injunction in this matter. Plaintiff's entire case, including his request for an injunction, is predicated on his argument that his version of the facts

is more credible than the complainant's version and, therefore, the Student Faculty Hearing Board was wrong in its decision. The plaintiff is asking the Court to substitute its opinion about the weight of the evidence, usurp the authority of the W&L investigators, Student Faculty Hearing Board and University Board of Appeals, and reach a contrary conclusion to that reached by the properly promulgated and authorized University officials. This is an extraordinary request for relief, and must be denied.

A. Legal Standard for Preliminary Injunction.

The defendant agrees with the plaintiff that the preliminary injunction standard is that which was spelled out by the United States Supreme Court in Winter v. Natural Resources Defense Counsel, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.E. 2d. 249 (2008). Defendant will not repeat the four factors in this Memorandum of Law since they are correctly stated in plaintiff's brief, but will analyze the facts in light of each of the four factors below.

B. Plaintiff Is Not Likely to Succeed on the Merits.

The judiciary has a well-established and long-standing tradition of deferring to the judgment and expertise of higher education administrators except in cases of the overt abuse of authority or arbitrary and capricious institutional actions. Regents of the University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88L.Ed. 2d 523(1985); Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55L.Ed. 2d 124 (1978). In Ewing, the Supreme Court upheld an institutional decision to dismiss a student, reasoning that the focus of the student's argument was that the University had misjudged his ability to remain in a special medical education program. The Court, in holding for the University, upheld judicial deference to academic decisions, stating:

When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

Ewing, 106 S.Ct. 507, 513 (1985). In the present case, the "accepted academic norms" would include the hearing standards and procedures required by the U.S. Department of Education, which are incorporated into W&L's Interim Sexual Harassment and Misconduct Policy and which were followed scrupulously.

Plaintiff's primary charge is that W&L's actions with respect to him violated Title IX. Courts have recognized that Title IX bars the "imposition of university discipline where gender is a motivating factor in the decision to discipline." See, e.g., Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994). There are two ways to state a Title IX claim: plaintiff-specific and systematic (alleging that the system itself was unfairly stacked against one gender).

Courts have grouped Title IX claims into four specific categories: 1) erroneous outcome; 2) selective enforcement; 3) deliberate indifference; and 4) archaic assumptions. Despite the particular theory, however, most sexual-misconduct plaintiffs fail to show that the College's actions were motivated by a gender bias.

In this case, the plaintiff appears to be relying on an "erroneous outcome" theory to support his claim. Under this theory, the plaintiff must show that the outcome of the disciplinary proceeding was flawed, and that the flawed outcome was due to a gender bias. Yusuf v. Vassar College, 35 F.3d at 715. The plaintiff here seems to be claiming that the individual decision-makers in his particular case were biased. Foremost, "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias."

Hill v. Bd. of Trs. of Michigan State Univ., 182 F. Supp. 2d 621, 628 (W.D. Mich. 2001); see also Yusuf (supra)(Although "Title IX bars the imposition of university discipline where gender is a motivating factor," Congress did not intend for Title IX "to impair the independence of universities in disciplining students."); Gomes v. Univ. of Maine Syst., 365 F. Supp. 2d 6, 30-31 (D.Me. 2005) ("Generally, in examining administrative proceedings, the presumption favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption.") As such, "[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." Gomes, 365 F. Supp. 2d at 30. Here, there are no allegations in the complaint that the members of the Student Faculty Hearing Board were biased against the plaintiff, and the allegations that the Title IX Coordinator, Lauren Kozak, was biased are false, conclusory and will be hotly contested. See, Kozak Declaration.

In the alternative, under the erroneous outcome theory, plaintiff would have to show that the college's "disciplinary procedures governing sexual assault claims are discriminatorily applied or motivated by a chauvinistic view of the sexes." Bleiler v. College of Holy Cross, No. 11-11541, 2013 WL 4714340, 2013 U.S. Dist. LEXIS 127775 (D. Mass. Aug. 25, 2013). In other words, plaintiff must point to statistical evidence to show that male students "are historically and systematically and invariably found guilty, regardless of evidence, or lack thereof." Yusuf, 35 F.3d at 715. If plaintiffs rely on this route, however, they must show that the college engaged in a "pattern of discriminatory decision-making." Doe v. Univ. of the South, 687 F.Supp.2d 744, 756 (E.D. Tenn. 2009). There are no allegations in the complaint that would support such a case. In fact, since the fall of 2011, W&L has dismissed one male student (other than plaintiff), suspended two male students, found two male students "not responsible" for

policy violations and decided not to pursue formal proceedings against other male students due to lack of evidence. These statistics are posted on the W&L website. See http://www.wlu.edu/student-life/policies-and-guidelines/student-conduct/student-faculty-hearing-board/decisions. Clearly, W&L's policies and its application of those policies has led to variable and case-specific outcomes, and are not infused with gender bias against respondents such as plaintiff.

The other three theories under which Title IX claims are brought are asserted less often. Under the "selective enforcement" theory, the plaintiff must allege that the college treated a person of the opposite gender in similar circumstances more favorably. Doe, 687 F.Supp.2d at 756. Under the "deliberate indifference" standard, a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the [discrimination]." Id. Finally, under the "archaic assumptions" standard, a plaintiff seeking equal opportunities has "the burden in establishing that a university's discriminatory actions resulted from classifications based upon archaic assumptions" of males and females. The evidence before the court does not support a Title IX claim under any of these other approaches.

In the context of disciplinary cases such as this one, Title IX plaintiffs have rarely prevailed. In fact, such claims rarely survive summary judgment. See e.g., Bleiler v. College of Holy Cross, No. 11-11541, 2013 WL 4714340, 2013 U.S. Dist. LEXIS 127775 (D. Mass. Aug. 25, 2013).. In Bleiler, the plaintiff alleged that the college's procedures—as a whole—were inherently biased against men. Specifically, the plaintiff argued that the code of conduct was facially discriminatory because it had a "penetration-based rubric" that singled out male students. Second, the plaintiff argued that the system was stacked against men because it was a "foregone

conclusion" that male students would always be found guilty. The court, however, rejected both claims. First, the court found that female students could be found guilty under the code of conduct, and, thus, it was not facially discriminatory. Id at *24. Second, the court rejected the plaintiff's claim that conviction was inevitable. Id. Specifically, the court noted that of the last six males that faced sexual misconduct charges, two of them were found not responsible. Id.

In addition to his systematic claims, the plaintiff in <u>Bleiler</u> also lodged an "as-applied" challenge. Id at *31. Namely, the plaintiff argued that the college departed from its normal procedures—which evidenced a gender bias toward him—and that the school official who made the charging decision was biased against males. Id. Addressing the first claim, the court reiterated that colleges are "not required to adhere to the standards of due process guaranteed to a criminal defendant or to abide by rules of evidence adopted by courts." Id at 32. Instead, colleges must "have broad discretion in determining appropriate sanctions for violations of [their] policies." Id. Further, the court reasoned that even if the college departed from its written procedures, those deviations did not support the inference that the administration acted discriminatorily. Id at *42. The court also rejected the plaintiff's claim that the initial charging officer was biased, finding that there was no evidence at all to support the claim. Id.

The evidence before this court will lead it to the same conclusion as the <u>Bleiler</u> court. W&L has constructed a fair and gender-bias free system for dealing with sex-based conduct among its students, faculty and staff consistent with federal regulations. W&L followed that system in this case and, therefore, it is not likely that plaintiff's case will survive summary judgment, much less a trial and subsequent appeal.

Plaintiff further grounds his claims in terms of the contractual relationship between plaintiff and W&L. In light of the precedent on this issue, plaintiff's breach of contract claim has no merit. Specifically, several courts have found that sexual assault policies and disciplinary procedures outlined in student handbooks do not form enforceable contracts, implied or otherwise. One court, for example, held that provisions in the student handbook detailing sexual assault investigations and disciplinary procedures were "guidelines" and did not "constitute the terms of an implied contract [or] contractually guarantee the rights asserted by the Plaintiff." Ruegsegger v. Bd. of Regents of Western New Mexico Univ., 141 N.M. 306, 313-314 (2006). As a result, "[e]ven though the Student Handbook sets out a general framework of policies, we are not persuaded that the language contractually obligates [the university] to conduct any specific type of investigation, to provide support services, or to impose specific discipline." Id. Other courts have reached the same conclusion. See e.g., Cook v. Talladega Coll., 908 F. Supp. 2d 1214, 1224 (2012) (holding that student handbook was not a binding contract); Guliani v. Duke Univ., 2010 WL 1292321 (M.D.N.C. Mar. 30, 2010) (same); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1141-1145 (D.N.M. 2011) (same); Mosby-Nickens v. Howard Univ., 864 F. Supp. 2d 93, 98-100 (D.D.C. 2012) (same).

Even if a student handbook can form an enforceable contract, courts have refused to enforce these publications where the school expressly disclaims the existence of a contract. In Brown v. Rector & Visitors of the Univ. of Va., Civil Action No. 3:07–CV–00030, 2008 WL 1943956, at *6 (W.D. Va. May 2, 2008), for example, this Court held that the University of Virginia was not bound by statements in its graduate handbook. Specifically, this Court reasoned that the handbook—which explicitly disclaimed that it is not to be construed as a contract between the student and the University—was "at most, an illusory contract because of

the illusory nature of its terms." Id.  As a result, this Court held that the graduate handbook

failed to form a binding contract under Virginia law.  See id.  Other courts agree.  Abbas v.

Woleben, Civil No. 3:13–CV–147, 2013 WL 5295672, at *4 (E.D. Va. Sept. 19, 2013) (finding

that university handbooks and catalogs do not form a contract when the terms are not binding on

the university); Davis v. George Mason Univ., 395 F.Supp.2d 331, 337 (E.D.Va. 2005) (finding

university course catalog to be an unenforceable illusory contract because while it purports to

promise specified performance by the university, the performance is entirely optional because of

the catalog's disclaimer that it may change its terms or requirements at any time); see also Truell

v. Regent Univ. School of Law, No. 2:04:cv716, 2006 WL 2076769, at *6-7 (E.D.Va. July 21,

2006) (same).

 The facts in this case compel the same result.  Here, W&L's student handbook contains

an explicit disclaimer that the handbook and its attendant policies do not and are not intended to

form a binding contract between W&L and its students.  The handbook states in pertinent part:

> The policies of Washington and Lee University are under continual examination and
> revision. This Student Handbook is not a contract; it merely presents the policies in effect
> at the time of publication and in no way guarantees that the policies will not change. For
> more updated policies and information see www.wlu.edu.

See: Student Handbook at the introduction http://go.wlu.edu/StudentHandbook.  As a result,

plaintiff's breach of contract claim fails as a matter of law and cannot provide the basis for a

preliminary injunction.

 Even were this Court to construe the student handbook as an enforceable contract, such

claims remain subject to a highly-deferential standard of review.  Generally, courts will review

student contract claims only if arbitrary or capricious institutional action resulted in violation of

an implied or expressed contractual commitment. In Lucey v. Nevada ex rel. Bd. of Regents of

Nevada Sys. of Higher Educ., No. 2:07-cv-00658, 2009 WL 971667, at *6 (D. Nev. Apr. 9,

2009), for example, the court granted summary judgment on the plaintiff's breach of contract claim arising from a student disciplinary hearing. There, the court first acknowledged that "courts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline." Id. at *6 (quoting Gukenberger v. Boston Univ., 974 F. Supp. 106, 150 (D. Mass. 1997)). In light of that guiding principle, the court acknowledged that it should "take a deferential review of a university's disciplinary procedures" and refrain from "second guess[ing] the professional judgment of the academic decision makers." Id. at *6 (citing Gutzwiller v. Fenik, 860 F.2d 1317 (6th Cir. 1998)). As such, the court held that, "[a] court's review under a breach of contract theory for violations of a university's established disciplinary procures is limited to whether the procedures used were arbitrary, capricious, or in bad faith." Id. at *6. Other courts have reached the same conclusion. See e.g., Kraft v. W. Alanson White Psychiatric Foundation, 498A. 2d 1145 (D.Ct. App. 1985); Clifton-Davis v. State, 930 P.2d 833 (Okla. App. 1996); Aldridge v. State of New York, 293 A.D. 2d 941(2002). While plaintiff uses the terms "arbitrary and capricious" in the complaint, the facts as alleged and as are before the court do not reflect arbitrary and capricious actions by W&L, but rather reflect thorough and legally compliant policies and procedures for dealing with sexual misconduct cases, and compliance by University officials with that procedure.

Plaintiff's claims rest on a fatally flawed assumption. Throughout his brief in support of his motion for a TRO, plaintiff mischaracterizes and overstates the obligations institutions of higher education have in the disciplinary context. Courts have stated correctly that, "[a] school is an academic institution, not a courtroom or administrative hearing room." Bd. of Curators v. Horowitz, 435 U.S. 78. 88 (1978). Even in the context of public institutions, where Constitutional levels of due process are required, "due process requires that appellants have the

right to respond; their rights in the academic disciplinary process are not co-extensive with the rights of litigants in civil trial or with those of defendants in a criminal trial." Nash v. Auburn Univ., 812 F.2d 655 (11th Cir. 1987); Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1200 (11th Cir. 2011) (same). Rather, "courts staunchly resist the suggestion that school discipline hearings should emulate criminal trials." Hammock ex rel. Hammock v. Keys, 93 F.Supp.2d 1222, 1229 (S.D. Ala. 2000); see also Dixon, 294 F.2d at 159 (a full-dress judicial hearing is not required). Thus, "[w]hile a university cannot ignore its duty to treat its students fairly, neither is it required to transform its classrooms into courtrooms." Jaksa v. Regents of the Univ. of Mich., 597 F.Supp. 1245 (E.D. Mich. 1984). As the First Circuit succinctly described:

> In fostering and insuring the requirements of due process, however, the courts have not and should not require that a fair hearing is one that necessarily must follow the traditional common law adversarial method. Rather, on judicial review, the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether his hearing mirrored a common law criminal trial.
>
> ***
>
> The Courts ought not to extol form over substance and impose on educational institutions all the procedural requirements of a common law criminal trial. The question is not whether the hearing was ideal, or whether its procedures could have been better. In all cases the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process.

Gorman v. Univ. of Rhode Island, 837 F.2d 7, 14-16 (1st Cir. 1988). W&L's policies and procedures certainly met and exceeded this standard in every respect.

In a case similar to the one at bar, the Supreme Judicial Court of Massachusetts reversed an appellate court's decision that had ruled against a university for failure to follow the stated procedures outlined in its student conduct code in disciplining an undergraduate student. Schaer v. Brandeis University, 432 Mass. 474, 735 N.E.2d 373 (Mass. 2000). The University Board on

Student Conduct had found an undergraduate at Brandeis, a private institution, guilty of violating several provisions of the student handbook after engaging in a sexual encounter with a female student. 735 N.E.2d at 376. The student argued that the encounter was consensual and that he was not interviewed prior to his hearing, a requirement clearly stated in university policy as part of the judicial process. Id at 377. Also, the student alleged that the hearing was not properly recorded and was not conducted in strict compliance with the institution's student code. Id. The student was suspended for three months and ordered to serve probation for his remaining tenure at the university. Id at 376. His university appeal of the decision was denied, and he filed suit for injunctive relief. The lower court dismissed his complaint on the grounds that he did not state a claim for which relief could be granted. Id. A state appeals court determined that the lower court has erred in dismissing the student's claim and ruled that the university failed to follow the disciplinary procedures outlined in its student code. Id. The Supreme Judicial Court of Massachusetts disagreed with the lower appellate court, and affirmed the ruling of the trial court. Id. The court found that the student had failed to state a claim on which relief could be granted. Id. The state high court's decision emphasized that the judiciary is "chary about interfering with academic disciplinary decisions made by private colleges and universities." Id. at 381. The court further stated that "A university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts." Id. The court concluded that institutions of higher learning must have broad discretion in the construction of appropriate disciplinary sanctions and that while a university should adhere to its stated policies, the student failed to produce sufficient evidence of a material breach. Id.

In the instant case, plaintiff's objections to W&L's procedures have no merit. On the question of direct cross-examination as an aspect of due process, for example, courts have

commented that the right to "cross-examination in the context of school discipline is a murky area of constitutional law." Wolski v. Orange County School Bd., 2014 WL 2612043, *5 (M.D. Fla. June 11, 2014). Courts including the Fourth Circuit Court of Appeals have held that cross-examination of witnesses is not usually required in the university disciplinary context. See e.g., Tellefsen v. Univ. Of North Carolina, 877 F.2d 60 (4th Cir. 1989) ("The right to cross-examine is not constitutionally required if the accused is present when his accuser testifies and the accused has the opportunity to present his own witnesses and evidence."); Nash v. Auburn University, 812 F.2d 665, 664 (11th Cir. 1987); see also Craig v. Selma City School Bd., 801 F. Supp. 585, 593 (S.D. Ala. 1992) ("[Courts] ha[ve] made clear that a student has no constitutional right to cross-examine witnesses at an expulsion hearing."); Oliver v. Bd. of Regents Univ. of Ga., 2008 WL 2302686, *7 (M.D. Ga. May 30, 2008) ("[I]n the context of a student disciplinary proceeding, the constitutionally-required opportunity to be heard did not need to rise to the level of a full-dress judicial hearing, with the right to cross-examine witnesses."). Again, it must also be noted that in the context of a private institution, the Constitution does not define the level of due process required, but W&L asserts that its procedures provide fundamental fairness and an opportunity for both sides to present their respective cases that would satisfy even an enhanced Constitutional standard of due process.

Specifically in the context of the Department of Education's interpretation of Title IX regulations, the Department of Education "strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing." See, Dear Colleague Letter, attached as Exhibit 2. "Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment." Id.

Finally, plaintiff will not prevail on his negligence claim. To support a negligence claim under Virginia law, "there must be a legal duty, a breach thereof, and a consequent injury which could have been reasonably foreseen by the exercise of reasonable care and prudence." Jordan v. Jordan, 220 Va. 160, 162, (1979). Plaintiff, however, has failed to articulate what—if any—duty W&L owes him. As the court noted in McFadyen v. Duke Univ., "the university-student relationship does not impose an actionable duty of care on administrators or advisors in the discharge of their academic functions." McFayden, 786 F. Supp. 2d 887, 998 (M.D.N.C. 2011), rev'd in part on other grounds, 703 F.3d 636 (4th Cir. 2012). To that effect, courts have dismissed negligence claims where—like here—the plaintiff does not articulate a particularized standard of care or provide the legal authority from which the purported legal duty arises. See e.g., Keerikkattil v. Hrabowsi, Civil Action WMN-12-2016, 2013 WL 5368744, *9 (D. Md. Sept. 23, 2013) (dismissing negligence action where the plaintiff failed to allege a specific standard of care during misconduct hearings, holding, inter alia, that purported violations of Title IX cannot form the basis of a negligence action); DeCecco v. Univ. of South Carolina, 918 F. Supp. 2d 471, 502 (D.S.C. 2013) (dismissing negligence claim against university because the plaintiff failed to articulate the university's legal standard of care in sexual assault investigations). As such, plaintiff has failed to plead a negligence claim that will survive a motion to dismiss, much less ultimately prevail at trial.

Assuming that plaintiff has alleged a legally cognizable duty, plaintiff merely repackages his breach of contract and Title IX claims as a negligence claim. Complaint ¶ 145-147. For the reasons stated above, however, plaintiff has failed to allege any facts to support his claims that W&L breached any such duty by acting in a bias manner, holding sex discriminatory animus, or acting in an arbitrary or capricious manner. As such, plaintiff's negligence claim must also fail.

See e.g., Gomes, 365 F. Supp. 2d at 43-44 (noting that the plaintiff's negligence claim was subsumed by his due process challenge).

### C. Plaintiff Will Not Suffer Irreparable Harm Without Injunctive Relief

Plaintiff alleges that he will suffer irreparable injury if the preliminary injunction is not granted. Plaintiff must make a "clear showing" that he will suffer irreparable harm if the court denies his request. Direx Isreal, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 811 (4th Cir. 1991). "The key word in this consideration is 'irreparable.' Mere injuries, however, substantial, in terms of money, time and energy necessarily expended in the absence of an injunction, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Weathers v. Univ. of N.C. at Chapel Hill, No. 1:08-cv-847, 2008 WL 5110952, *3 (M.D.N.C. Dec. 4, 2008) (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

Here, plaintiff will suffer at most a delay in his education, not a deprivation of his education if he ultimately prevails, so there is no irreparable injury. Courts have regularly denied preliminary injunctive relief against colleges and universities by plaintiff students seeking admission or readmission, finding no irreparable harm as a matter of law. Most importantly, courts have found that the mere delay in education is not a sufficient showing of irreparable injury. In B.P.C. v. Temple Univ., Civil Action No. 13-7595, 2014 WL 4632462, *4 (E.D. Pa. Sept. 16, 2014), for example, the court held that a delay in educational services failed to constitute irreparable injury. Similar to this case, the plaintiff in Temple Univ. alleged that a pending expulsion would cause him to "lose his right to a higher education" and "affect his future well-being." Id. at *6. The court, however, rejected the plaintiff in Temple Univ.'s

argument, holding that, "if he is successful in this litigation, a possible remedy is reinstatement at Temple." Id. As a result, "because Plaintiff's loss of an education can be remedied by the instant lawsuit, Plaintiff fails to establish irreparable harm." Id. * 6 (citing Mahmood v. Nat'l Bd. of Med. Examiners, No. 12–1544, 2012 U.S. Dist. LEXIS 156477, at *15, 2012 WL 5364689 (E.D.Pa. Oct. 31, 2012); Marsh v. Del. State. Univ., No. 05–00087, 2007 U.S. Dist. LEXIS 10544, at *18, 2007 WL 521812 (D.Del. Feb. 15, 2007)).

Other courts have reached similar conclusions. See e.g., Spadone v. McHuge, 842 F. Supp. 2d 295, 302 (D.D.C. 2012) (holding that a delay in completing courses at West Point does not constitute irreparable harm); Martin v. Helstead, 699 F.2d 387 (7th Cir. 1983) (delay in obtaining admission to graduate school did not constitute an irreparable injury for a 38-year-old, and threatened injury to applicant paled before the threatened injury to the law school and public if unsuitable candidates were forced to be readmitted); Donnelly v. Boston Coll., 401 F.Supp. 1, 4 (D. Mass. 1975) aff'd., 558 F.2d 634, (1st Cir. 1977) cert. denied 434 U.S. 987 (1975) (mandatory injunction on the basis of conclusory allegations not available); Timmerman v. Univ. of Toledo, 421 F.Supp. 464, 466 (N.D. Ohio 1976); Sill v. Pennsylvania State Univ., 315 F.Supp. 125, 129 (M.D. PA 1970); Doe v. New York Univ., 666 F.2d 761, 773 (2d Cir. 1981); Fruth v. New York Univ., 2 AD Cases 1197 (1993) (delay of one year in attending academic program not irreparable injury).

D. The Balance of Equities Weighs in Favor of W&L

Plaintiff's brief argues that the equities weigh in his favor because there is no harm to W&L in allowing him to return to school and that plaintiff has already completed the class work for the past semester. These arguments have no merit. In fact, there will be significant harm to

W&L if plaintiff is permitted to return to school and receive credit for the classes that he only partially completed this past semester.

Academic integrity and the integrity of W&L's internal disciplinary process are at the heart of W&L's educational mission. The academic integrity of W&L will be harmed by allowing plaintiff to return to school and complete the work for his fall classes because plaintiff did not meet the requirements for receiving passing grades for these classes, even if he is permitted to take his final exams. Even before plaintiff's SFHB hearing, plaintiff had fallen behind significantly in his classwork. Specifically, it should be noted that at the point plaintiff was notified of the initial charge of a potential violation of W&L's Sexual Harassment and Misconduct Policy – and several weeks before the finding of responsibility -- he unilaterally decided to stop attending one or more of his classes. Plaintiff's decision to stop attending his classes resulted in him missing many assignments and other periods of classroom instruction. The missed classes, assignments, and other factors have all contributed to plaintiff's failure to meet the requirements of his fall term courses. Even if plaintiff was permitted to complete his final exams, his failure to attend classes and complete assignments between the time that he was initially charged under W&L's disciplinary process and the time he was found responsible would preclude him from receiving passing grades absent special accommodations.

To provide plaintiff with special accommodations for the consequences of his own decision to stop attending certain of his classes would undermine W&L's academic integrity, which is at the heart of W&L's educational mission. W&L should not be forced compromise its academic integrity by making special accommodations for an individual's choice to not complete the requirements of his or her classes.

With respect to the integrity of its disciplinary processes, W&L is entitled to have its policies and procedures respected and upheld by this court unless and until the court has made a determination, following a full hearing on the merits at trial, that W&L has violated plaintiff's legal rights. Anything less than that says to the entire higher education world that procedures like W&L's, developed and applied in accordance with the Department of Education guidance and for the safety and well-being of its students, faculty and staff, are flawed, and any individual who makes a complaint of sexual misconduct not only will have to endure a hearing and an appeal on campus, but then will be subjected to all of the intrusions of being a material witness in a federal court trial. Unless and until that trial has occurred, W&L and its administration and students are entitled to the knowledge and assurance that the policies and procedures that have been developed by trained individuals in compliance with the current legal standards will be free from judicial interference until the court has a complete record before it and finds actual wrongdoing as opposed to mere self-serving allegations of bias and misconduct. If plaintiff is permitted to return to W&L pending an outcome at trial, filing a lawsuit in federal court would seem to be the logical next steps in any case where an individual is dismissed from a university, which would completely undermine the internal disciplinary processes of all colleges and universities and deter complainants from bringing complaints as any internal remedy granted would, as a practical matter, be delayed until a full trial on the merits has been concluded in federal court.

For the reasons set for the above, and in order to protect the academic integrity and the integrity of the internal disciplinary processes of all colleges and universities, including W&L, the court must find that the balance of equities, particularly in this case, weigh in favor of W&L.

E.  The Public Interest Weighs in Favor of Denying an Injunction

The public interest lies in supporting colleges and universities in their efforts to create gender neutral and mutually respectful policies and procedures, and to remove from campus those who fail to abide by those policies.  It does not lie in a court reversing a thorough investigation, and a fair hearing and appeal, the first moment an expelled student runs to it and demands to be reinstated without putting his or her case to the scrutiny of discovery, summary judgment and trial.  Additionally, the public interest lies in courts maintaining a posture of deference to professional higher education administrators who are trained in their fields, and who understand the dynamics of their particular institutional communities and in courts not interfering with universities that are trying to create and maintain safe and secure environments for all students.

For the reasons set forth in this Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, the Motion for a Preliminary Injunction should be denied.


Respectfully submitted,

WASHINGTON AND LEE UNIVERSITY
By Counsel

_⟨R. Craig Wood⟩_
Counsel:

R. Craig Wood, VSB #24264
McGuireWoods LLP
300 Fourth Street, N.E., Suite 300
P. O. Box 1288
Charlottesville, VA 22902-1288
Phone: 434-977-2558
Fax: 434-981-2274
cwood@mcguirewoods.com

*Counsel for Defendant Washington and Lee University*

<u>CERTIFICATE</u>

I hereby certify that a true copy of the foregoing Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction was electronically filed in the courts CM/ECF system and sent to Andrew T. Miltenberg and Kimberly C. Lau, Nesenoff & Miltenberg, counsel for Plaintiff, by electronic mail this 9th day of January, 2015.

*‹R. Craig Wood›*
R. Craig Wood