# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

JOHN DOE,

Plaintiff,

-against-

WASHINGTON AND LEE UNIVERSITY

Defendant.

Civil Action No

## DECLARATION OF LAUREN KOZAK

Lauren Kozak hereby states as follows:

1. I am over 21 years of age, am under no legal or mental disability or duress, and have personal knowledge of the facts set forth herein.

2. I am Washington & Lee University's (the "University") current Title IX Coordinator. The University's President appointed me to that position on July 1, 2014.

3. Before my appointment as Title IX Coordinator, I had served since 2012 as an investigator for the Student Faculty Hearing Board ("SFHB").

4. In my role as the University's Title IX Coordinator, I am responsible for the oversight and resolution of all reports of sexual misconduct involving students, staff, and faculty as well as volunteers and third parties. I also am available to advise individuals about the courses of action available at the University and in the community for addressing allegations of sexual misconduct. Furthermore, I am responsible for overseeing sexual misconduct-related training, prevention, and education efforts and monitoring compliance with all procedural requirements, record-keeping, and time frames outlined in the University's applicable policies and procedures.

5. In my role as the University's Title IX Coordinator, I also am responsible for conducting or overseeing investigations of complaints against students. I do not, under any circumstances, "prosecute" sexual misconduct complaints or represent or advocate for the University or any party to a sexual misconduct complaint. My goal during an investigation is to conduct a thorough, fair, and impartial investigation. I strive to treat everyone involved in the investigation with respect and sensitivity during the process.

6. On August 25, 2014, the University adopted an Interim Sexual Harassment and Misconduct Policy (the "Policy"), a true and accurate copy of which is attached hereto as **Exhibit A**. The Policy applies to sexual misconduct by or against any member of the University community, including students, faculty, staff, consultants, volunteers, vendors, or others engaged in business with the University.

7. Drawing on advice from legal counsel with relevant expertise, the University carefully drafted the Policy with the aims of complying with the sexual misconduct-related regulations and guidance issued by the U.S. Department of Education's Office for Civil Rights, ensuring the safety of all members of the University community, and protecting the procedural rights of all individuals (including both complainants and respondents) involved in allegations of sexual misconduct. I was heavily involved in the drafting of the Policy along with other University administrators.

8. I have received extensive training regarding the Policy, other University policies and procedures relevant to sexual misconduct, and relevant state and federal laws. Before I was appointed as an investigator for the SFHB, I attended a sexual misconduct investigator certification course. Since being appointed as Title IX Coordinator, I have participated in the numerous trainings listed below. And, in addition to those trainings, I have read and continue to

read numerous articles on best practices in investigation and Title IX Coordinator responsibilities and also discussions on those issues on multiple professional list-serves.

- **NASPA and University of Richmond—Sexual Misconduct and Substance Abuse**
- **United Educators—Title IX Compliance Training: Investigating Sexual Assaults in Higher Education** (October 10-11, 2013)
- **National Association of College and University Attorneys ("NACUA") Webinar—Campus SaVE and Clery Compliance** (April 30, 2014)
- **NACUA Webinar—Sexual Misconduct on Campus: New Federal Guidance** (May 9, 2014)
- **Stetson Law Webinar—Not Alone: The White House and the OCR's New Guidance on Title IX** (May 15, 2014)
- **Franczek Radelet Webinar—Establishing Title IX and Campus SaVE Act Compliance Strategies on Campus** (July 8, 2014)
- **Ballard Spahr Webinar—A Conversation with OCR: Investigating and Responding to Sexual Misconduct on Campus** (July 29, 2014)
- **NACUA Webinar—Title IX Investigations: Advanced Issues, Challenges, and Opportunities** (August 20, 2014)
- **National Institute of Justice Webinar—The Neurobiology of Sexual Assault** (August 25, 2014)
- **NACUA Online Course—Title IX Coordinator Training** (August 20, 2014 and September 10, 2014)

3

- **Everfi—Beyond Checking the Box: Examining Best Practices for Sexual Assault** (October 22, 2014)
- **ATIXA—When Social Media & Title IX Collide: What Colleges Need To Know About Gossip Sites, Free Speech & Proactive Policies** (December 2, 2014)

9. I am aware that the Verified Complaint in the above-captioned lawsuit (the "Complaint") asserts that, during an October 5, 2014 presentation to SPEAK (a student organization that advocates against sexual assault) I introduced and referred to an article entitled "Is it Possible That There Is Something In Between Consensual Sex and Rape...And That It Happens to Almost Every Girl Out There?" In fact, I did not introduce that article during an October 5, 2014 presentation, nor have I introduced that article during any training or presentation I have ever conducted. I was not present at the October 5, 2014 presentation to SPEAK. I presented to SPEAK regarding Washington and Lee's Interim Sexual Harassment and Misconduct Policy October 7, 2014. A true and accurate copy of the PowerPoint presentation from that meeting is attached hereto as **Exhibit B.**

10. I also am aware that the Complaint asserts that I "introduced and discussed the article ... to make [my] point that 'regret equals rape'" and that I "went on to state [my] belief that this point was a new idea everyone is starting to agree with." This also is false. I never made any such statement during an October 5, 2014 presentation or at any other time, nor do I believe that statement is true. The Policy forbids intercourse without consent; however, if consent is present, any regret of a decision to engage in intercourse would not mean the act was non-consensual.

4

11. On October 13, 2014, I met with the female student identified as "Jane Doe" in the Complaint (the "Complainant"), and she alleged that the Plaintiff in the above-captioned lawsuit (referred to herein as the "Respondent" because of his role in the University's investigation of Complainant's sexual misconduct allegations) had sexually assaulted her. She requested that the University not proceed with an investigation of her allegations. In accordance with Sections XI.B. and XI.C. of the Policy, I conducted an initial Title IX assessment and, based on factors set forth in Section XI.C. of the Policy, granted the student's request.

12. On October 30, the Complainant again contacted me to request a meeting. We met on October 31. She was visibly upset in my office. She asked me questions regarding the Policy's investigation and disciplinary processes. I explained that, as part of an investigation, I and my colleague, Dean Rodocker, would speak with her, speak with the Respondent, and speak with any witnesses that might have relevant information and would then compile an investigation report. She and the Respondent would have an opportunity to review that report and comment on it before it would be submitted to the Chair of the SFHB. The Chair of the SFHB would determine whether a charge should be issued. The Complainant asked me whether, after she shared her account of what happened, I would comment on whether I believed it should move forward or not. I told her that I would not do that. I explained that my role as investigator is that of a neutral fact-finder. I would not opine on the merit of the case, but would rather do my best to investigate and present both parties' accounts to the Chair of the SFHB and then potentially the SFHB Hearing Panel. She told me that she wanted to move forward with the investigative process and asked if we could do it that day. I contacted Dean Rodocker to see if he was available to meet. He was available later that afternoon. We set up a time for her to come back to share her account with Dean Rodocker and myself.

5

Case 6:14-cv-00052-NKM-RSB Document 21-1 Filed 01/09/15 Page 6 of 11 Pageid#: 279

13.     On November 3, 2014, I e-mailed the Respondent to arrange to meet with him as part of the investigation of the Complainant's allegations. Although Dean Rodocker and I typically e-mail witnesses and Respondents to request meetings with them, our practice is not to explain the purpose of the meeting in that e-mail, but rather to explain it in person. Accordingly, when Respondent e-mailed me to ask the reason for the meeting, I informed him that we would explain the purpose when we met with him.

14.     During our initial meeting with the Respondent, we did not interview him regarding the Complainant's allegations. We simply informed him that Complainant had alleged that he violated the Policy by engaging in Non-Consensual Sexual Intercourse. We explained that we wanted to interview him as part of the investigation but that we realized this allegation likely was difficult for him to hear so we wanted to allow him time to process the allegation and would speak with him the next day. He agreed to return and speak with us the next day.

15.     While we did tell the Respondent during that initial meeting that he should avoid speaking to any potential witnesses about the alleged incident so as to protect the integrity of the investigation and should not contact or retaliate against the Complainant, neither I nor Dean Rodocker ever said that he could only speak to his parents about it. Additionally, neither I nor Dean Rodocker ever stated the following, as Respondent alleges in the Complaint: "[A] lawyer can't help you here. We won't talk to them. This matter stays strictly within the school." In fact, we explained to Respondent that at that point we were investigating whether a disciplinary proceeding needed to occur and that, if there were to be a charge and disciplinary proceedings were to begin, we would assign an Honor Advocate to assist him during the disciplinary process, and he also could have an advisor of his choice accompany him at all disciplinary process meetings and/or hearings. We further explained, as does the Policy, that the advisor of his

6

choice could be anyone, including an attorney. In addition to explaining this verbally, we provided him a sheet with information regarding the Policy. A copy of that information sheet is attached hereto as **Exhibit C**.

16. As is our typical practice during investigations under the Policy, Dean Rodocker and I took the following steps with respect to each interview we conducted in investigating Complainant's allegations to ensure that our investigative report accurately reflected the information provided by the interviewee: (1) we both took careful notes during the interview; (2) I sent my typed notes to Dean Rodocker and he reviewed them and compared them to his notes to confirm that they accurately reflect the information provided by the interviewee and made any necessary changes, additions, or comments; and (3) I sent the finalized notes to the interviewee and requested that he or she review them and respond to me with any corrections or additions. In connection with this investigation, each of the interviewees reviewed and confirmed the accuracy of the notes Dean Rodocker and I prepared. Some of the interviewees provided suggested revisions, which we then presented to the SFHB.

17. Despite his allegations to the contrary in the Complaint, the Respondent had ample opportunity to review the investigative report, and we made numerous revisions to the report based on his comments. In fact, we made every revision that he requested except one, which is addressed in paragraph 20 of this Declaration.

18. First, Dean Rodocker and I met in person with the Respondent to go over a draft of an initial report before it was submitted to the Chair of the SFHB. We explained that we wanted to hear all of his comments. We asked him to respond to the Complainant's statements as well as the summary of information provided by witnesses. We also asked him if there were additional things he wanted added in the Findings of Fact section of the investigative report. We

7

stated that we wanted the report to reflect the facts and arguments that the parties wish to present to the Board and wanted to hear all of his thoughts. The Respondent responded to Complainant's allegations and the summary of witness section. We added his responses to the investigation report by creating the sections entitled "Respondent's Response to Complainant's Statement" and "Respondent and Complainant's Response to Witness Statements." We also asked him if there were any additional people he believed we should speak with, and he stated that he didn't think anyone else needed to be spoken with.

19. Second, after the Respondent was formally charged with a potential violation of the Policy, both the Respondent and the Complainant received a copy of the investigation report to share with their Honor Advocates and other advisors. They then had the opportunity to submit further revision requests during the pre-hearing conference with Dean Simpson. Dean Simpson provided me a memorandum detailing the revisions both parties had requested. I then sent an e-mail to each party and their advisors responding to their requested revisions. True and accurate copies of those e-mails are attached hereto as **Exhibits D** and **E**, respectively.

20. The Respondent requested that all mentions of Complainant's statements made to witnesses, except those made directly after the incident, be redacted. That request was denied. I stated: "We believe that there may be relevance to the information that was shared with others this semester. The Board will determine how much weight to give that evidence. We will note in the report that Respondent believes that statements made closer in time to that evening are more reflective of what Complainant felt that night." We did that. Specifically, we included the following language in the investigative report: "While Complainant has told people otherwise this semester, Respondent believes that statements made closer in time to that evening are more reflective of what she felt that night."

8

21. The Policy allows for the parties to submit questions for consideration by the Board. It never provides that all questions will be asked. The Board reviewed and considered all the questions requested by the Respondent to determine whether the question would aid them in reaching their decision. As permitted by Policy, the Board did not ask the questions it found repetitive or irrelevant. The Chair, Tammi Simpson, informed me that she asked each of the parties during the hearing whether they wished to contest the Board's decision on any particular questions, but the Respondent and Complainant declined to do so.

22. Contrary to the Respondent's allegations in the Complaint, we did allow the evidence that Complainant had sexual intercourse with Respondent after February 8th to be considered by the SFHB. It was included in the investigation report over Complainant's objection. The Complainant objected to the evidence and asked that it be taken out of the report. In my e-mail response to Complainant, I ruled that it was relevant as to credibility and would stay in the report. I explained this to the Complainant in an e-mail. A true and accurate copy of that e-mail is attached hereto as **Exhibit F**.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Lauren Kozak

1-8-15
Date

Signed before me this 8th day of January, 2015



9

