G. Robert Gage, Jr. (NY Bar No. 1901412)
Joseph B. Evans (NY Bar No. 5221775)
Gage Spencer & Fleming LLP
410 Park Avenue, Suite 900
New York, New York 10022
Tel:    (212) 768-4900
Fax:    (212) 768-3629
grgage@gagespencer.com
jevans@gagespencer.com

(Admitted *Pro Hac Vice*)

David G. Harrison (VSB 17590)
The Harrison Firm, P.C.
5305 Medmont Circle
Roanoke, Virginia 24018-1120
Tel:    (540) 777-7100
Fax:    (540) 777-7101
david@harrisonfirm.us

*Attorneys for Plaintiff John Doe*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| John Doe,<br><br>　　　　Plaintiff,<br><br>　-against-<br><br>Washington and Lee University,<br><br>　　　　Defendant. | **Civil Action No.:**<br>**6:14-cv-0052-NKM**<br><br>**First Amended Verified Complaint** |

Plaintiff John Doe[1] ("Plaintiff"), by his attorneys Gage Spencer & Fleming LLP and The Harrison Firm, P.C., as and for his Amended Complaint against Washington and Lee University ("W&L") respectfully alleges as follows:

## A.    Nature of the Action

1.    This case arises out of the actions taken and procedures employed by W&L concerning allegations made against Plaintiff, a male junior student at W&L, as a result of false allegations of nonconsensual sex with fellow sophomore student Jane Doe.

2.    These allegations purportedly referred to what was clearly consensual sexual activity on or about February 8, 2014 (the "Incident").

3.    On October 13, 2014, some eight (8) months later, Jane Doe contacted W&L's Title IX officer, Lauren Kozak, and reported that the Incident was not consensual, but was not ready to file a complaint at that time.  For the reasons that follow, Jane Doe's claim was false, as the contemporaneous statements and actions of Jane Doe are inconsistent with the claim that the encounter was non-consensual.

4.    After a flawed and gender-biased investigation and hearing W&L made a finding of sexual misconduct against Plaintiff.  He was then immediately expelled.

5.    When W&L subjected Plaintiff to disciplinary action, it did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex.

---

[1] Plaintiff has filed, contemporaneously with the Original Complaint, a Motion to proceed pseudonymously which was subsequently granted by this Court.  (*See* ECF No. 14).

2

W&L failed to adhere to its own policies, guidelines, and regulations.[2]  W&L's Policy itself is insufficient to protect the rights of male students.  W&L relied on a discriminatory bias against males in making its finding of sexual misconduct.

6.     Plaintiff has been greatly damaged by the actions of Defendant W&L: his academic future is severely damaged; the monies spent on obtaining a college education at Defendant lost; and the real sacrifices made by Plaintiff's family so that he could receive a quality education have been wasted.

7.     Plaintiff therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX, the Fifth Amendment of the United States Constitution and state law.

**B.     The Parties**

8.     Plaintiff is a natural person, citizen of the United States, and resident of the State of West Virginia.  During the events described herein, Plaintiff was a student at W&L and resided at the Pi Kappa Fraternity House at 201 E. Washington St., Lexington, VA 24450 (which is owned by W&L).

9.     Upon information and belief, Defendant Washington and Lee University is a private, liberal arts college in the city of Lexington, Virginia, with an address of 204 W. Washington St., Lexington, VA 24450.  Upon information and belief, W&L receives federal financial assistance.

10.     Plaintiff and W&L are referred to collectively as the "Parties."

---

[2] W&L's Interim Sexual Harassment and Misconduct Policy, W&L's Student Handbook and other related policies are referred to collectively as "W&L's Policy."  A true copy of W&L's Interim Sexual Harassment and Misconduct Policy was attached to the Original Complaint as Exhibit A and is hereby incorporated by reference.  A true copy of W&L's Student Handbook has been attached hereto as Exhibit H.

3

## C. Jurisdiction and Venue

11. This Court has federal question and supplemental jurisdiction under 28 U.S.C. § 1331 because: (i) Plaintiff's claims arise under the United States Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.

12. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the related state law claims because they arise out of the same common nucleus of operative fact as the federal claims.

13. This Court has personal jurisdiction over W&L because it conducts business within the State of Virginia.

14. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because W&L is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## D. The First Night

15. On Saturday, February 8, 2014 (during Winter Term 2014), Plaintiff and Jane Doe were at a party off campus. They talked, danced together and made out at the party. After the party ended they spent about thirty minutes talking on the porch at the party.

16. Jane Doe drank at the party, and claimed that her memory of that night was "fuzzy" although Jane Doe admits that she was not incapacitated.

17.	At Plaintiff's invitation, Jane Doe accompanied him back to his room located at the Pi Kappa Phi fraternity, via Traveller.[3]

18.	In Plaintiff's bedroom, there was a couch and two chairs.  After they arrived at Plaintiff's bedroom, they each sat on a chair and engaged in conversation for about an hour.  No kissing or sexual activity occurred during this time.

19.	Subsequently, Jane Doe, approached Plaintiff in his chair and said "I usually don't have sex with someone I meet on the first night, but you are a really interesting guy."

20.	Later, the "but you are a really interesting guy" portion of that comment was omitted from the investigative report ("Investigative Report").[4]

21.	Jane Doe then initiated sexual activity by kissing with Plaintiff while in his chair.  She took off all of her clothing except her panties.  Jane Doe led Plaintiff to his bed.  Jane Doe then took Plaintiff's clothes off.  At no point did Jane Doe state that she "did not want to have sex."

22.	Jane Doe and Plaintiff proceeded to engage in oral sex on each other. The entirety of these circumstances compelled Plaintiff to advise Jane Doe that he did not have a condom available.  Instead of giving any verbal response, Jane Doe responded by pulling Plaintiff closer to her and continued to make out.

23.	Jane Doe and Plaintiff then started to engage in sexual intercourse, and at one point Jane Doe switched positions so that she was on top during sex.  During

_____

[3] Traveller is a transportation service that W&L provides to its students between 10:00 p.m. and 2:00 a.m.

[4] The Investigative Report in connection with Jane Doe's allegations of sexual misconduct was attached to the Original Complaint as Exhibit B and is hereby incorporated by reference.

5

this time, Jane Doe never asked Plaintiff to stop or advise him, verbally or physically, that she did not want to have sex.

24.    Jane Doe initiated sexual activity.  Later, at the hearing, Jane Doe admitted she initiated the sexual activity.

25.    As the initiator of sexual activity, Jane Doe never made any indication that she was withdrawing her consent.  She never outwardly demonstrated by words or actions, clearly or otherwise, that she desired to end sexual activity.

26.    After they concluded, Jane Doe and Plaintiff made out and talked for a while before drifting off to sleep.  Jane Doe spent the night in Plaintiff's room.

27.    Later, at the hearing, Jane Doe admitted that every activity that night, sexual or otherwise, before and after intercourse, was wholly consensual, but claimed that intercourse was not.

28.    The next morning, Plaintiff asked Jane Doe if she would like to go out for brunch.  Jane Doe declined, but acknowledged that she thought it was a nice gesture, and claimed she said no was because she did not have any other clothes besides for what she wore the night before.

29.    Plaintiff drove Jane Doe home, and as she got out of the car, they exchanged phone numbers.

6

**E.    The Second Night**

30.    The next day, Plaintiff texted Jane Doe but received no response. Since the time they first met, Plaintiff and Jane Doe had become Facebook friends. As such, on March 9, 2014, he sent her a message on Facebook saying "Hey ummm I don't know how to approach this but idk if I have your right cell phone number because I've texted you but got no response but I felt like we had a pretty good connection. [(---) --- ----] is that you?"

31.    Jane Doe responded by saying "haha I thought we did as well. it is actually [(---) --- ----]. also, I lost my phone at Das Klub so when I get it back feel free to text me if you like. thanks for reaching out."

32.    The day after the Incident, Jane Doe spoke to a friend about the Incident. Jane Doe indicated that she had had sex with Plaintiff, but never indicated that it was not consensual, in fact, Jane Doe said she "had a good time last night."

33.    One month later, in March 2014, Jane Doe met with Plaintiff and they engaged in consensual sexual intercourse again.

34.    Later, at the hearing, Jane Doe admitted that every sexual act, including intercourse, that occurred during the second night was wholly consensual.

35.    During Winter Term 2014, a witness saw Jane Doe and Plaintiff interact at parties at the fraternity house, but did not observe any indication that anything uncomfortable had occurred between Jane Doe and Plaintiff. He remarked that things looked very "normal."

36.    Less than a week later, on March 15, 2014, at Pi Kappa Phi's St. Patrick's Day party, Jane Doe saw Plaintiff kissing another female and, upset, left the party

7

early. As of August 1, 2014, it has been public knowledge that Plaintiff and the female who Jane Doe saw him kissing have become an exclusive couple, and they have been seen together publicly at parties and on campus.

**F.    Jane Doe's Complaint**

37.    Following Winter Term 2014, Jane Doe spent her summer break working at a women's clinic that dealt with the sexual assault issues.

38.    Over the next several months, Jane Doe engaged in discussions with various individuals about the Incident.

39.    In July 2014, for the first time, Jane Doe told her friend that she had been sexually assaulted, in complete contradiction to what she had said contemporaneously with the incident.

40.    Jane Doe applied to be a Peer Counselor at W&L. In her application, in a section labeled "life experiences or personal anecdotes you have that you think may help make you qualified to be a Peer Counselor" she presented her experience and research done in connection with so-called "grey rape." Jane Doe claims she did a "Google search" and found "grey rape" and that she was happy to know that there was "some tangible definition" for what she claimed to have experienced. She presented her desire to "voice [her] story."

41.    In September 2014, Jane Doe applied for a program in Nepal sponsored by the school. When she saw the list of applicants, she noticed that Plaintiff had applied as well.

42.    Soon thereafter, Jane Doe visited a therapist and described "an evolution about how she felt about the incident," that she "felt confused" and that "she had

8

a strong physical reaction" to seeing Plaintiff's name on the Nepal program acceptance list, which prompted her to "proceed to a [disciplinary] hearing."

43.    On October 12, 2014, W&L held an informational session for the semester abroad in Nepal.  At that meeting, roughly thirty potential participants in the semester abroad at Nepal attended.  Plaintiff and Jane Doe were among the potential participants.

44.    On October 13, 2014, eight months after the Incident, Jane Doe first contacted W&L's Title IX Coordinator, Ms. Lauren Kozak, to report that she had been "sexually assaulted."  Jane Doe indicated that she did not want anything further to occur yet.

45.    On October 30, 2014, the list of the students who would be attending the semester abroad in Nepal was made public.  Plaintiff and Jane Doe were both selected to attend the semester abroad.

46.    The next day, Jane Doe decided that she wanted to move forward with an investigation of Plaintiff.  Jane Doe advised Ms. Kozak of her request to investigate Plaintiff.

47.    Jane Doe's first complaint was made to Ms. Kozak just days after she had attended Ms. Kozak's October 5, 2014 presentation for SPEAK, a student organization. During her presentation, Ms. Kozak introduced an article, "Is it Possible That There Is Something In Between Consensual Sex And Rape…And That It Happens To Almost Every

Case 6:14-cv-00052-NKM-RSB   Document 37-2   Filed 03/20/15   Page 9 of 53   Pageid#: 434

Girl Out There?"[5]  Ms. Kozak introduced and discussed the article with the members of SPEAK to make her point that "regret equals rape," and went on to state her belief that his point was a new idea everyone is starting to agree with.

48.     The TSM Article presented the concept of "rape-ish," a label the article attached to a situation where a woman had sex with a man, and made no outward demonstration by words or actions that she was withdrawing her consent.

49.     Jane Doe is a member of SPEAK and was present for the October 5, 2014 presentation by Ms. Kozak.

## G.     W&L Performs an Unequal and Gender-Biased Investigation

50.     Each step in the investigation against Plaintiff was flawed and motivated by gender bias.  The procedures employed by W&L deprived him the means to defend himself and pre-supposed the accuracy of Jane Doe's statements and the inaccuracy of Plaintiff's recollection.  W&L's process, as applied, was designed to find that Plaintiff engaged in non-consensual sex.

### 1.  The Assessment

51.     According to its written rules, receiving a report of alleged sexual misconduct, W&L is required to conduct an "initial Title IX assessment" to consider whether to proceed with: (i) remedies-based resolution, which does not involve disciplinary action against a respondent; or (ii) initiate an investigation to determine if a Student Faculty

---

[5] *See* Total Sorority Move, *Is It Possible That There Is Something In Between Consensual Sex And Rape . . . And That It Happens To Almost Every Girl Out There?*, http://totalsororitymove.com/is-it-possible-that-there-is-something-in-between-consensual-sex-and-rape-and-that-it-happens-to-almost-every-girl-out-there/ (last visited March 16, 2015) (hereinafter "TSM Article").  A true copy of the TSM Article has been attached hereto as Exhibit I.

10

Hearing Board ("SFHB") hearing is warranted. (*See* Interim Sexual Harassment and Misconduct Policy, at § XI(A)).

52. As part of the Title IX assessment, W&L is required, *inter alia*, to assess the nature and circumstances of the allegation, address the immediate physical safety and emotional well-being, assess for pattern evidence or other similar conduct by respondent, and discuss the complainant's expressed preference for manner of resolution and any barriers to proceeding. (*See* Interim Sexual Harassment and Misconduct Policy, at § XI(B)).

53. W&L's Interim Sexual Harassment and Misconduct Policy expressly required Ms. Kozak, as the Title IX Coordinator, to conduct the assessment and to determine how the complaint should be resolved including whether there should be an "initiation of an investigation to determine if a Student Faculty Hearing Board hearing is warranted." (*See* Interim Sexual Harassment and Misconduct Policy, at § XI(B)).

54. At the conclusion of her assessment, which was based on a faulty one-sided gathering of facts, Ms. Kozak determined that those facts merited an investigation. Ms. Kozak's decision was not based on a sufficient gathering of relevant facts but rather, it was arbitrary and capricious and reflected a gender bias.

55. The assessment failed to properly consider (i) the nature and circumstances of Jane Doe's allegation involved an event that occurred eight months prior; (ii) Jane Doe admitted to having voluntarily engaged in sexual intercourse with Plaintiff a month after the alleged sexual misconduct took place; (iii) Plaintiff had a clean disciplinary record; and (iv) there was no record that Jane Doe understood that she had alternative

11

resolution options available other than proceeding with an in investigation and, ultimately, a SFHB hearing, *e.g.*,. having Plaintiff withdraw from the Nepal program.

### 2. W&L Ignored its Own Policies and Employed Methods That Denied Plaintiff of Any Meaningful Opportunity to Defend Himself

56. During the investigation Plaintiff was denied the right to counsel and denied equal access to witnesses.

57. Moreover, under the express terms of W&L's Interim Sexual Harassment and Misconduct Policy:

> "The University will designate an investigative team who has specific training and experience investigating allegations of sexual misconduct. The University will typically use a team of two investigators who have been specifically trained to review cases involving prohibited conduct. Any investigator must be impartial and free of any conflict of interest."

(*See* Interim Sexual Harassment and Misconduct Policy, at § IX(E)).

58. In spite of this unequivocal policy, Ms. Kozak, who had already reached a determination that Plaintiff had engaged in non-consensual sex (or at least, that an investigation should be conducted), was designated by W&L to be one of two investigators.

59. Moreover, Ms. Kozak was the lead and the most active investigator. Ms. Kozak performed her investigation with the help of W&L's Associate Dean of Students, Jason L. Rodocker.

60. Additionally, Ms. Kozak's public observation on October 5, 2014, that regret could actually equal rape and presenting an article regarding the concept of "rape-ish," also made her involvement in the investigation highly improper and further

12

demonstrative of the bias and pre-judgment which infected the process which led predictably to the determination of Plaintiff's guilt as the male accused in such a scenario.

61.     Under W&L policies, Ms. Kozak was required to be informed of all reports of sexual misconduct and oversaw W&L's review, investigation, and resolution of those reports to ensure the University's compliance with Title IX and other applicable laws. (*See* Interim Sexual Harassment and Misconduct Policy, at § III(B)).

62.     She was further required to be "knowledgeable and trained in University policies and procedures and relevant state and federal laws" and to ensure that all conduct board members received proper training.  (*See* Interim Sexual Harassment and Misconduct Policy, at § III(B)).

63.     On or about November 3, 2014, Ms. Kozak first notified Plaintiff that he would need to meet with her and Dean Rodocker without any explanation of why and with less than six-hours notice.  Plaintiff's request that Ms. Kozak advise on the subject-matter of the meeting went unanswered.

64.     At the outset of the November 3, 2014 meeting, Ms. Kozak notified Plaintiff that he had been accused of rape and immediately sought to question Plaintiff about his interaction with Jane Doe.  Ms. Kozak did not show Plaintiff a copy of Jane Doe's written complaint.  Plaintiff was shocked and asked for the identity of the person who made the allegations against him.  Plaintiff was visibly upset and distraught.  Plaintiff began crying and told Ms. Kozak that he would never do anything like that. Plaintiff was completely caught off guard and ambushed by the meeting.

65.     Ms. Kozak advised Plaintiff that she and Dean Rodocker would take notes, compile those notes and memorialize his statement.

13

66.     When Plaintiff asked if he was entitled to consult with a lawyer, Ms. Kozak stated "a lawyer can't help you here.  We won't talk to them.  This matter stays strictly within the school."  The message was clear: Plaintiff was on his own.

67.     Ms. Kozak and Dean Rodocker required Plaintiff to meet them the next day.  At this meeting, on November 4, 2014, Plaintiff again requested legal representation and was told by Ms. Kozak that a representative would not be allowed to participate during the investigation.  Plaintiff raised the fact that he knew of another student who had gone through this process that was afforded representation during the investigation.  Ms. Kozak stated, unequivocally, that the previous investigations were under the "old policy," and this one is under the "new policy" and under the "new policy," Plaintiff was not allowed representation during the investigation.

68.     Plaintiff then asked Ms. Kozak and Dean Rodocker if he could postpone the meeting.  Ms. Kozak and Dean Rodocker indicated that they wanted to move forward quickly and began to question him.

69.     Plaintiff responded by stating that he did not want to be interviewed without representation.  Ms. Kozak responded by saying, that's fine, we'll just submit the investigation report without your side of the story.

70.     In the face of this threat, Plaintiff relented.  Ms. Kozak, then proceeded to question him about his encounter with Jane Doe.

71.     Plaintiff asked Ms. Kozak if she wanted him to talk about the first night or the second night.

72.     Ms. Kozak appeared surprised at the mention of a second night.  After a pause, she then told Plaintiff to tell her about whatever he felt was necessary.

14

73.     Still confused as to why he was being asked about an encounter which was completely consensual, and occurred nine months prior, Plaintiff described as much to Ms. Kozak.  Plaintiff mentioned the lighthearted Facebook messages they exchanged the month after the incident where they discussed reconnecting again, and the fact that Jane Doe engaged in consensual sexual intercourse with Plaintiff a month following the incident. Ms. Kozak took notes of her interview with Plaintiff.  Ms. Kozak's interview of Plaintiff was very quick.  Ms. Kozak insisted that Plaintiff sign a form agreeing not to discuss the investigation with anyone or to retaliate against Jane Doe.  The form included strict confidentiality requirements including: " . . . I am expected to keep the investigation and content of my communications with Investigators confidential."

74.     Ms. Kozak asked Plaintiff for a list of people she should interview. Plaintiff, having only known of this investigation 24-hours prior and being under strict confidentiality constraints, provided her with four students.

75.     In addition to Plaintiff and Jane Doe, Ms. Kozak and Dean Rodocker interviewed at least nine witnesses.  Only two of the four witnesses Plaintiff requested to be interviewed were in fact interviewed.   Conversely, Ms. Kozak and Dean Rodocker interviewed at least eight witnesses at Jane Doe's request.  Ms. Kozak and Dean Rodocker summarized each interview in writing as "witness statements" for presentment to the SFHB.

76.     During the interviews, the following witnesses observed Plaintiff and/or Jane Doe immediately after the incident during the Winter Term 2014:[6] (i) Plaintiff's roommate, stated that he was in the room shortly after the sexual intercourse ended and "nothing seemed abnormal," the next morning he woke up to hear them talking and the

---

[6] Washington and Lee University's Winter Term 2014 is January 6, 2014 to April 15, 2014.

15

"tone of voices was normal and nothing indicated to [him] that anything strange had occurred between them," and he recalls that he "got a positive vibe from [Plaintiff] about the encounter" afterward; (ii) Plaintiff's acquaintance, stated that he saw Plaintiff and Jane Doe talking on the night of the Incident, learned that Plaintiff thought Jane Doe seemed really cool, was aware that Plaintiff and Jane Doe "hooked up again in March," and that Jane Doe has since attended parties at the fraternity house and been in the presence of Plaintiff where "there never seemed to be anything wrong. It seemed to be two people who got along well;" (iii) Jane Doe's friend, stated that, the day after the Incident, Jane Doe said she had sex with Plaintiff but "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," but that five months later, Jane Doe claimed that she had been "assaulted by Plaintiff during winter term," but that "at first she didn't see it as sexual misconduct and had been really confused;" and (iv) Jane Doe's old roommate, stated that, the morning after the Incident, Jane Doe "seemed confused whether something was wrong about what had happened" and claimed she didn't want to have sex, but remarked that she was surprised to learn of the sexual misconduct allegations because Jane Doe "never told her that she thought of it as a sexual assault," and it was not until after Jane Doe had "worked at a women's clinic that dealt with the sexual assault issues" over the summer that Jane Doe said she was sexually assaulted.

77.     At least three witnesses observed Jane Doe several months after the incident after she had already begun to develop an alternative narrative for the consensual sexual encounter with Plaintiff: (i) Jane Doe's current roommate, stated that, "shortly after the incident," Jane Doe framed the Incident as "concerning" and "wasn't sure how she felt about it," admitted that she "had consensual sex with him after that night" and that Jane

16

Doe decided to go forward with the proceeding because she found out that both of them were going to go to the same Nepal program and she wanted to avoid him; (ii) Jane Doe's friend, stated that, halfway through the winter term, Jane Doe mentioned that she had been sexually assaulted but didn't share specifics, and that following the summer break, in October 2014, Jane Doe cried when she saw that Plaintiff was accepted to the same Nepal program; and (iii) Jane Doe's resident advisor observed Jane Doe around March/April and said she discussed the Incident but "didn't feel terrible when he was inside of her, so it made her confused," and that following summer break, Jane Doe felt panicked when she saw Plaintiff so he encouraged her to talk to the Title IX Coordinator, Ms. Kozak.

78.    Two witnesses purported to be Jane Doe's therapists.  The first therapist stated that Jane Doe visited her twice in the Winter Term 2014 and described that she "had feelings for Plaintiff" and she "enjoyed the sexual intercourse with Plaintiff."  The first therapist, however, "walked her through those feelings to discuss how her actions and feelings didn't negate that it was a sexual assault."  Jane Doe only visited this therapist twice during the Winter Term 2014.  The second therapist, stated that Jane Doe came to visit her in September 2014 (seven months after the incident) and described "an evolution about how she felt about the incident," that she "felt confused" and that "she had a strong physical reaction" to seeing Plaintiff's name on the Nepal trip acceptance list, which prompted her to "proceed to a [disciplinary] hearing."

79.    Ms. Kozak and Dean Rodocker prepared an Investigation Report based on summaries of their interviews and the Facebook message evidence received by Plaintiff.

80.     On November 10, 2014, Plaintiff was called into Dean Rodocker's office.  Ms. Kozack and Dean Rodocker presented him with the Investigative Report.  He was required to review the Investigative Report in their presence and make any comments on the spot without any meaningful opportunity to review it.

81.     Plaintiff noticed that Ms. Kozak's summary of his verbal account of the events was incomplete and did not include all facts.  For example, he stated that when Jane Doe first became intimate with Plaintiff in his bedroom, she stated that she doesn't usually have sex with someone the first time she meets them, but remarked that Plaintiff seemed very interesting and continued to approach Plaintiff in his chair.  Ms. Kozak left out the second part of Plaintiff's statement, but remarked that Plaintiff seemed very interesting, which materially and prejudicially changed the context of Jane Doe's statement.  Plaintiff advised Ms. Kozak of this omission, but the change was never made.  This egregious omission reflects Ms. Kozak's gender bias and that she had already made a determination of this matter.  Later, Ms. Kozak was forced to admit this omission and the fact that Plaintiff had made her aware of it before she finalized her draft of the Investigative Report.

82.     Additionally, Plaintiff inquired of Ms. Kozak and Dean Rodocker why two of the witnesses he requested to be spoken to had not been interviewed.  Ms. Kozak sought to explain this away by claiming she and Dean Rodocker already had enough facts.

## 3.  The Hearing was Flawed and Gender-Biased

83.     Ms. Kozak and Dean Rodocker concluded their investigation and forwarded the Investigative Report, dated November 11, 2014, to Dean Tammi Simpson, in her role as Chairperson of the SFHB.

84.    On November 12, 2014, Dean Simpson required Plaintiff to attend a meeting in her office.  Plaintiff was not permitted to have legal representation at this meeting but for the first time was assisted by student-Honor Advocates.  Dean Simpson sought to effectively coerce Plaintiff to transfer, rather than to be formally charged and to proceed to a hearing.  Dean Simpson advised him that if he chose to withdraw or transfer, his record would be "clean."  Plaintiff refused to accept this "offer."  Dean Simpson urged Plaintiff to further consider the "offer" so he would not be committed to his rejection of it.

85.    On November 13, 2014, Plaintiff was informed in writing that he would be charged with sexual misconduct and that a hearing would be held within 14 days.[7]

86.    The notice indicated that Plaintiff was not to attempt to discuss the case with anyone other than family and those necessary to obtain support.  The notice expressly prohibits any communications with witnesses.  By preventing Plaintiff from communicating with anyone about it, Plaintiff was prevented from obtaining information necessary to disprove the false allegations against him.

87.    On or about November 17, 2014, Dean Simpson held a meeting outside of Plaintiff's presence, with one of his Honor Advocates.  Dean Simpson advised the Honor Advocate to convince Plaintiff to withdraw, as opposed to proceeding with the Hearing.  Plaintiff again rejected this "offer."

88.    On November 18, 2014, Dean Simpson held another meeting with Plaintiff.  Plaintiff, because he was innocent, formally rejected the "offer" of foregoing a formal charge and a SFHB hearing in exchange for a voluntary withdrawal or transfer.  Dean Simpson proceeded with the selection of the SFHB panel members.  Plaintiff was

---

[7] A true copy of the notice was attached to the Original Complaint as Exhibit C and is hereby incorporated by reference.

19

presented with a list of possible panel members and required to make his objections on the spot, without a meaningful opportunity to review, consider, or inquire about any of the candidates.

89.     Dean Simpson failed to disclose any information regarding the potential SFHB panel members' backgrounds or potential bias and Plaintiff did not have the opportunity to obtain any such information.

90.     The W&L Interim Sexual Misconduct Policy requires that

"Each member of the Panel must be neutral and impartial. The complainant and respondent shall be informed of the Panel's composition at least 48 hours in advance of the hearing. Either party may object to the appointment of any member of the Panel, directing that objection to the Chair, and stating the basis for the objection. The Chair will make the final determination on a member's ability to serve on the Panel. Additionally, any Panel member who has reason to believe he or she cannot make an objective determination must recuse himself or herself from the process."

(Interim Sexual Misconduct Policy, at § XI(F)(1)).

91.     Plaintiff was denied his right to meaningfully "object to the appointment of any member of the Panel" because he was not given any information about the potential members. (Interim Sexual Misconduct Policy, at § F(1)).

92.     Had Plaintiff been given the opportunity to perform a meaningful review, he would have objected to one or more of the members who ultimately formed the SFHB panel.

93.     For example, SFHB panel member, Professor David Novack, a sociology professor, has a number of works, research and studies which would have caused Plaintiff to object to his involvement. These include works such as "The Gender

20

Conundrum and Date Rape: The Potential Significance of Dimensions of Power" and "Rape Nullification in the United States: A Cultural Conspiracy."

94. There were no written transcripts of interviews or contemporaneous notes. Rather, Ms. Kozak made summaries of the interviews, which often contained multiple levels of hearsay.

95. An Investigation Report was completed on November 11, 2014, and later amended on November 18, 2014 to include some, but not all, of Plaintiff's corrections to the original investigation report following his review of same. (*See* Ex. B).

96. Given Ms. Kozak's lack of accuracy or thoroughness in her summary of Plaintiff's account, there are no assurances that Ms. Kozak was any more thorough in her "summaries" of the other witnesses interviewed, and no way to challenge her accuracy because those witnesses were not produced at the hearing.

97. According to W&L's policies, "consent" is defined as:

Consent is demonstrated through *mutually understandable words and/or actions that clearly indicate a willingness to engage freely in sexual activity.*

Additional Guidance about Consent:

- Consent to one form of sexual activity does not constitute consent to engage in all forms of sexual activity.

- Consent consists of an *outward demonstration indicating that an individual has freely chosen to engage in sexual activity.* Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

- A verbal "no" is a clear demonstration of the lack of consent.

- Either party may withdraw consent at any time. *Withdrawal of consent should be outwardly demonstrated by words or actions that*

21

*clearly indicate a desire to end sexual activity.* Once withdrawal of consent has been expressed, sexual activity must cease.

- Individuals with a previous or current intimate relationship do not automatically give either initial or continued consent to sexual activity. Even in the context of a relationship, there must be mutually understandable communication that clearly indicates a willingness to engage in sexual activity.

- *The responsibility of obtaining consent rests with the individual who initiates sexual activity.* Prior to engaging in sexual activity, each participant should ask himself or herself the question, 'Has the other person consented?" If the answer is "No" or "I'm not sure,' then consent has not been demonstrated and does not exist. *An individual who initiates sexual activity should be able to explain the basis for his/her belief that consent existed.*

- Consent is not effective if it results from the use or threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise his or her own free will to choose whether or not to have sexual contact. See "Force" and "Coercion" for further discussion.

- An individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent. See "Incapacitation" for further discussion.

- In the Commonwealth of Virginia, the age of majority is 18. Under state law, consent cannot be given for any individual under the age of 18 to participate in sexual

(Interim Sexual Harassment and Misconduct Policy, at §VI(A)(emphasis added)).

    98.    Other than Jane Doe's say-so, the evidence gathered from the witnesses during the investigation failed to corroborate (independent of hearsay statements made by Jane Doe) Jane Doe's claim that she did not provide consent by actions or words to Plaintiff on the night of the Incident. There was no evidence to corroborate Jane Doe's claim that she failed to provide Plaintiff with an outward demonstration of consent, or that

22

she outwardly demonstrated withdraw her consent *during the Incident*.  All evidence going to consent, other than Jane Doe's say-so, was developed and recast after-the-fact.

99.   Moreover, Jane Doe admitted that she "initiated making out," "took off her clothes except for her underwear and got into the bed," "took off her underwear in bed," "[h]e also got naked" and "she was fine with all of that."

100.   Under W&L's Policy, the "responsibility of obtaining consent rests with the individual who initiates sexual activity," and, by her own account, Jane Doe admits that she initiated the sexual activity.  The burden to establish "consent," or, in this case "lack of consent," should have been assigned to Jane Doe.  The failure of the investigative team to require Jane Doe to meet this burden constitutes clear burden-shifting and demonstrates the gender bias of the investigation.  (*See* Interim Sexual Harassment and Misconduct Policy, at § VI(A)).

101.   Conversely, because of his male sex, Plaintiff, was vigorously questioned on the basis for his belief that consent existed.  (*See* Interim Sexual Harassment and Misconduct Policy, at § VI(A)).

102.   Both Plaintiff and Jane Doe were given the opportunity to comment on the summary of each other's statements.  But only Jane Doe was given an additional opportunity to comment.  Jane Doe was allowed to review and make comments on Plaintiff's comments regarding the summary of her statement.  This inequality further reflects the gender bias of the investigation.

103.   On November 19, 2014, the day before the hearing, Plaintiff's Honor Advocate expressly requested in a writing to Dean Simpson that the hearing be recorded for the purposes of making a record.  Dean Simpson denied this request.

104.     On November 20, 2014, a hearing ("Hearing") was held before a panel of four SFHB members; two W&L professors and two W&L students ("SFHB panel").  All panelists were selected by SFHB Chairperson Dean Simpson.  However, all panelists possessed an inherent bias; the panel members have no incentive to render a decision that would be considered at odds with W&L's mandate of taking sexual assault "seriously" and would present a risk of retaliation on the part of the panel members who still maintained their respective positions at W&L.

105.     At the hearing, Jane Doe was physically separated from Plaintiff by a partition.  Also, Plaintiff was not allowed to ask questions.  Instead, he was required to submit written questions, which Dean Simpson would first review for "relevancy" before passing them onto the SFHB panel.  Notwithstanding, the SFHB panel only proceeded to ask questions if they deemed such questions to be appropriate.  The SFHB panel largely failed to do so.  There is no indication in the Interim Sexual Harassment and Misconduct Policy that the SFHB panel maintains such additional discretion to determine "relevancy" once the Chairperson has made that determination.  When the SFHB panel did pose questions submitted by Plaintiff, they often paraphrased the questions and did not ask them in the correct order.  The manner and order in which the questions were posed to Jane Doe, combined with the fact that Jane Doe was not in plain view, precluded Plaintiff of any real right to confront his accuser.

106.     At the Hearing, Jane Doe's statements were repeatedly inconsistent with her prior statements to Title IX investigators during the investigation.  For example, during the investigation, she claimed that she drank at the party but was not incapacitated.  However, at the Hearing, she stated that she was "considerably intoxicated."  Also, in the

24

investigation report Jane Doe claimed that she had no recollection of talking to Plaintiff for 20 minutes after the party on the porch. In the Hearing, however, she remembered that 20-minute conversation on the porch very well after Plaintiff had answered the SFHB panel's questions about talking on the porch. Moreover, during the hearing she described Plaintiff as disrespectful, dishonorable, and treated her as though she was worthless. But when asked later on in the hearing about what kind of connection she had with Plaintiff, she said it was great and that Plaintiff was smart, interesting, sweet, and genuinely interested in her. The SFHB panel failed to question Jane Doe about her inconsistencies or ask her to explain the reason for her inconsistencies.

107. In fact, one panelist, the male W&L professor, questioned Jane Doe about how it was that she could recall her statements purporting to object to sexual intercourse so clearly, but could not recall other parts of the evening clearly. In response, Jane Doe stated, "I know I said it because I know I said it." The SFHB panel did not question Jane Doe further on this.

108. Again at the Hearing, W&L engaged in impermissible burden-shifting. Given that Jane Doe admitted she was the initiator of sexual activity, it is her "responsibility [to] obtain[] consent" and to be able to "explain the basis for his/her belief that consent existed." (*See* Interim Sexual Harassment and Misconduct Policy, at § VI(A)). The SFHB panel did not require her to do so.

109. Plaintiff was cross-examined vigorously and asked to articulate his basis for consent and to "explain the basis for his belief that consent existed," the burden W&L's Interim Sexual Harassment and Misconduct Policy places on initiators. (*See* Interim Sexual Harassment and Misconduct Policy, at § VI(A)).

25

110.    In contrast, Jane Doe's basis for obtaining his consent went unaddressed and unquestioned.    Moreover, the SFHB panel refused to ask Jane Doe questions which it calculated to cause her distress.

111.    The Hearing was not recorded and there were no witnesses presented. Instead, the SFHB panel relied on the summary of witness statements that was prepared by the investigators and compiled in the Investigation Report.

112.    There was no direct testimony of witnesses or even statements made by witnesses.    Rather, the SFHB panel simply reviewed summaries of witness statements.

113.    One cannot ask follow-up questions to a written summary, nor can one consider the tone and demeanor in evaluating the truthfulness of the witnesses.

114.    Moreover, there were no statements under oath.

115.    Every interview and summary was done by the same person, Lauren Kozak.

116.    Because Ms. Kozak was the Title IX officer, this creates a susceptibility to bias.

117.    Because the Title IX officer's job is to prosecute sexual assault cases, it hardly makes her an unbiased person that is responsible for summarizing witness statements.

118.    In addition, there were not recordings or records made of the proceedings.

119.    At the Hearing, Plaintiff's Honor Advocates requested from Dean Simpson a record of the questions that were asked and the questions that were not.    Dean Simpson refused to give Plaintiff or his Honor Advocates a record.

26

120.    After the Hearing, Plaintiff's Honor Advocates again requested from Dean Simpson a record of which questions were asked and which were not. Dean Simpson again refused.

121.    On November 21, 2014, Plaintiff was notified in writing that by a vote of 3-1, the hearing panel found him responsible for non-consensual sexual intercourse and he would be expelled from W&L University.[8] There was no written explanation for the basis of the decision. The decision indicated claimed the SFHB panel:

> "[t]horoughly reviewed the Investigative Report, appendices, asked follow-up questions of the investigators, and heard directly from the complainant and the respondent. The Board determined by a preponderance of the evidence that the Respondent did not have effective consent, and engaged in non-consensual sexual intercourse in violation of the Interim Sexual Misconduct Policy."

122.    No explanation was given as to how the SFHB panel reached the conclusion it did.

123.    The SFHB panel used a preponderance of the evidence standard.

124.    The letter further indicated that he could file an appeal within 72 hours to Dean David Leonard. (Exhibit D).

---

[8] A true copy of the notice was attached to the Original Complaint as Exhibit D and is hereby incorporated by reference.

27

## H. There Was No Factual Basis to Conclude That Plaintiff Committed Sexual Assault

125.     The evidence makes clear that Jane Doe did not believe *at the time* that she was the victim of a sexual assault, *nor did she act in conformity therewith*.  In fact, Jane Doe engaged in consensual sexual intercourse with Plaintiff a second time just one month after the Incident.   However, over the next several months of engaging in after-the-fact discussions with various individuals, including a therapist who "walked her through those feelings to discuss how her actions and feelings didn't negate that it was a sexual assault," and after spending the summer break working at a women's clinic that dealt with the sexual assault issues, Jane Doe convinced herself that she must have been sexually assaulted.

126.     In this case, Plaintiff, who was intoxicated himself, was punished for having consensual sexual intercourse with a woman who, on her own accord, was intoxicated but "not incapacitated," initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him.  At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in consensual sexual intercourse *again* with Plaintiff.  Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February 8 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's policies.  In finding

28

Plaintiff culpable of sexual misconduct, W&L afforded preferential treatment to Jane Doe's evidence on the basis of her female gender and engaged in sex discrimination against Plaintiff in violation of W&L's policies.

127.    In W&L's policies, W&L states that it will not consider a complainant's *prior* sexual history with the accused student.   However, nowhere does it preclude the consideration of the complainant's *post-incident* sexual history with the accused student:

> "In general, a complainant's prior sexual history is not relevant and will not be admitted as evidence during an investigation. Where there is a current or ongoing relationship between the complainant and the respondent, and the respondent alleges consent, the prior sexual history between the parties may be relevant to assess the manner and nature of communications between the parties. As noted in other sections of this policy, however, the mere fact of a current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent. Any prior sexual history of the complainant with other individuals is typically not relevant and will not be permitted."

(*See* Interim Sexual Harassment and Misconduct Policy, at § XI(H)(4)).

128.    Evidence of Jane Doe's sexual intercourse with Plaintiff one month *after* the alleged incident should have been considered as relevant evidence in contravention of her claims of sexual assault, but there is no indication that Ms. Kozak or the SFHB panel took this fact into consideration.

## I.    W&L Failed to Provide Plaintiff With a Meaningful Right of Appeal

129.    On November 24, 2014, Plaintiff filed an appeal.[9]

130.    Among the factors that the Student Handbook gives for ruling on the appeal is whether there is a reasonable basis for the appeal:

---

[9] A true copy of the petition for appeal was attached to the Original Complaint as Exhibit E and is hereby incorporated by reference.

29

The UBA may grant or reject a request for appeal based on one or more of the following grounds if it reasonably determines the ground(s) would more likely than not impact the underlying decision: (1) no reasonable basis/reasonable basis for sanction; (2) new relevant information/no new relevant information; (3) procedural defect or error/no procedural defect or error; or (4) extraordinary circumstances/no extraordinary circumstances. If the UBA decides to grant an appeal, it may decide the case based solely upon the record of the conduct body, the written appeal and other documents it deems relevant, or the UBA may determine to hold a hearing and seek additional information from: i) any person who provided first-hand information to the student conduct body; ii) any person who may have new, relevant information; and/or iii) the Chair of the conduct body, before reaching its final decision.

(*See* Student Handbook, at 54).

131.    Of course, without a factual record of the hearing, there is essentially nothing for the appeals board to review.

132.    It is not surprising, then, that on December 3, 2014, Plaintiff was notified that by a 2-1 vote, the appeal was denied.[10]  The Appeals Board failed to provide any detailed factual basis for its denial.  (*Id.*)

## J.    OCR's Direction to W&L

133.    The Department of Education's, Office of Civil Rights ("OCR") has issued guidance regarding the handling of sexual misconduct allegations at universities, including the Dear Colleague Letter[11] and Questions and Answers[12] (referred to collectively as "OCR Guidance").

---

[10] A true copy of the denial was attached to the Original Complaint as Exhibit F and is hereby incorporated by reference.

[11] UNITED STATES DEP'T OF EDUCATION'S, OFFICE FOR CIVIL RIGHTS, Dear Colleague Letter (April 4, 2011) *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.   A true copy of this document has been attached hereto as Exhibit J.

30

134.    W&L was biased against males out of concern that a failure to find males accused of sexual misconduct responsible would cause OCR to investigate it.   On June 9, 2014, President Ruscio announced the appointment of Lauren Kozak as Title IX Coordinator.[13]   The letter prominently mentioned the fact that "there are reports that as many as 60 colleges and universities are currently under investigation by the U.S. Department of Education's Office for Civil Rights for violations under Title IX."  (*Id.*)

135.    In the letter from the president of W&L dated June 9, 2014 announcing that Lauren Kozak was being appointed Title IX officer, he indicated that "[s]exual assault runs counter to our institution's fundamental values and has no place in our community."  One would hope that punishing people based on false claims of sexual assault also goes against the institution's fundamental values, although from the letter, this does not seem to be as much of a concern.  The release also introduces a prior version of W&L's sexual misconduct policy stating that "[t]hese guidelines have been developed as part of an ongoing examination of our policies and procedures and will be useful to you as we undertake a comprehensive assessment of current policies and procedures in *response to the guidance from federal agencies*."  (*Id.* (emphasis added)).

136.    President Ruscio's June 9, 2014 letter followed on the heels of a May 1, 2014, OCR press release titled "U.S. Department of Education Releases List of Higher

---

[12] UNITED STATES DEP'T OF EDUCATION'S, OFFICE FOR CIVIL RIGHTS, Questions and Answers on Title IX and Sexual Violence (April 29, 2014) *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.   A true copy of this document has been attached hereto as Exhibit K.

[13] A true copy of this press release was attached to the Original Complaint as Exhibit G and is hereby incorporated by reference.

31

Education Institutions with Open Title IX Sexual Violence Investigations."[14]  OCR once again expressly states that "[s]chools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action."[15]

137.    Just one day prior to W&L's November 20, 2014 decision finding Plaintiff responsible for sexual misconduct, Rolling Stone published its article on November 19, 2014, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" describing the (now debunked) harrowing tale of a young female victim of rape at University of Virginia ("UVA"), a Virginia institution located just an hour drive away from W&L.  UVA experienced a surge of negative public scrutiny and backlash for the perception that it had failed to adequately address campus sexual assault.  Upon information and belief, the negative impact of the Rolling Stone article on UVA influenced W&L's decision to find Plaintiff responsible for sexual assault so as to avoid a similar fate.

138.    Less than two weeks after the SFHB panel decided that Plaintiff should be expelled, on December 1, 2014, W&L released "A Time to Examine, Affirm Our

---

[14] UNITED STATES DEP'T OF EDUCATION'S, OFFICE FOR CIVIL RIGHTS, *U.S. Department of Education Releases List of Higher Education Institutions With Open Title IX Sexual Violence Investigations*, http://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-ix-sexual-violence-investigations (May 1, 2014). A true copy of this press release has been attached hereto as Exhibit L.

[15] This is one of a series of statements by OCR to follow their guidelines or lose federal funding.  In 2011, OCR published the Dear Colleague Letter which dictated how sexual misconduct investigations should be conducted at universities, including private universities. As per the Dear Colleague Letter "[w]hen a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."  OCR has publicly disclosed a list of schools which it is investigating under Title IX for their handling of complaints of sexual misconduct.

Commitments" which responded to the UVA article, "A Rape on Campus," which was later discounted as largely untrue.[16]

**K.  Plaintiff's Entire Future Has Been Severely Damaged by W&L's Actions**

139.    As a result of W&L's actions, Plaintiff's entire academic career is ruined and, without a college education, his overall economic future is completely compromised.

140.    Currently, Plaintiff's education is at a standstill as a result of W&L's decision to expel Plaintiff and brand him guilty of "sexual misconduct."

141.    Plaintiff's academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by any transfer to another educational institution, including graduate studies.

142.    As a result of W&L's actions, Plaintiff's parents' financial resources used to provide Plaintiff with a good education have been squandered.

143.    As a result of W&L's actions, Plaintiff had to undergo psychological counseling at W&L.  Since his expulsion, Plaintiff was required to cease his psychological treatment at W&L and is now seeking replacement psychological care.

144.    Any attempt to move on with his future in the face of W&L's arbitrary and capricious decision will be met with great resistance and little success; it is a known fact that the likelihood of his acceptance at a school of the same caliber merited by Plaintiff's academic record have been significantly compromised, and the same outcome can be expected for Plaintiff's future graduate applications in light of high applicant numbers and stiff competition.

---

[16] A true copy of this press release has been attached hereto as Exhibit M.

33

145.    Under Section 133-23-7, of the West Virginia Higher Education Policy Commission, Series 23 Standards and Procedures for Undergraduate Admissions at Four-Year Colleges and Universities "[s]tudents seeking transfer admission to a state college or university must be academically and otherwise eligible to return to the institution from which they wish to transfer and must meet the institutions' basic admission standards." Plaintiff attempted to enroll at West Virginia State University which denied him because of that rule and his expulsion from W&L.

146.    On or about December 13, 2014, W&L held a meeting with every Honor Advocate involved in the investigation and hearing.  At this meeting, counsel for W&L advised the Honor Advocates that they were agents of W&L and instructed them not to speak with anyone or to assist in the litigation of this lawsuit in anyway unless the Court ordered them to do so.  The Honor Advocates so instructed included Plaintiff's Honor Advocates.  This restriction continues W&L's ongoing pattern, which has existed from the very outset of this matter, to improperly restrict Plaintiff's access to information and witnesses.

147.    Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff, with no end in sight.  Plaintiff seeks redress from this Court to undo the wrongs occasioned by W&L on his education and future.

34

## AS AND FOR THE FIRST CAUSE OF ACTION
### *Title IX of the Education Amendments of 1972*

148.    Plaintiff repeats and realleges paragraphs 1 through 147 as if fully restated herein.

149.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.  Upon information and belief, W&L receives federal funding through federal financial aid programs used by their students and for research and development.

150.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides, in relevant part, that:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

151.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and *equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b)(Dep't of Education)(emphasis added); 28 C.F.R. § 54.135(b)(Dep't of Justice)(emphasis added).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[17]

---

[17] *See generally* UNITED STATED DEP'T OF EDUCATION, OFFICE FOR CIVIL RIGHTS, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

Case 6:14-cv-00052-NKM-RSB   Document 37-2   Filed 03/20/15   Page 35 of 53   Pageid#: 460

152. The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"accord[] due process to both parties involved...*"[18]

153. The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed;"

- "Application of the procedure to complaints alleging [sexual] harassment...;"

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;"

- "Designated and reasonably prompt timeframes for the major stages of the complaint process;" and

- "Notice to the parties of the outcome of the complaint...'"[19]

154. A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[20]

155. W&L violated Title IX of the Education Amendments of 1972 in multiple respects, including but not limited to the following: (a) a wrongful outcome predicated by gender biased procedures, as written and as applied, including the use of biased archaic assumptions, selective enforcement, and the deliberate indifference to those biased procedures; (b) failing to follow OCR's Guidance; (c) failing to follow their own

---

[18] *Id.* at 22 (emphasis added).
[19] *Id.* at 20.
[20] *Id.* at 21.

36

policies; and (d) otherwise denying Plaintiff of a fundamentally fair and equitable resolution.

156.    W&L has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of W&L's Policy.

157.    W&L conducted its investigation of the incident of February 8, 2014 and subsequent Hearing, in a manner that was biased against the male being accused. From the outset, Ms. Kozak's involvement in Plaintiff's investigation was highly improper and demonstrated an inherent bias and predetermination of guilt of Plaintiff as the male accused given her October 5, 2014 presentation to SPEAK and her stated position that "regret equals rape."

158.    Furthermore, the Hearing and SFHP panel were slanted in favor of Jane Doe and took her eight-month belated statements at face-value, which were contradictory to witness statements from the hours, next day and month after the incident belated. Absent from the Decision or the Sanction is the mention of any factual basis or rationale for its finding of "not [having] effective consent" on the evening of February 8, 2014.

159.    The SFHB panel's decision reflects its failure to consider the evidence or witness statements in support of Plaintiff's defense, and demonstrates W&L's favorable treatment of Jane Doe on the basis of her gender.

160.    W&L has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a

37

presumption of guilt.  Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at W&L on the basis of his sex.

161.   In this case, Plaintiff, who was intoxicated himself, was punished for having consensual sexual intercourse with a woman who, on her own accord, was intoxicated but "not incapacitated," initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him.  At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in consensual sexual intercourse *again* with Plaintiff.  Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February 8, 2014 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's Policy. In finding Plaintiff culpable of sexual misconduct, W&L afforded preferential treatment to Jane Doe's evidence on the basis of her female gender and engaged in sex discrimination against Plaintiff in violation of W&L's Policy.

162.   W&L had no intention of following its own policies and procedures for Plaintiff as the male accused of sexual misconduct when it found Plaintiff responsible for sexual misconduct in the face of witness statements corroborating Plaintiff's account that the evening of February 8, 2014 was consensual.

163.    W&L failed to follow W&L's Policy as set forth in its Student Handbook and the Interim Sexual Harassment and Misconduct Policy, including the failure to provide Plaintiff: (a) with sufficiently trained and experienced persons involved in the disciplinary process; (b) an impartial investigation and hearing; (c) an impartial SFHB panel; (d) a meaningful opportunity to object to the composition of the hearing panel; (e) to keep adequate record of the investigation and hearing; and (f) a meaningful appeals process.

164.    Moreover, W&L failed to follow the express guidelines of OCR. Including: (a) "the opportunity for both parties to present witnesses and other evidence;" (b) "equal opportunity to present relevant witnesses and other evidence;" (c) maintenance of "documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings;" (d) "[a]ll persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipients grievance procedures . . . [i]n sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence;" and (e) "[A] school's investigation and hearing processes cannot be equitable unless they are impartial.  Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."

165.    All persons involved in W&L's disciplinary process including, Investigators, SFHB members, Appeals Board and Honor Advocates, were not specifically trained or experienced in handling complaints of sexual harassment and sexual violence.

166.    W&L's actions have demonstrated its gender bias against Plaintiff as the male accused of sexual assault.

39

167.    Among other things, W&L exhibited its gender bias by reversing the burden of proof at the Hearing.   Jane Doe, as the initiator, should have been asked to articulate "the basis for his/her belief that consent existed." (*See* Interim Sexual Harassment and Misconduct Policy, at § IV(A)).   The SFHB panel did not question her on this point.   Additionally, Jane Doe should have been asked about her withdrawal of consent.   Specifically, if she made an "outward[] demonstrat[ion] by words or actions that clearly indicate a desire to end sexual activity.   (*See* Interim Sexual Harassment and Misconduct Policy, at § IV(A)).

168.    Instead, the SFHB panel, in part because of traditional gender norms and on the basis of his male sex, focused their cross-examination on Plaintiff.   It required Plaintiff to articulate in detail his basis for consent, when in fact, it was Jane Doe's duty to obtain consent.

169.    Based on the foregoing, the timing of W&L's decision on the heels of the Rolling Stone article about the perceived missteps by UVA in dealing with campus sexual assault influenced W&L's decision to avoid a similar fate for deciding in favor of Plaintiff as the male accused.

170.    Based on the foregoing, W&L imposed the highest of five (5) possible sanctions for a charge of sexual misconduct, namely, expulsion, on Plaintiff without any consideration of his clean disciplinary record at W&L, and without providing any written summary for the basis therefor.

171.    Based on the foregoing, W&L's Policy is set up to disproportionately affect the male student population of the W&L community as a result of the higher

40

incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

172.    Based on the foregoing, male respondents in sexual misconduct cases at W&L are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

173.    W&L is liable to Plaintiff for damages.  Additionally, Plaintiff is entitled to equitable relief, requiring, among other things, the expungement of the wrongful determination of the hearing panel, reinstatement to W&L, as well as reimbursements of attorneys' fees and costs under 42 U.S.C. § 1988.

## AS AND FOR THE SECOND CAUSE OF ACTION
### *Title IX of the Education Amendments of 1972*

174.    Plaintiff repeats and realleges paragraphs 1 through 147 as if fully restated herein.

175.    Title IX of the Education Amendments of 1972, and its governing regulations require an "equitable" resolution of allegations of sexual misconduct against students.

176.    As written and applied, W&L's Policy (including the Interim Sexual Harassment and Misconduct Policy, Student Handbook and others) and OCR's Guidance,[21] deprive respondents, as occurred here, of a reliable fact determinations and fundamental fairness.

---

[21] The OCR Guidance did not pass the administrative rule process unlike the regulation which requires an "equitable resolution."

41

177.    W&L's Policy and OCR's Guidance further deprive respondents, as occurred here, of the right to counsel during the investigation as well as during the hearing itself.[22]

178.    W&L's Policy and OCR's Guidance further deprive respondents, as occurred here, of the right to cross-examine the complainant in a meaningful way and to cross-examine witnesses against the respondent.

179.    Moreover, the failure to extend a meaningful right of cross-examination of a complainant is particularly egregious in a he-said she-said factual setting such as was present here.

180.    W&L's Policy and OCR's Guidance further deprive respondents, as occurred here, to discover and present defense witnesses and evidence such as all electronic evidence in the possession of the complainant.

181.    W&L's Policy and OCR's Guidance further deprive respondents, as occurred here, of a fair and unbiased hearing panel.  Here, the proceedings were conducted under the threat of losing federal financial assistance, as well as, an OCR investigation for failure to properly investigate and sanction.  Moreover, respondents, as occurred here, are deprived of an opportunity to meaningfully object to the hearing panel.

182.    W&L's Policy and OCR's Guidance further deprive respondents, as occurred here, by requiring a mere preponderance of the evidence standard as well as permitting a non-unanimous decision.

---

[22] The lack of minimally accepted protections is also illustrated by other policies of W&L. For example, in matters involving violations "except for allegations of sexual misconduct" a respondent is permitted "to summon and question witnesses and offer tangible evidence" and the complainant and respondent may ask direct questions to one another through the chair these protections do not exist for sexual misconduct investigations.  (*See* Student Faculty Hearing Board Procedures).

42

183.    These serious deprivations of fundamental fairness both individually, and collectively, deprive a respondent, as occurred here, of an "equitable resolution" as required by Title IX and governing regulations.

184.    W&L is liable to Plaintiff for damages.    Additionally, Plaintiff is entitled to equitable relief, requiring, among other things, the expungement of the wrongful determination of the hearing panel, reinstatement to W&L, as well as reimbursements of attorneys' fees and costs under 42 U.S.C. § 1988.

## AS AND FOR THE THIRD CAUSE OF ACTION
### Due Process

185.    Plaintiff repeats and realleges paragraphs 1 through 147 as if fully restated herein.

186.    The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law."

187.    The Due Process Clause of the United States Constitution applies to higher education investigation procedures and disciplinary decisions, because it has the potential to deprive a person of property and liberty including, the loss of reputation, education and status as a student.

188.    W&L receives federal financial assistance.

189.    W&L was compelled by OCR to adopt the OCR Guidance, (to wit, the Dear Colleague Letter and the Questions and Answers).  The OCR Guidance, as written and as applied, deprived Plaintiff of his constitutional due process protections.  Plaintiff was denied fundamental fairness, including (1) the right to the assistance of counsel in preparation for and conduct of the hearing; (2) the right to cross-examine witnesses against

43

him and to present witnesses and evidence; and (3) the right to a fair and unbiased hearing panel.

190.     Additionally, the OCR Guidance subjected Plaintiff to unequal and overly restrictive confidentiality requirements which deprived Plaintiff the opportunity to obtain and present information and witnesses.

191.     W&L adopted its Interim Sexual Harassment and Misconduct Policy in direct response to direction from OCR, indeed, W&L's President, when introducing W&L's past Interim Sexual Harassment and Misconduct Policy, stated that "federal officials have issued new guidance on how colleges and universities *must* deal with sexual harassment and sexual assault . . . these guidelines have been developed as part of an ongoing examination of our policies and procedures and will be useful to you as we undertake a comprehensive assessment of current policies and procedures in *response to the guidance from federal agencies.*"  (Exhibit G (emphasis added)).

192.     W&L was compelled to adopt the OCR Guidance, and to apply it during Plaintiff's Investigation, Hearing and Appeal because it was under a direct threat from OCR that failure to do so would result in (1) the withdrawal of federal funding; and (2) lead to an investigation for the failure to properly investigate and sanction alleged sexual misconduct.

193.     OCR's Guidance was adopted without an administrative rule-making process and the opportunity for public comment.

194.     OCR's Guidance, including its deprivation of due process, fundamental fairness and a reliable fact determination, which W&L adopted, was determinative of the adverse outcome.

44

195.    The Fifth Amendment's promise of due process also entitles Plaintiff to the equal protection of the laws.

196.    W&L's implementation of OCR's Guidance, as written and as applied, deprived Plaintiff of his right to the equal protection of the laws by treating him differently from others similarly situated and the unequal treatment was the result of discriminatory animus towards males.

197.    W&L's conduct was so arbitrary and egregious that it shocks the conscience.

198.    There was no rational basis for W&L's decision.

199.    W&L's decision was motivated by bad faith, ill will, or was otherwise unrelated to the alleged conduct at issue.

200.    As a direct and proximate result of W&L's violations of Plaintiff's constitutional rights Plaintiff has suffered substantial damages in an amount to be determined at trial.  Pursuant to 42 U.S.C. § 1988, and any other applicable law, Plaintiff is entitled to attorneys' fees and costs, incurred in bringing this action.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Breach of Contract / Implied Contract

201.    Plaintiff repeats and realleges paragraphs 1 through 147 as if fully restated herein.

202.    Based on the aforementioned facts and circumstances, W&L breached express and/or implied agreement(s) with Plaintiff.

203.    W&L offered and Plaintiff accepted admission.   In consideration, Plaintiff, paid W&L substantial monies, through significant tuition and aid.   W&L was obligated to follow its own policy in its discipline of Plaintiff and it failed to do so.

204.    W&L committed several breaches of its agreements with Plaintiff, including, without limitation:

> "In compliance with Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and all other applicable non-discrimination laws, Washington and Lee *does not discriminate on the basis of* race, color, religion, national or ethnic origin, *sex*, sexual orientation, age, disability, veteran's status, or genetic information in its educational programs and activities, admissions, and with regard to employment.
>
> *W&L does not discriminate on the basis of sex* in its educational, extracurricular, athletic, or other programs or in the context of employment."

(*See* Interim Sexual Harassment and Misconduct Policy, at § III(A)(emphasis added)).

> "The President has appointed Lauren E. Kozak to serve as the University's Title IX Coordinator. *She will be informed of all reports of sexual misconduct and will oversee the University's review, investigation, and resolution of those reports to ensure the University's compliance with Title IX and other applicable laws*, and the effective implementation of this policy.
>
> The Title IX Coordinator is:
>
> • Responsible for the oversight of the resolution of all reports of sexual misconduct involving students, staff, and faculty as well as volunteers and third parties;

46

- *Knowledgeable and trained in University policies and procedures and relevant state and federal laws*;

- Available to advise any individual, including a complainant, a respondent, or a third party, about the courses of action available at the University, both informally and formally, and in the community;

- Available to provide assistance to any University employee regarding how to respond appropriately to a report of sexual misconduct;

- Responsible for monitoring compliance with all procedural requirements, record keeping and time frames outlined in this policy;

- *Responsible for overseeing training*, prevention and education efforts, and reviews of climate and culture; and

- Responsible for conducting or overseeing investigations of complaints against students."

(*See* Interim Sexual Harassment and Misconduct Policy, at § III(B)(emphasis added)).

"*The training of conduct board members, the hearing procedures that are tailored to address specific types of misconduct* and the overall structure of each conduct body are *designed to create a system that upholds the University's standards--honor, integrity and civility--while providing fair process and judgment for students and student organizations.*"

(*See* Student Handbook, at 37 (emphasis added)).

"Although a report may arrive through many sources, the University is committed to ensuring that all reports are referred to the Title IX Coordinator, *who will ensure consistent application of the policy to all individuals and allow the University to respond promptly and equitably* to eliminate the harassment, prevent its recurrence, and eliminate its effects."

(*See* Interim Sexual Harassment and Misconduct Policy, at §(XI)(emphasis added)).

"Each member of the Panel must be *neutral and impartial*."

47

(*See* Interim Sexual Harassment and Misconduct Policy, at (XI)(F)(1)(emphasis added)).

> "Members of the Hearing Panel may question the complainant and respondent, question the investigators, *and examine related information and evidence*. They shall *restrict their questions to matters that the Chair deems relevant* to the specific case."

(*See* Interim Sexual Harassment and Misconduct Policy, at § (XI)(E)(2)(emphasis added)).

205.    In this case, Plaintiff, who was intoxicated himself, was punished for having consensual sexual intercourse with a woman who, on her own accord, was intoxicated but "not incapacitated," initiated the sexual intercourse by initiating the "making out," removed her clothes, and had sexual intercourse with him.  At least three witnesses observed Jane Doe in the hours, next day and month after the incident and stated that "nothing indicated [] that anything strange had occurred between them," Jane Doe "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," and "there never seemed to be anything wrong." One month following the incident, Jane Doe sent an upbeat Facebook message to Plaintiff and also engaged in consensual sexual intercourse *again* with Plaintiff.  Any other evidence introduced at the Hearing to support Jane Doe's narrative that she purportedly realized eight (8) months later that she did not engage in consensual sex on February 8 was improper since (i) it contradicted Plaintiff's account and other witness statements to the contrary; and (ii) did not appropriately relate to a finding of "consent" under W&L's policies.  In finding Plaintiff culpable of sexual misconduct, W&L afforded preferential treatment to Jane Doe's evidence on the basis of her female gender and engaged in sex discrimination against Plaintiff in violation of W&L's policies.

206.    In W&L's policies, W&L states that it will not consider a complainant's *prior* sexual history with the accused student.  However, nowhere does it

48

preclude the consideration of the complainant's *post-incident* sexual history with the accused student.

207. W&L's failure to consider all relevant evidence, including evidence of Jane Doe's sexual intercourse with Plaintiff one month *after* the alleged incident, was in violation of its obligations to remain neutral and impartial, and examine related information and evidence.

208. W&L's decision to find Doe culpable of sexual misconduct in the face of evidence to the contrary demonstrates that W&L did not employ neutral, impartial or properly trained student conduct board members in violation of W&L's policies.

209. Based on the aforementioned facts and circumstances, W&L breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by finding Plaintiff culpable of sexual misconduct, notwithstanding the lack of evidence in support of Jane Doe's claim of sexual misconduct.

210. As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

211. Plaintiff is entitled to recover damages for W&L's breach of the express and/or implied contractual obligations described above.

212. As a direct and proximate result of the above conduct, actions and inactions, Plaintiff has suffered physical, emotional and reputational damages, economic injuries and the loss of educational and athletic opportunities.

49

213.    Upon information and belief, W&L is currently under investigation by OCR regarding its mishandling of sexual assault allegations.

214.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE FIFTH CAUSE OF ACTION
*Declaratory Judgment*

215.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

216.    W&L has committed numerous violations of the Parties' contracts and of federal and state law.

217.    Plaintiff's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff's educational career and future employment prospects, with no end in sight.

218.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at W&L.

219.    By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by W&L at Plaintiff's Hearing be reversed; (ii) Plaintiff be reinstated as a student at W&L; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion from W&L be removed from his education file; (v) any record of Plaintiff's Hearing be permanently destroyed; and (vi) a finding that W&L's Policy, as written and as applied, is unconstitutional.

50

*Prayer for Relief*

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against

W&L as follows:

(i)     Judgment in favor of Plaintiff and against W&L;

(ii)    Compensatory damages in an amount to be determined at trial;

(iii)   Punitive damages in an amount to be determined at trial;

(iv)    Injunctive relief as follows: (a) The outcome and findings made by W&L at Plaintiff's Hearing be reversed; (b) Plaintiff be reinstated as a student at W&L; (c) Plaintiff's disciplinary record be expunged; (d) the record of Plaintiff's expulsion from W&L be removed from his education file; (e) any record of Plaintiff's Hearing be permanently destroyed; and (f) a finding that W&L's Policy, as written and as applied, is unconstitutional;

(v)     Pre-judgment and post-judgment interest on all sums awarded;

(vi)    Cost of pursuing this action including, reasonable attorney's fees under 42 U.S.C. § 1988 and any other applicable law;

(vii)   A jury trial; and

(viii)  Any other relief this Court deems just and proper.

*Jury Demand*

Plaintiff herein demands a trial by jury of all triable issues in the present

matter.

Dated:      New York, New York
              March 20, 2015

/s/    G. Robert Gage, Jr.
G. Robert Gage, Jr. (NY Bar No. 1901412)
Joseph B. Evans (NY. Bar No. 5221775
Gage Spencer & Fleming LLP
410 Park Avenue, Suite 900
New York, New York 10022
Tel:   (212) 768-4900
Fax:   (212) 768-3629
grgage@gagespencer.com
jevans@gagespencer.com

(Admitted *Pro Hac Vice*)


/s/
David G. Harrison (VSB 17590)
The Harrison Firm, PC
5305 Medmont Circle, SW
Roanoke, VA 24018-1120
Tel:   (540) 777-7100
Fax:   (540) 777-7101
david@harrisonfirm.us

*Attorneys for Plaintiff John Doe*

*Verification*

I Plaintiff, declare under penalty of perjury that the foregoing Verified Complaint is true to the best of my knowledge and belief.

March 20, 2015

_____
John Doe
Plaintiff

Case 6:14-cv-00052-NKM-RSB   Document 37-2   Filed 03/20/15   Page 53 of 53   Pageid#: 478