G. Robert Gage, Jr. (NY Bar No. 1901412)
Joseph B. Evans (NY Bar No. 5221775)
Gage Spencer & Fleming LLP
410 Park Avenue, Suite 900
New York, New York 10022
Tel:    (212) 768-4900
Fax:    (212) 768-3629
grgage@gagespencer.com
jevans@gagespencer.com

(Admitted *Pro Hac Vice*)

David G. Harrison (VSB 17590)
The Harrison Firm, P.C.
5305 Medmont Circle
Roanoke, Virginia 24018-1120
Tel:    (540) 777-7100
Fax:    (540) 777-7101
david@harrisonfirm.us

*Attorneys for Plaintiff John Doe*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | |
|---|---|
| John Doe,<br><br>        Plaintiff,<br><br>    -against-<br><br>Washington and Lee University,<br><br>        Defendant. | **Civil Action No.:**<br>**6:14-cv-0052-NKM**<br><br>**Memorandum of Law in Opposition to Defendant's Motion to Dismiss** |

## *Table of Contents*

Table of Contents ............................................................................................... i

Table of Authorities........................................................................................... ii

Preliminary Statement ....................................................................................... 1

Statement of Facts ............................................................................................. 3

Argument............................................................................................................ 4

A.     Legal Standard: Notice Pleading ............................................................ 4

B.     Plaintiff Has Properly Alleged Claims under Title IX ........................... 5
      1.  The Complaint Amply Alleges W&L's Demonstrated Gender Bias ................... 5
      2.  Pressure from OCR Compelled the Gender Bias Carried Out in Plaintiff's Hearing................................................................................14
      3.  The Complaint Sufficiently Pleads Three Theories of Gender-Based Title IX Discrimination .................................................................................17
           a.  Erroneous Outcome.................................................................17
           b.  Archaic Assumptions...............................................................20
           c.  Deliberate Indifference............................................................22
      4.  W&L Violated the Requirement That It Supply an Equitable Resolution ..........22
      5.  W&L Deprived Plaintiff of Fundamental Due Process, Not Merely an Administrative Requirement ..............................................................24

C.     Plaintiff Has Sufficiently Alleged the Existence of Governmental Action to Ground Constitutional Claims ...........................................................26

D.     The Complaint Sufficiently Pleads a Contract Between Plaintiff and W&L ............30

Conclusion.........................................................................................................38

## Table of Authorities

**Cases:**

*1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc.*,
235 F. Supp. 2d 458 (D. Md. 2002) ............................................................ 38 n. 11

*Abbas v. Woleben*,
No. 3:13-cv-147, 2013 U.S. Dist. LEXIS 134446
(E.D. Va. Sept. 19, 2013) ....................................................................... 33 n. 9

*Althiabat v. Howard Univ.*,
No. 13-788, 2014 U.S. Dist. LEXIS 177119
(D.D.C. Dec. 24, 2014) ......................................................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 4

*Assoc. Aluminum Prods. v. Elvira-Menez*,
No. 2301-13-2, 2014 Va. App. LEXIS 317
(Va. Ct. App. Sep. 16, 2014).............................................................................37

*Atria v. Vanderbilt*,
142 F. App'x 246 (6th Cir. 2005) ......................................................................35

*Barger v. General Electric. Co.*,
599 F. Supp. 1154 (W.D. Va. 1984).............................................................. 37, 38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................... 4

*Bleiler v. Coll. of the Holy Cross*,
No. 11-11541, 2013 U.S. Dist. LEXIS 127775
(D. Mass. Aug. 26, 2013) ...................................................................... 20, 22, 23

*Blum v. Yaretsky*,
457 U.S. 991 (1982) .............................................................................. 26, 28, 29

*Brogan v. La Salle Univ.*,
70 F. Supp. 2d 556 (E.D. Pa. 1999) ...................................................................29

*Brown v. Rector & Visitors of the Univ. of Va.*,
No. 3:07-cv-00030, 2008 U.S. Dist. LEXIS 36427
(W.D. Va. May 2, 2008) ............................................................ 31, 32, 33, 33 n.6

*Brown v. Rector & Visitors of the Univ. of Va.*,
    360 F. App'x 531 (4th Cir. 2010) ...........................................................32

*Byer v. Virginia Elec. & Power Co.*,
    11 Va. Cir. 171 (Va. Cir. Ct. 1988) .......................................................34

*Commonwealth v. Stewart*,
    66 Va. Cir. 135 (Va. Cir. Ct. 2004) ......................................................31

*Cook v. Talladega Coll.*,
    908 F. Supp. 2d 1214 (N.D. Ala. 2012) .................................................36

*Craig v. Selma School Bd.*,
    801 F. Supp. 585 (S.D. Ala. 1992) .........................................................37

*Crissman v. Dover Downs Entm't Inc.*,
    289 F.3d 231 (3d Cir. 2002) ..................................................................27

*Davis v. George Mason Univ.*,
    395 F. Supp. 2d 331 (E.D. Va. 2005) ........................................... 33 n. 7

*Doe v. Brimfield Grade Sch.*,
    552 F. Supp. 2d 816 (C.D. Ill. 2008) ....................................................25

*Doe v. Univ. of the South*,
    687 F. Supp. 2d 744 (E.D. Tenn. 2009) ................................. 19, 20, 25

*Flagg v. Yonkers Sav. & Loan Ass'n.*,
    396 F.3d 178 (2d Cir. 2005) ...........................................................28, 29

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) .......................................................................24, 25

*Gerald v. Locksley*,
    785 F. Supp. 2d 1074 (D.N.M. 2011) ...................................................36

*Giuliani v. Duke Univ.*,
    No. 1:08-cv-502, 2009 U.S. Dist. LEXIS 44412
    (M.D.N.C. May 19, 2009) .....................................................................36

*Giles v. Howard Univ.*,
    428 F. Supp. 603 (D.D.C. 1977) ...........................................................35

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
    218 F.3d 337 (4th Cir. 2000) ...........................................................26, 27

*Gomes v. Univ. of Maine,*
365 F. Supp. 2d 6 (D. Me. 2005) ...................................................... 33, 36

*Goss v. Lopez,*
419 U.S. 565 (1975) ....................................................................... 33

*Groman v. Twp. of Manalapan,*
47 F.3d 628 (3d Cir. 1995) .............................................................. 27

*Haley v. Virginia Commonwealth Univ.,*
948 F. Supp. 573 (E.D. Va. 1996) ............................................... 19 n. 2

*Havlik v. Johnson & Wales Univ.,*
490 F. Supp. 250 (D.R.I. 2007), *aff'd*, 509 F.3d 25 (1st Cir. 2007) .......................... 35

*Hernandez v. Universidad Metropolitana,*
233 F.3d 49 (1st Cir. 2000) ............................................................. 27

*Jackson v. Metro Edison Co.,*
419 U.S. 345 (1974) ................................................................... 27, 28

*Jansen v. Emory Univ.,*
440 F. Supp. 1060 (N.D. Ga. 1977) .................................................... 27

*King v. Depauw Univ.,*
No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075
(S.D. Ind. Aug. 22, 2014) ............................................................ 19 n. 2

*Klunder v. Brown Univ.,*
778 F.3d 24 (1st Cir. 2015) ............................................................. 27

*Kloth-Zanard v. Ambridge Univ.,*
No. 3:09-cv-606, 2012 U.S. Dist. LEXIS 87560
(D. Conn. June 22, 2012) ................................................................ 35

*Larkman v. Dynalectron Corp.,*
No. 86-3172, 1987 U.S. App. LEXIS 18728
(4th Cir. Oct. 7, 1987) .................................................................... 34

*Maher v. Roe,*
432 U.S. 464 (1977) ....................................................................... 29

*Mallory v. Ohio Univ.,*
76 F. App'x 634 (6th Cir. 2003), *cert. denied*, 540 U.S. 1052 (2003) ............... 5, 17, 20

*Mangla v. Brown Univ.*,
    135 F.3d 80 (1st Cir. 1998) ...................................................................35

*McFadyen v. Duke Univ.*,
    786 F. Supp. 2d 887 (M.D.N.C. 2011) *rev'd in part*, *aff'd in part*, *sub nom.*
    *Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) ................................. 35, 36

*Mosby-Nickens v. Howard Univ.*,
    864 F. Supp. 2d 93 (D.D.C. 2012) ................................................... 35, 36

*Nash v. Auburn Univ.*,
    812 F.2d 655 (11th Cir. 1987) ...............................................................37

*Pederson v. La. State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ........................................................... 20, 21

*Peretti v. State of Montana*,
    464 F. Supp. 784 (D. Mont. 1979), *rev'd on other grounds*,
    661 F.2d 756 (9th Cir. 1981) ................................................................35

*Reguli v. Guffee*,
    371 F. App'x 590 (6th Cir. 2010) ..........................................................26

*Ross v. Corp. of Mercer Univ.*,
    506 F. Supp. 2d 1325 (M.D. Ga. 2007) ..................................................25

*Roe v. St. Louis Univ.*,
    746 F.3d 874 (8th Cir. 2014) ................................................................25

*Ross v. Creighton*,
    957 F.2d 410 (7th Cir. 1992) ........................................................... 34, 35

*Ruegsegger v. Bd. of Regents of Western New Mexico Univ.*,
    141 N.M. 306 (N.M. Ct. App. 2006) .................................................. 35, 36

*Sahm v. Miami Univ.*,
    No. 1:14-cv-698, 2015 U.S. Dist. LEXIS 1404
    (S.D. Ohio Jan. 7, 2015) ......................................................................18

*S.F. Arts & Athletics, Inc. v. United States Olympic Comm.*,
    483 U.S. 522 (1987) ...................................................................... 27, 28

*Skinner v. Ry. Labor Executives' Ass'n.*,
    489 U.S. 602 (1989) .................................................................. 27, 28, 29

*Sterret v. Cowan*,
No. 14-cv-11619, 2015 U.S. Dist. LEXIS 13056
(E.D. Mich. Feb. 4, 2015) ................................................................20

*Thompson v. American Motor Inns, Inc.*,
623 F. Supp. 409 (W.D. Va. 1985)............................................... 33, 34

*Truell v. Regent Univ. School of Law*,
No. 2:04-cv-716, 2006 U.S. Dist. LEXIS 54294
(E.D. Va. July 21, 2006) ............................................................ 33 n. 8

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) ...........................................................29

*United States v. Virginia*,
518 U.S. 515 (1996) ......................................................................20

*Virginia Block Co. v. Virginia Mut. Ins. Agency, Inc.*,
16 B.R. 771 (W.D. Va. Bankr. 1982) ................................................31

*Walton v. Greenbrier Ford, Inc.*,
370 F.3d 446 (4th Cir. 2004)..................................................... 33 n. 10

*Wells v. Xavier Univ.*,
7 F. Supp. 3d 746 (S.D. Ohio 2014)....................................16, 17, 19, 22

*Yu v. Vassar Coll.*,
No. 13-cv-4373, 2015 U.S. Dist. LEXIS 43253
(S.D.N.Y. Mar. 31, 2015) ......................................................... 36, 37

*Yusuf v. Vassar Coll.*,
35 F.3d 709 (2d Cir. 1994)..............................................5, 6, 11, 17, 18

*Zumbrun v. Univ. of Southern California*,
25 Cal. App. 3d 1 (Cal. Ct. App. 1972) ............................................35

**Statutes, Rules and Regulations:**

20 U.S.C. § 1681(a). ................................................................................... *passim*

28 U.S.C. § 2201 .................................................................................. 38 n. 11

34 CFR § 106.8(b) ........................................................................................22

*Preliminary Statement*

Plaintiff John Doe[1] ("Plaintiff") joins the ever-growing list of male college students who find themselves embroiled in litigation seeking to undo the ruinous personal consequences flowing from decisions made by college administrators concerning complicated and highly subjective sexual encounters.

In reaching its decision to expel Plaintiff, Defendant Washington & Lee University ("W&L") demonstrated repeatedly an illicit gender bias, and violated its mandate under Title IX to act equitably and to resolve the dispute in an equitable fashion. W&L made its decision to expel plaintiff even though the evidence adduced in the hearing bore little indicia that Jane Doe's sexual encounter with Plaintiff was not consensual. To the contrary, Jane Doe herself initiated the sexual encounter both physically and verbally; she did not dispute that she made the first physical movement towards sexual contact and first sexual contact itself. Not only did W&L determine that this undisputed evidence did not establish Jane Doe's consent, but the school violated its own procedures by placing the burden on Plaintiff to prove he had obtained that consent even though those procedures clearly impose that burden on the person initiating the sexual contact. In this case, the undisputed evidence was that that was Jane Doe. Furthermore, as Plaintiff explained and as alleged in the Complaint, Jane Doe stated to him that she did not "usually" "have sex" with someone on the first night of meeting them (the clear implication being that she consented to this being an exception). Indeed, the entirety of communications and circumstances prior to, contemporaneous with, and subsequent to the encounter, (including that Jane Doe undisputedly had consensual sexual intercourse with Plaintiff a second time a

---

[1] Plaintiff has filed, contemporaneously with the Original Complaint, a Motion to proceed pseudonymously which was subsequently granted by this Court. (*See* ECF No. 14).

month later), attested to its consensual nature. The only evidence to the contrary was Jane Doe's bare, uncorroborated testimony that it was not consensual. But that assertion was not made until eight months after the incident, and, when it was made, gave all appearances by the circumstances of the case to have been retrofitted in the wake of her romantic spurning by Plaintiff. Nevertheless, W&L chose to credit that isolated piece of evidence and, though it conflicted with all other evidence, to expel Plaintiff on that ground.

W&L's flawed decision, and the predicate biased conduct of its administrators, is very much explained by its context. W&L made this inequitable decision in an atmosphere of intimidation and threats issued by the Federal Government. In May 2014, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a press release that openly and ominously warned that Title IX institutions which did not address problems identified by it in connection with sexual misconduct complaints would face withdrawal of federal funds and/or a Department of Justice investigation. With that aggressive announcement, OCR compelled W&L, among others, to alter its policies rapidly to demonstrate compliance. Since the imposition of the OCR guidance and pressure from OCR, there have been a waterfall of cases in which male students have been expelled after schools have credited female students' claims on the issue of consent, which speaks to the gender-based outcomes sought by the government. The detailed facts alleged in the First Amended Verified Complaint (the "Complaint") catalogue the numerous instances of gender bias demonstrated by the school in reaching this wrongful result. Those factual assertions, and their fair inferences, establish in fact, and certainly for pleading purposes, that the inequitable outcome here was a result of just such gender bias.

*Statement of Facts*

In February and March, 2014, Plaintiff and Jane Doe had two, separate sexual encounters, approximately one month apart, in which they engaged in sexual intercourse. (Complaint, at ¶¶ 23, 33) As set forth in detail in the Complaint, it is undisputed that Jane Doe initiated sexual contact with Plaintiff during their first encounter. (*Id.*, at ¶¶ 21, 24, 25, 99, 100, 108, 126, 161, 167, 205) Nevertheless, Jane Doe made a formal complaint with W&L, approximately eight months later, asserting for the first time that the first of her two sexual encounters with Plaintiff was not consensual. (*Id.*, at ¶¶ 43-46) The Complaint further catalogues that, prior to making her complaint, she had witnessed Plaintiff being romantic with another woman. (*Id.*, at ¶ 36)

Additionally, as set forth in greater detail below, W&L conducted its proceeding against Plaintiff in a manner that was deeply influenced by pressure placed on Title IX institutions by OCR. In May 2014, OCR increased its public attention to problems relating to sexual misconduct on campuses, and issued a warning to schools not adequately addressing the problems identified by OCR by threatening them with referral to the Department of Justice for investigation and/or loss of federal funding. (Complaint, at ¶ 136). W&L responded immediately to these threats and hired a Title IX Coordinator, Lauren Kozak, and changing its policies on investigating and prosecuting alleged sexual misconduct. (*Id.*, at ¶¶ 134, 135). In announcing her appointment, W&L President Kenneth P. Ruscio acknowledged the large number of schools under federal investigation, and the fact that the school's change in policies was made in response to the federal guidance. (*Id.*, at ¶¶ 134-35). Though issued after the sexual encounter at issue, these changed policies were applied to the proceeding against Plaintiff.

The school's changed policies included those made in its Interim Sexual Harassment and Misconduct Policy ("Sexual Misconduct Policy") in which it set forth various standards by which it promised to govern the University, its students, and its operations. In these policy manuals, W&L covenanted, among other things,

- not to discriminate on the basis of sex. (Complaint, at Ex. A, § III(A));

- to have a properly trained Title IX coordinator who was knowledgeable in University policies and procedures and relevant state and federal laws. (*Id.*, at Ex. A, § III(B));

- to properly train individuals involved with Title IX issues. (*Id.*, at Ex. A, § III(B));

- to ensure consistent application of the Sexual Misconduct Policy to all students. (*Id.*, at Ex. A, § XI);

- to provide a hearing panel that was neutral and impartial. (*Id.*, at Ex. A, § XI(F)(1)); and

- to provide a hearing panel that would examine information and evidence relevant to claims. (*Id.*, at Ex. A, at § XI(E)(2)).

*Argument*

**A.      Legal Standard: Notice Pleading**

To survive a motion to dismiss, a Complaint need be plausible enough to state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The specificity of allegations in Plaintiff's Complaint easily satisfies these governing standards. Among the allegations of the Complaint, we note that W&L has made affirmative efforts to block access to information. In particular, W&L has, through its counsel, specifically directed the law students that participated in the proceeding against Plaintiff ("Honor Advocates") including one of Plaintiff's own Honor Advocates who was

4

his lead representative permitted to him in the process, not to speak to anyone or assist in the instant litigation of this lawsuit in any way on the express ground that they were "agents" of W&L. (Complaint, at ¶ 146). Despite this, we contend that the detailed allegations of the Complaint, regarded as true for the purposes of the motion to dismiss, are sufficient at this stage of the case.

**B.  Plaintiff Has Properly Alleged Claims under Title IX**

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance . . . ." 20 U.S.C. § 1681(a).

Generally, there are four theories under which a claim of gender-based Title IX discrimination can be brought against universities arising from disciplinary hearings: (1) erroneous outcome; (2) archaic assumptions; (3) selective enforcement; and (4) deliberate indifference. *See Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003), *cert. denied*, 540 U.S. 1052 (2003). Plaintiff has properly alleged gender-based Title IX claims under the erroneous outcome, archaic assumptions and deliberative indifference theories.

**1.  The Complaint Amply Alleges W&L's Demonstrated Gender Bias**

A central requirement to prove Title IX discrimination is gender bias. *See, e.g., Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The Complaint is replete with factual allegations demonstrating that from the outset, W&L responded to a student complaint in a manner infected with gender bias.

First, Jane Doe's complaint was handled by the Title IX Coordinator at W&L, Lauren Kozak, who, just days before had made public statements conveying her bias

against males in cases involving issues of sexual consent. (Complaint, at ¶¶ 47, 48, 60). Before a student organization, and in Jane Doe's presence, Kozak expressed with approval and acceptance the concept that "regret" can equal rape, even where a woman has given no indication of withdrawing her consent to sexual activity. (*Id.*, at ¶¶ 47, 48, 49). Addressing an article entitled "Is it Possible That There Is Something In Between Consensual Sex And Rape…And That It Happens To Almost Every Girl Out There?" – which, with its explicit reference to the perspective of "every girl," was clearly not gender-neutral – Kozak expressed her point that "regret equals rape" and stated that the idea expressed by the author was one with which people were all starting to agree. (*Id.*, at ¶ 47). The article, published by a female-oriented website [www.totalsororitymove.com](www.totalsororitymove.com), further presented the concept of "rape-*ish,*" a label characterizing as wrongful conduct a situation where a woman had unwanted sex with a man, but had made no outward demonstration by words or actions that she had withdrawn her consent. (*Id.*, at ¶ 48). These statements are manifestly gender-biased, establish Kozak's bias or partiality, and cast doubt on the entire investigation, which was extraordinarily subjective and gave Kozak significant opportunities (which she took advantage of) to slant the factual record against the male respondent. *See Yusuf*, 35 F.3d at 715 (gender bias is provable by statements of pertinent university officials that tend to show the influence of gender).

Second, after Jane Doe notified Kozak of her complaint days later, and without even notifying or speaking with Plaintiff, Kozak decided to proceed under the more serious of the two approaches available for such situations. (Complaint, at ¶¶ 54, 55). Under W&L's written procedures, Kozak was required to make an "initial assessment" to determine whether to proceed with a remedies-based resolution or to initiate an

investigation to determine if an SFHB hearing is warranted. (*Id.*, at ¶¶ 51, 52). Without contacting Plaintiff, reviewing any documents, or speaking to any witnesses, Kozak rejected a remedies-based approach and initiated an investigation. (*Id.*, at ¶¶ 54, 55). This decision was based solely on Jane Doe's account of the story, was unnecessarily rushed, and was motivated by Kozak's publicly-expressed bias against males on issues of sexual consent. At a minimum, the alleged facts fairly permit that inference.

Jane Doe's account, moreover, omitted critical information including that she had had consensual sex with Plaintiff a second time, approximately one month after the night in question. (*Id.*, at ¶ 72). Kozak did not learn this fact, which had been withheld from her by Jane Doe, until she confronted Plaintiff after she had already decided against a remedies-based approach and in favor of a full investigation. (*Id.*).

Third, Kozak's confrontation with Plaintiff afforded no real opportunity to steer the investigation towards uncovering the truth, but was conducted after critical and erroneous conclusions had been formed. When Kozak finally contacted Plaintiff on November 3, 2014, she told him he was required to appear for a meeting with herself and Dean Rodocker, and refused his requests for information about the purpose of the meeting. (*Id.*, at ¶ 63). She preferred to accuse him cold of rape, even though the incident was nine months old by then. (*Id.*, at ¶¶ 3, 64, 73).

Kozak and Rodocker further rejected Plaintiff's requests for legal representation. (*Id.*, at ¶ 66). When Plaintiff expressed that he knew a male who had been accused the year before and was able to have his lawyer participate, Kozak stated that the Jane Doe investigation was being conducted under a "new policy" where, unlike the "old policy," he had no right to a lawyer. (*Id.*, at ¶ 67). She did not identify what "new" policy

she was referencing, nor that OCR had recently increased pressure on W&L on the issues of sexual misconduct. Kozak also threatened to submit an investigation report without his side of the story if he insisted on any delay to consult with a lawyer. (*Id.*, at ¶¶ 68, 69).

Fourth, though Jane Doe had had months to put together her case against Plaintiff, Kozak and W&L, in their inexplicable (to Plaintiff) and unnecessary rush to proceed, provided Plaintiff indefensibly short periods of time to make critical decisions. For instance, at the meeting, Kozak required that Plaintiff name his witnesses on the spot. (*Id.*, at ¶ 74). But then, at the end of their meeting, Kozak required that Plaintiff sign a confidentiality form before he left the office agreeing to "keep the investigation and content of my communications with Investigators confidential." (*Id.*, at ¶ 73). These restrictions hampered his ability effectively to gather witnesses on his behalf or otherwise develop his defense to any charge. (*Id.*, at ¶¶ 73-74). In contrast, Jane Doe, had had nine months to evolve her claim (she herself ultimately expressed that her views on the encounter had done just that – undergone an "evolution"), gather witnesses, and create a number of hearsay witnesses by repeating her evolved story to them. (*Id.*, at ¶¶ 42, 78). Kozak and Rodocker meticulously interviewed each of these "hearsay" witnesses, including two witnesses who claimed to be Jane Doe's therapists, even though none were able to provide any authentic information, but could only relate what they were told, months after the incident, by Jane Doe. (*Id.*, at ¶¶ 75-78). Conversely, Kozak and Dean Rodocker only interviewed two people for Plaintiff. (*Id.*, at ¶ 75). When Plaintiff asked, following his review of the investigative report, why Kozak and Rodocker had only interviewed two of the witnesses he had given, Kozak said that she and Rodocker had enough facts already. (*Id.*, at ¶ 82).

Plaintiff also pointed out that the investigative report omitted a critical gloss bearing on the ultimate issue of Jane Doe's consent. While it recounted Plaintiff's statement that Jane Doe had told Plaintiff that "I usually don't have sex on the first night," it omitted her additional comment immediately following "but you are a really interesting guy." (*Id.*, at ¶¶ 19-20, 81). Though the word "usually," in this context, clearly implies that she was making an exception with Plaintiff and was consenting to sex with him, the phrase "but you are a really interesting guy" removes any remaining doubt about the issue. In response to Plaintiff's request for its inclusion, though Kozak said she would address it, that portion of Jane Doe's statement was never included into the investigative report. (*Id.*, at ¶¶ 20, 81). This critical example demonstrates the subjective discretion exercised by Kozak and Rodocker in formulating the investigative report. The subjective methods apparently chosen by Kozak and Rodocker rightly call into question the report's accuracy and the extent to which Kozak's previously expressed gender bias colored its formation. The underlying unreliability of the investigative report is demonstrated by Kozak's unconcerned lack of fidelity to the reporting of evidence. For instance, she offered no explanation for omitting the admittedly missing statement from the investigative report, she simply chose to omit it. (*Id.*, at ¶ 20).

Fifth, consistent with her gender bias, Kozak provided Jane Doe an additional opportunity to review and to rebut portions of the investigative report not afforded to Plaintiff. (*Id.*, at ¶ 102). In particular, Jane Doe was permitted to supplement the investigative report, in her additional opportunity to review it, by augmenting her supposed "violent reaction" when she found out that, nine months after the night in question, Plaintiff had, like her, also been approved for a semester abroad in Nepal. (*Id.*, at

¶ 102, at Ex. B, at 8).  Plaintiff had stated that he didn't notice any sort of violent reaction and that she seemed normal.  (*Id.,* at Ex. B, at 8).  W&L gave Jane Doe an opportunity to add, and ultimately approved for inclusion in the report, a footnote rebuttal that "not all physical reactions are on the surface," "[h]er heart was racing," "she experienced anxiety and a sort of paralysis like a panic attack," and "[t]hese symptoms may not necessarily be visible." (*Id.*).  Plaintiff had no such opportunity.  (*Id.*, at ¶ 102).  The investigative team at W&L made sure that Jane Doe had the last word, especially with regard to the only factual record of the case it could control.

Sixth, as also alleged in the Complaint, Kozak pushed an investigation to placate OCR, which had recently issued its guidance designed to increase sanctions in cases of sexual assault and which had increased pressure on Title IX in situations in this regard. (*Id.*, at ¶¶ 133-138).  The Complaint alleges that OCR provided the primary motivation for the involvement of Dean Tammi Simpson who, to obviate any possible OCR review, was employed to try to convince Plaintiff to transfer or withdraw so there would be no SFHB hearing (and thus, nothing for OCR to review). (*Id.*, at ¶¶ 84-88).  In her office, she introduced Plaintiff to his Honor Advocates and then sought to effectively coerce Plaintiff to transfer and told him, that if he just withdrew, his record would be "clean." (*Id.,* at ¶ 84). After Plaintiff refused, Dean Simpson nevertheless made two more attempts to get Plaintiff to withdraw.  (*Id.*, at ¶¶ 87, 88).  One of these attempts was to one of Plaintiff's Honor Advocates, outside of his presence, where she urged him to convince Plaintiff to withdraw. (*Id.,* at ¶ 87).

As alleged in the Complaint, the concerns about OCR – with which, following Plaintiff's refusal to withdraw, W&L now had to contend – led the school to its

next demonstration of gender bias. To ensure that the Student Faculty Hearing Board ("SFHB") panel which would hear the case against Plaintiff consisted of panelists who could influence a finding in favor of Jane Doe, W&L took steps to control the information provided to Plaintiff about the potential panelists. (*Id.*, at ¶¶ 88, 89). When Dean Simpson presented him with a list of potential SFHB panel members, she provided only a list of names and no information about them. (*Id.*). She also afforded Plaintiff no time to investigate the list or to consider the proposed names, but forced Plaintiff to voice any objection on the spot. (*Id.*). Furthermore, W&L critically failed to disclose that Professor David Novack, who became a member of the SFHB panel, had published a series of works, research and studies which, if Plaintiff had been made aware, would have caused him to object to Novack's involvement. (*Id.*, at ¶¶ 92, 93). These include, among others, "The Gender Conundrum and Date Rape: The Potential Significance of Dimensions of Power" and "Rape Nullification in the United States: A Cultural Conspiracy." (*Id.,* at ¶ 93); *see Yusuf*, 35 F.3d at 715 (gender bias is provable by statements of pertinent university officials that tend to show the influence of gender). Ultimately, Novack was on the SFHB panel and was by far the most active participant. (*Id.,* at ¶ 107). Out of concern about possible OCR review, and to limit the factual record of the case to the content of the investigative report it had taken painstaking steps to control, Dean Simpson also denied Plaintiff's multiple requests to record the hearing. (*Id.*, at ¶¶ 103, 111, 118, 119, 120). Lastly, Dean Simpson also denied Plaintiff's requests during the hearing and afterwards for a record of which questions were asked and which were not. (*Id.*, at ¶¶ 119, 120). These decisions composed an effort to ensure that W&L's appeals board, OCR, or any other potential reviewer

(including, as here, a plaintiff's attorney in a follow-on civil litigation) had no meaningful review of the case and its orchestrated result.

The last request for a list of questions asked was made necessary by the heavy-handed control exhibited by W&L over which questions would be permitted at the hearing. (*Id.*, at ¶¶ 105, 110). While sensitivity to complainants of sexual misconduct generally should be respected, wherever possible, the efforts made in this case, out of concern for OCR, prejudiced Plaintiff. Jane Doe was separated by a partition and Plaintiff was unable to ask questions to any of Jane Doe's nine witnesses. (*Id.*, at ¶ 105). W&L also employed a biased lean against the male plaintiff as to which questions would be asked. (*Id.*). At bottom, the SFHB panel refused to ask Jane Doe questions urged by Plaintiff where it determined such questions would cause her distress. (*Id.*, at ¶ 110).

Plaintiff was required to submit written questions on index cards which Dean Simpson would first review for "relevancy" before passing them onto the SFHB panel. (*Id.*, at ¶ 105). Then the questions went through another level of review by the SFHB panel members. (*Id.*). Thus, it was only when questions passed through two gatekeepers – one whose involvement was dedicated to ensuring that W&L did not experience any problems from OCR arising out of the case, and the other whose conduct was unduly influenced by a member, Professor Novack, who had a well-documented bias on the very types of issues presented in the case – that the SFHB panel asked the questions in whatever order or wording they happened to choose. (*Id.*).

Seventh, the Complaint alleges yet more gender bias was demonstrated by W&L when it engaged in impermissible burden shifting. Under the Sexual Misconduct Policy, the "responsibility of obtaining consent rests with the individual who initiates sexual

activity" who then must further "explain the basis for his/her belief that consent existed." (*Id.*, at ¶¶ 100, 108, Ex. A, § VI(A)). Throughout the investigation and hearing Jane Doe consistently confirmed that she was the initiator of sexual activity, (*id.*, at ¶¶ 21, 24, 25, 99, 100, 108, 126, 161, 167, 205), but was never asked to explain her belief that consent existed. (*Id.*, at ¶¶ 100, 108, 110, 167). Rather it was Plaintiff, not Jane Doe, who was vigorously questioned on the basis for *his* belief that consent existed. (*Id.,* at ¶¶ 100, 101, 108-110, 168). W&L's investigators and the SFHB panel allowed their archaic assumption that males consent to sexual activity by virtue of engaging in it to cause them to shift a vital burden of proof on the central issue before them, i.e. whether the encounter between Plaintiff and Jane Doe was consensual.

Additionally, if Jane Doe's theory (which is not quite clear) is that she initially gave consent, but later withdrew it, the SFHB panel was required to hold her to the burden of establishing "outward[] demonstrat[ion] by words or actions that clearly indicate a desire to end sexual activity." (*See id.*, at ¶¶ 98, 167, Ex. A, § IV(A)). This burden too was insufficiently tested by investigators and the SFHB panel. (*Id.,* at ¶¶ 25, 98, 167, 168). Despite Jane Doe's consistent confirmation that she was the initiator, the investigators and SFHB panel treated Plaintiff as if he was the initiator because of his male sex. (*Id.,* at ¶¶ 100, 101, 108-110, 168).

Jane Doe's inconsistent and uncorroborated statements and conveniently spotty recollection went largely untested by the SFHB panel, while, conversely, Plaintiff was faced with hot cross-examination by the more senior professors on the SFHB panel, most particularly Novack. (*Id.*, at ¶¶ 107, 109).

The totality of these demonstrated examples of gender bias, each alleged in the pleading challenged on this motion, warrant denial of the motion at this preliminary stage of the case. Ultimately, and not surprisingly in the face of the various orchestrations shamefully employed by W&L against one of its own students, the SFHB panel issued a bare-bones finding that he was guilty of rape by a preponderance of the evidence without any discussion of the factual findings that came to that decision, only directions of how to appeal. (*Id.,* at ¶ 121). The investigative report and that two sentence decision, was the only written record of the hearing given to Plaintiff. (*Id.*). With an incomplete factual record and a flawed hearing without records of its content, it is of no great surprise that W&L's appeals board affirmed the decision. (*Id.*, at ¶¶ 131, 132). Even then, with the absence of a true reviewable record, one of the Appeals Board members voted in favor of Plaintiff. (*Id.*).

## 2. Pressure from OCR Compelled the Gender Bias Carried Out in Plaintiff's Hearing

Furthermore, as an overarching gender-biased pressure, and as touched on above as the reason for, and motive behind, Dean Simpson's efforts in the case, the proceedings against Plaintiff are properly considered in the context of OCR's recent emergence as a fierce regulator and its open threats to colleges to follow their various guidances or, to lose all federal funding, including federal financial aid.

OCR has issued guidance setting forth its policy for the handling of allegations of sexual misconduct at schools which receive federal funding. (*Id.,* at ¶ 133). The guidance included a Dear Colleague Letter and Questions and Answers (collectively "OCR's Guidance"). (*Id.*). OCR's Guidance reflected OCR's policy preferences, but was never subjected to any administrative rule-making process necessary to give it the force and effect of law. (*Id.*, at ¶ 176 n. 21). The Dear Colleague Letter states "[w]hen a recipient [of

14

federal funding] does not come into compliance voluntarily, OCR may initiate proceedings to withdraw federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." (*Id.*, at ¶ 136). With that threat as a precursor, OCR publicly proceeded to launch investigations into universities to make sure they were compliant with all of OCR's policy preferences. (*Id.*, at ¶ 134).

On May 1, 2014, OCR issued a press release titled "U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations." (*Id.*, at ¶ 136, Ex. L). In it OCR reiterated that "[s]chools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action." (*Id.*).

W&L directly responded to OCR's threats by hiring its Title IX Coordinator, Kozak, and changing their policies on investigating and prosecuting alleged sexual misconduct. (*Id.*, at ¶¶ 134, 135). Announcing her appointment on June 9, 2014, W&L President Ruscio noted "that as many as 60 colleges and universities are currently under investigation by the U.S. Department of Education's Office for Civil Rights for violations under Title IX." (*Id.*, at ¶ 134, Ex. G). President Ruscio further acknowledged the influence of the OCR policy preferences in causing W&L to "undertake a comprehensive assessment of current policies and procedures *in response to the guidance from federal agencies.*" (*Id.*, at ¶135, Ex. G) (emphasis added).

Just one day prior to W&L's November 20, 2014 decision finding Plaintiff responsible for sexual misconduct, Rolling Stone published an article on November 19, 2014, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" describing

the (now debunked) tale of a young female victim of rape at University of Virginia ("UVA"), a Virginia institution located just an hour drive away from W&L. (*Id.*, at ¶ 137).

Less than two weeks after the SFHB panel decided that Plaintiff should be expelled, on December 1, 2014, W&L released "A Time to Examine, Affirm Our Commitments" which responded to the Rolling Stone article. (*Id.*, at ¶ 138).

Consistent with W&L's tactic of denying male-respondents access to any records or potential witnesses through various unnecessarily oppressive confidentiality requirements, W&L continues to deny him access to the information needed to protect his rights. On or about December 13, 2014, W&L held a meeting with every Honor Advocate involved in the investigation and hearing. (*Id.,* at ¶ 146). At this meeting, counsel for W&L advised the Honor Advocates that they were agents of W&L and instructed them not to speak with anyone or to assist in the litigation of this lawsuit in anyway unless the Court ordered them to do so. (*Id.*).

Thus, from start to finish, W&L's actions exhibited a gross gender bias against male students. Every step it took in the case was made in an attempt to keep OCR as far away from this incident as it could. These included numerous "plea" offers, refusing to keep, and meticulously controlling the content of, all reviewable records and, ultimately, wrongfully dismissing the male accused student. Here, "taking all inferences in favor of Plaintiff, as [the Court] is required to do in its consideration of a motion to dismiss, Plaintiff's erroneous outcome theory survives Defendants' challenge" because "Plaintiff's Complaint puts Defendants on adequate notice that he contends that they have had a pattern of decision-making that has ultimately resulted in an alleged false outcome that he was guilty of rape." *See Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014).

### 3. The Complaint Sufficiently Pleads Three Theories of Gender-Based Title IX Discrimination

#### a. Erroneous Outcome

Claims of discrimination predicated on an erroneous outcome theory assert that the party was innocent and wrongly found to have committed the offense. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). To prevail upon an erroneous outcome theory Plaintiff is required to prove that the hearing was flawed due to his gender. *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (citing *Yusuf*, 35 F.3d at 715). John Doe is required "to demonstrate that the conduct of the university in question was motivated by sexual bias." *Mallory v. Ohio Univ.,* 76 F. App'x 634, 638 (6th Cir. 2003), *cert. denied*, 540 U.S. 1052 (2003). Here, the Complaint easily meets this standard.

First, the outcome was wrong. As alleged, Plaintiff did not engage in any non-consensual activity. W&L contends that Plaintiff seeks impermissibly to re-litigate the events of the case. (W&L's Memorandum of Law in Support of its Motion to Dismiss ("W&L's Brief"), at 4). The Complaint, however, does not seek to "re-litigate" the case, rather it simply meets the pleading requirements of the he "erroneous outcome" theory.

> "[T]he pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strength of the defense or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof."

*Yusuf,* 35 F.3d at 715 (a claim that "males invariably lose" when charged with sexual harassment was sufficient to allege a causal connection between the erroneous outcome and gender bias).

Plaintiff's Complaint is replete with allegations of "particular procedural flaws affecting the proof," all originating out of the impermissible gender bias demonstrated by W&L throughout and addressed above. *See Yusuf*, 35 F.3d at 716.

Second, Plaintiff has also established a "motive to lie" and "other reason to doubt the veracity of the charge," (*see id.* at 715), by pleading that Jane Doe abruptly left a party a few nights after they had slept together for the second time after seeing him kissing another girl, (Complaint, at ¶ 36), and only filing the Complaint eight months afterwards once she learned that she and Plaintiff would be on the same trip to Nepal. (*Id.*, at ¶¶ 43-46). Additionally, Plaintiff has established "other reason to doubt the veracity of the charge," (*see Yusuf*, 35 F.2d at 715), because Jane Doe admits that, except for intercourse on the first night, all sexual activity on both nights was consensual, including pre and post-coital sexual activity on the first night, (Complaint, at ¶ 27), and all sexual activity on the second night. (*Id.*, at ¶ 34). At the hearing, Jane Doe also gave contradictory testimony, at one point describing Plaintiff as having been disrespectful, dishonorable, and having treated her as though she was worthless, and then later saying that she had a great connection with Plaintiff and that he was smart, interesting, sweet, and genuinely interested in her. (Complaint, at ¶ 106). These allegations cast doubt as to the accuracy of the outcome of the disciplinary proceeding. *See Sahm v. Miami Univ.*, No. 1:14-cv-698, 2015 U.S. Dist. LEXIS 1404, at *11 (S.D. Ohio Jan. 7, 2015) ("[t]he Court easily concludes that [Plaintiff] has pleaded sufficient allegations of a flawed process to cast doubt on the accuracy of the disciplinary proceedings").

The facts alleged in the Complaint give rise to the inference that W&L, in an effort to dissuade OCR from investigating it, have discriminated against Plaintiff because of

his gender and wrongfully expelled him. While there is no controlling case law in this circuit, the Southern District of Ohio upheld a claim that a male student was deprived of a fair proceeding on the basis of his gender where it alleged that the school sought to demonstrate to OCR that it would take action, as it had failed in the past, against males accused of sexual misconduct. *Wells*, 7 F. Supp. 2d at 751.

 *Wells* correctly distinguishes itself from cases cited by W&L finding that the *Wells* Complaint contained "additional allegations . . . absent" from the other cases. 7 F. Supp. 3d at 752 (distinguishing *Doe v. Univ. of the South*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009) (cited in W&L's Brief, at 4, 5, 12, 13). Here too, Plaintiff's Complaint contains those sorts of "additional allegations" contained in *Wells*. *See id.* These included, as discussed above, W&L's acknowledged concern about, and response to, OCR's Guidance, its rushed and tightly controlled proceeding against Plaintiff designed to produce the perceived correct result in favor of Jane Doe without leaving any meaningful record for review, and Dean Simpson's repeated urging that Plaintiff just withdraw to obviate any OCR involvement.[2]

---

[2] W&L cites to *Haley v. Virginia Commonwealth Univ.*, 948 F. Supp. 573 (E.D. Va. 1996). (W&L's Brief, at 6). *Haley* though, survived a motion to dismiss and highlights W&L's fatal reliance on resolutions of issues of fact. 948 F. Supp. at 577. Further, the *Haley* Plaintiff's theory of discrimination was that the handbook lists four examples of men harassing females and only one of females harassing men. *See id.* at 579. This is significantly weaker than here, where Plaintiff has alleged discriminatory statements, violations of W&L's written policy including impermissible burden-shifting and the looming presence of, and pressure from, OCR. For similar reasons, W&L's reliance on *King v. Depauw Univ.* is misplaced. No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014); (cited in W&L's Brief, at 6, 7, 12, 14). In that case, the gender-bias theory lacked the case-specific allegations present here and, made in the context of a preliminary injunction motion, was subjected to a higher standard of proof.

19

### b.     Archaic Assumptions

In the course of proceeding to Plaintiff's expulsion from the school, W&L demonstrated yet further gender-based discrimination through its shifting of a burden of proof established by its own written procedures. This impermissible burden shifting was caused by its actionable and archaic assumption that males, by physically engaging in sexual intercourse, must have consented to it.

"Title IX claims against universities arising from disciplinary hearings are analyzed under the . . . archaic assumptions standard." *Sterret v. Cowan*, No. 14-cv-11619, 2015 U.S. Dist. LEXIS 13056, at *40 (E.D. Mich. Feb. 4, 2015) (citing *Mallory v. Ohio Univ*, 76 F. App'x 634, 638 (6th Cir. 2013), *cert. denied*, 540 U.S. 1052 (2003)); *see also Bleiler v. Coll. of the Holy Cross*, No. 11-11541, 2013 U.S. Dist. LEXIS 127775, at *16 (D. Mass. Aug. 26, 2013) (applying archaic assumption theory); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (same).

A Plaintiff has the burden "to show that a university's discriminatory actions resulted from 'classifications based upon archaic assumptions.'" *Sterret*, 2015 U.S. Dist. LEXIS 13056, at *40 (quoting *Mallory*, 76 F. App'x at 638); *see also Pederson v. La. State Univ.*, 213 F.3d 858, 881 (5th Cir. 2000) ("[w]ell-established Supreme Court precedent demonstrates that archaic assumptions such as those firmly held by LSU constitute intentional gender discrimination. We conclude that, because classifications based on 'archaic' assumptions are facially discriminatory, actions resulting from an application of these attitudes constitutes intentional discrimination.") (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding that Virginia Military Institute's male-only policy violated the Constitution's equal protection guarantee)).

20

W&L's rules are clear, it is the initiator of sexual activity who bears "responsibility of obtaining consent," (Complaint, at ¶ 100, Ex. A, § VI(A)), and to "explain the basis for his/her belief that consent existed." (*Id.*, at ¶ 108, Ex. A § VI(A)). Though Jane Doe acknowledged that she was the initiator of sexual activity with Plaintiff on the night in question, (*id.*, at ¶¶ 21, 24, 25, 99, 100, 108, 126, 161, 167, 205), W&L operated under an archaic assumption that Plaintiff, as a male, had consented to sexual activity since he had physically engaged in it. Most prejudicially, W&L flipped the burden in the process and required Plaintiff to articulate the basis for his belief that Jane Doe had consented. (*Id.,* at ¶¶ 100, 101, 108-110, 168). When he answered he was met with hot cross-examination. (*Id.*); *see, e.g.*, *Pederson*, 213 F.3d at 57, 60-61 (holding the existence of paternalistic and stereotypical assumptions to be "facially discriminatory, and actions resulting from an application of these attitudes constitutes intentional discrimination").

The SFHB panel, for the same reasons, failed to hold Jane Doe to her burden of proving that she "outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity." (*See* Complaint, at ¶¶ 25, 98, 167, 168, Ex. A, § IV(A)); *see, e.g.*, *Pederson*, 213 F.3d at 57, 60-61. Accordingly, the record – or non-record as the case may be in light of W&L's refusal to record the proceedings in any fashion – never included any portion demonstrating corroboration of her simple statement that she wished to end the sexual activity she initiated. In any event, where, as here, the case presents, at best, a "he said/she said" scenario, the inferences must lie with and favor Plaintiff on a motion to dismiss whose allegations must be assumed true.

### c.     Deliberate Indifference

Plaintiff is required to plead that "an official of the institution who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct, in this case the alleged defective hearing" and investigation. *See Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014).

W&L officials were aware of the misconduct here and have been taking an active, and public, stance against sexual misconduct. The biased procedures and hearing which led to the wrongful SFHB panel finding could have been rehabilitated by W&L officials during the appeal. (Complaint, at ¶¶ 129-132). W&L's consistent press postings, including the "A Time to Examine, Affirm Our Commitments" press release less than two weeks after Plaintiff's expulsion, (Complaint, at ¶ 138, Ex. M), evidence W&L officials' interest in the matter and "there is no question that Defendants were on notice of Plaintiff's situation." *See Wells*, 7 F. Supp. 3d at 752. The failure to correct the misconduct amounts to a deliberate indifference to the rights due to Plaintiff.

### 4.     W&L Violated the Requirement That It Supply an Equitable Resolution

W&L further contends that it is not subject to constitutional due process provisions, contract law, or Title IX without a showing of gender bias. First, for all the reasons already discussed, the Complaint is filled with allegations of gender bias. Second, moreover, the notion that W&L can make incorrect or unfair decisions without review disregards the "equitable resolution" provision in 34 CFR § 106.8(b).

Non-gender-based "equitable resolution" claims are actionable under Title IX. *See Bleiler v. Coll. of the Holy Cross*, No. 11-11541, 2013 U.S. Dist. LEXIS 127775, at *14 (D. Mass. Aug. 26, 2013). Plaintiffs seeking relief under an "equitable resolution" claim are

required to plead that (1) "the College was [not] in compliance with [OCR]'s guidance;" (2) the College was [not] in compliance with its own policies;" or (3) "the College acted arbitrarily or capriciously." *See id.*

Here, W&L failed to follow its own policy as set forth in its Student Handbook and Sexual Misconduct Policy, including the failure to provide Plaintiff: (a) with sufficiently trained and experienced persons involved in the disciplinary process; (Complaint, at Ex. A, §§, XI(E), XI(F)); (*id.*, at ¶¶ 57, 62, 154, 163, 165, 208); (b) an impartial investigation and hearing (*id.*, at Ex. A, §§ XI(E)); (*id., at passim*); (c) an impartial SFHB panel; (*id.*, at § (XI)(F)); (*id.*, at ¶¶ 92, 93, 107); (d) an impartial investigative team free of any conflict of interest; (*id.*, at Ex. A, § XI(E)); (*id.*, at ¶¶ 57, 60); (e) an investigative team who has specific training and experience investigating allegations of sexual misconduct; (*id.*, at Ex. A, at § XI(E)); (*id.*, at ¶¶ 57, 163); (f) a meaningful opportunity to object to the composition of the hearing panel; (*id., at Ex. A, § XI (F)(1)); (*id., at ¶¶ 88-93, 163); (g) to keep adequate record of the investigation and hearing; (*id.*, at Ex. A, §§ IX(E), IX(H)(7)); (*id.*, at ¶¶ 103, 111, 118, 119, 120, 163); and (h) a meaningful appeals process. (*Id.*, at Ex. A, § IX(H)); (*id.*, at ¶¶ 130, 131, 163). Each was violated here by W&L.

Moreover, W&L failed to follow OCR's Guidance. Those failures include: (a) "the opportunity for both parties to present witnesses and other evidence;" (*id.*, at Ex. J, at 9); (*id.*, at ¶¶ 56, 74, 75, 82, 86, 96, 98, 133-136, 164) (b) "equal opportunity to present relevant witnesses and other evidence;" (*id.*, at Ex. J, at 11); (*id.*, at ¶¶ 56, 74, 75, 82, 86, 96, 98, 133-136, 164) (c) maintenance of "documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings;" (*id.*, at Ex. J, at 12); (*id.*, at ¶¶ 103, 111, 118-120, 131, 133-136, 164) (d) "[a]ll persons involved in implementing a

recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipients grievance procedures . . . [i]n sexual violence cases, the fact-finder and decisionmaker also should have adequate training or knowledge regarding sexual violence;" (*id.*, at Ex. J, at 12); (*id.*, at ¶¶ 53-55, 57, 61, 62, 133-136, 164) and (e) "a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed." (*Id.*, at Ex. J, at 12); (*id.*, at ¶¶ 47-50, 53-55, 81, 92-93, 115-117, 133-136, 164).

Last, W&L's process and decision was "arbitrary and capricious." It denied Plaintiff a meaningful ability to defend himself or prepare for his defense, and, despite the utter lack of evidence against him, made a life-altering finding and expelled him in less than a month from when he was first notified of the allegation.

### 5. W&L Deprived Plaintiff of Fundamental Due Process, Not Merely an Administrative Requirement

W&L next contends that its violations of OCR's Guidance do not constitute discrimination. (W&L's Brief, at 13). Specifically, it reasons that to the extent such rules establish administrative requirements their violation does not yield to any private right of action to recover damages. (*Id.*). Yet, it is not violations of OCR's Guidance that constitute the discrimination achieved here, it is the systematic, outcome driven process which did so. W&L's straw-man argument thus overlooks the Complaint's clear allegations that Plaintiff was denied fundamental procedural protections to ensure an unbiased procedure. These assertions firmly establish that the rules violated by W&L do not set up mere administrative requirements, but rather go to the heart and substance of fairness due an accused. *Cf. Gebser*

24

*v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) (declining to extend the implied right of action under Title IX to a school's failure to publish and disseminate a policy and grievance procedure or other "sorts of administrative requirements"); *Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816 (C.D. Ill. 2008) (same)).

W&L's response to this argument is to portray Plaintiff's Complaint to be like that in *Doe v. Univ. of the South* in which the misconduct at issue was "the University's alleged failure to comply with Title IX regulations." 687 F. Supp.2d 744, 758 (E.D. Tenn. 2009) (cited in W&L's Brief, at 4, 5, 12, 13). For such claims, which are violations of mere administrative requirements, no private right of action exists. However, as the Complaint alleges, Plaintiff's claims are predicated on much more than W&L's violation of mere administrative requirements. Here, Plaintiff was directly discriminated against and denied his rights to due process and fundamental fairness by the direct actions of the officials within the University. That this occurred in part through violations of OCR's Guidance should not provide W&L with a technical way of avoiding the harm it has caused.

At the barest minimum, the cases W&L cites in support of its position, (which decisions were made on a full record at the summary judgment stage), hold that it is the absence of causation between the failure to follow OCR's Guidance and the alleged harm which W&L insists warrants dismissal in this case. *See Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325 (M.D. Ga. 2007) (summary judgment); *Roe v. St. Louis Univ.*, 746 F.3d 874 (8th Cir. 2014) (summary judgment). In contrast, the causal relationship between W&L's violations and Plaintiff's substantial harm is clearly pleaded.

**C.** **Plaintiff Has Sufficiently Alleged the Existence of Governmental Action to Ground Constitutional Claims**

Plaintiff further contends that the OCR, through both OCR's Guidance and its threats of both withdrawing federal funding and subjecting institutions to costly and intrusive investigations, overwhelmed and compelled W&L to such a degree as to supply the necessary element of state action to the constitutional due process violations suffered by Plaintiff. (Complaint, at ¶¶ 133, 134, 135, 136, 137, 138, 169, 181, 189, 191, 192).

The U.S. Supreme Court has set forth three tests for determining when a private university may be deemed a state actor: the "state compulsion" test, the "nexus/joint action" test, and the "public function" test. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Under the state compulsion test, the Government must have exercised either coercive power or significant overt or covert encouragement of a private party that the conduct is legally deemed to be the Government's. *Id.* Here, Plaintiff has alleged the exercise of coercive power. (*See* Complaint, at ¶¶ 133-138, 189-194). On a motion to dismiss, for a factual inquiry of this nature, the allegation is enough. *See Reguli v. Guffee*, 371 F. App'x 590, 601 (6th Cir. 2010) (holding "a plaintiff must allege and prove that state officials coerced or participated in [the coerced entity's] decision-making"). Furthermore, only discovery will reveal the extent to which the Government exercised overt encouragement, and the fact that "covert" encouragement also suffices under the legal compulsion test to determine state action means that, by its self-definition, that encouragement may be known only to the Government, and Plaintiff would have to be permitted subpoena power to develop the factual record fully. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000) (noting that a state action determination is fact specific and depends on an "examination of all the relevant circumstances") (citing

*Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 614-15 (1989)). Indeed, W&L's reference to cases in which courts have "found" no state action - *Klunder v. Brown Univ.*, 778 F.3d 24 (1st Cir. 2015*); Hernandez v. Universidad Metropolitana*, 233 F.3d 49 (1st Cir. 2000); *Althiabat v. Howard Univ.*, No. 13-788, 2014 U.S. Dist. LEXIS 177119 (D.D.C. Dec. 24, 2014); and *Jansen v. Emory Univ.*, 440 F. Supp. 1060 (N.D. Ga. 1977) - were all decided on motions for summary judgment on a full factual record.[3]  These cases, on which W&L principally relies, are thus inapposite to the current posture of the case.  Accordingly, the motion to dismiss Plaintiff's due process claim should be denied.

The close nexus test is a fact-specific inquiry as well.  *See, e.g., Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) ("the inquiry is fact-specific"); *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 234 (3d Cir. 2002) (en banc) (noting that "the facts are crucial").  Under this test, the actions of a private entity are attributable to the State if "there is a sufficiently close nexus between the State and the challenged action of the entity so that the action of the latter may be fairly treated as that of the State itself."  *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351 (1974).  The state's "[m]ere approval of or acquiescence in the initiatives" of a private entity is not enough, (*see S.F. Arts & Athletics, Inc. v. United*

---

[3] W&L also cites to a host of cases in support of legal points that do not bear on the relevant allegations.  While it is noteworthy that those fact-specific cases were decided on a full record at the summary judgment stage, the contention that private universities are not subjected to the demands of constitutional due process, or that acceptance of federal funding alone is not sufficient to establish a private institution as a state actor, (W&L's Brief, at 16-18), is not germane to the Complaint's assertions that W&L is bound to that constitutional standard by virtue of its being a state or government actor under the factual circumstances alleged in the Complaint.  Indeed, it is the particular circumstances presented by OCR's aggressive threatening which govern the inquiry; it is nonsense, in this context, for W&L to warn that Plaintiff's argument calls for a ruling that would turn "almost every private university in the United States into a public institution."  (W&L's Brief, at 20).  In any event, Defendant's case authority is ineffective for the purpose of dismissing the issues under consideration here.

*States Olympic Comm.*, 483 U.S. 522 (1987)), nor is when an entity is merely subject to governmental regulation. *Jackson*, 419 U.S. at 350 n.7. Rather, "[t]he purpose of the [close nexus requirement] is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004. Thus, state action is found when "the Government d[oes] more than adopt a passive position toward the underlying private conduct" and when it "ma[k]e[s] plain not only its strong preference for [the private conduct], but also its desire to share the fruits of such intrusions." *Skinner*, 489 U.S. at 615.

The allegations of the Complaint plead precisely that. The OCR compelled W&L to adopt OCR's Guidance in order that it might cause greater enforcement of complaints of sexual misconduct on campus. (Complaint, at ¶ 133-138, Ex. M) (W&L's president acknowledging that new federal guidance dictated how W&L "must" deal with sexual misconduct cases). OCR caused this, among other ways, by issuing to schools that did not address "problems identified by OCR" express threats to withhold from them federal funding, to subject them to investigation by OCR, or to refer them to the Department of Justice for further civil or criminal action. (*Id.*, at ¶¶ 134-136).

The Government's employment of fulsome coercive power is thus alleged. The Complaint's allegations are also sufficient to establish for pleading purposes, among other factors needed to demonstrate state action, the requisite "significant encouragement" of W&L by the Government and W&L's willful joining as a participant in joint activity with OCR. *See Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005) (finding a "nexus of state action exists between a private entity and the state when the state exercises coercive power, is entwined in the management or control of the private actor, or provides

the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies"); *Blum*, 457 U.S. at 1004.

Furthermore, while it has been said that "Constitutional concerns are greatest when the State attempts to impose its will by force of law . . . ," (*see Maher v. Roe*, 432 U.S. 464, 476 (1977)), those concerns are no less (and indeed might be even greater) where, as here, the Government attempts to impose its will in the form of policy preferences. After all, OCR's Guidance was not a regulation with the force and effect of law such that W&L could attempt to justify its conduct as reflecting its compliance with law. Rather, W&L succumbed to the threats issued by OCR on this political policy issue. *See United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (affirming finding of state action where the Government overwhelmingly influenced a private entity to join in participation with its policy of restricting the advancement of legal fees to individual employees charged with crimes). Finally, OCR not only made clear its preferences but, with its coercions, also realized its desire to garner the political benefits from being perceived as the champion for female student victims and thereby to "share the fruits of such intrusions." *Skinner*, 489 U.S. at 615; *accord Stein*, 541 F.3d at 147.

For these reasons, W&L misplaces its reliance on cases that federal funding and government regulation is insufficient, "alone or together," to create a "symbiotic relationship sufficient to create state action." (W&L's Brief, at 18-19 (quoting *Brogan v. La Salle Univ.*, 70 F. Supp. 2d 556, 569 (E.D. Pa. 1999)). OCR's Guidance was not a government regulation, and the state action arguments do not rest on simplistic arguments

that the Government origin of both funding and regulation makes the governed recipients state actors. The pertinent decisional authority emphasizes the fact-specific nature of the inquiry into issues of state action. For the reasons given, the particular coercion brought to bear by OCR to enforce its policies – which, whether for purposes political or otherwise, were gender based – created precisely the sort of overwhelming compulsion needed to establish state action in this circumstance.[4]

## D.     The Complaint Sufficiently Pleads a Contract between Plaintiff and W&L

Contrary to W&L's argument that no enforceable contract existed between the parties to ground liability against it for its breaches, a contract did exist between the parties. There can be no dispute that W&L distributed to its student body its 48-page Sexual Misconduct Policy which it expressly stated established binding procedures and otherwise governed the relationship between W&L and its students regarding alleged sexual misconduct. (Complaint, at Ex. A). Upon introducing the Sexual Misconduct Policy, W&L's President urged students to "examine" the policy because it defined the rules that would be enforced regarding cases of alleged sexual misconduct. (*Id.*, at Ex. G, at 1). Thus, at a minimum, the Sexual Misconduct Policy constituted an implied-in-fact contract

---

[4] The third test for finding state action – the "public function" test – warrants a finding of state action where a private party performs a public function that has traditionally been supplied by the State. While the heart of Plaintiff's allegations bear on the other two tests for state action discussed above, we note that the governing Sexual Misconduct Policy was amended to comply with OCR's Guidance in a manner that expanded the jurisdiction of W&L over incidents of possible sexual misconduct committed by its students. The Sexual Misconduct Policy now subjects students to discipline for sexual misconduct committed outside W&L, including anywhere in the world. (Complaint, at Ex. A, § II). In such cases, the school extended its care and attention to non-W&L complainants, offering to allow them to bring an advisor from their own "community," wherever that might be. (*Id.*). In so doing, W&L has usurped yet more of the traditional role of law enforcement and the courts, now serving as adjudicator of incidents over which its jurisdiction is ever more tenuous, all in an attempt to avoid the backlash of OCR's overt concern over the treatment of women on college campuses.

between W&L and Plaintiff as one of its students. An implied-in-fact contract is "an agreement founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Commonwealth v. Stewart*, 66 Va. Cir. 135, 144 (Va. Cir. Ct. 2004). "Where an express contract is not made, but might have been, or in equity and good conscience should have been made, the law will impose the duty and infer the necessary promises to effect a contractual relationship between the parties." *Virginia Block Co. v. Virginia Mut. Ins. Agency, Inc.*, 16 B.R. 771 (W.D. Va. Bankr. 1982). Plaintiff's Complaint alleges the existence of such a contract. (Complaint, at ¶¶ 203-204).

W&L's reliance on *Brown v. Rector & Visitors of the Univ. of Va.* does not establish the contrary. No. 3:07-cv-00030, 2008 U.S. Dist. LEXIS 36427 (W.D. Va. May 2, 2008) W&L seeks to connect the Sexual Misconduct Policy with the school's Student Handbook which contains a disclaimer of contract, the existence of which the Court in *Brown* held defeated any claim that a contract existed. *See Brown*, 2008 U.S. Dist. LEXIS 36427, at *17 ("the Graduate Student Handbook clearly states that it is subject to the requirements of the University's Graduate Record, and the Graduate Record explicitly disclaims that it is not to be construed as a contract between the student and the university"). W&L's arguments, however, are misplaced because the requisite connection between the Sexual Misconduct Policy and the Student Handbook is lacking. First, W&L's bare assertion that the disclaimer contained in the W&L Student Handbook is incorporated by reference in the Sexual Misconduct Policy is simply inaccurate. Second, the Student Handbook in fact expressly carves out of its purview "Prohibited Discrimination, Harassment, Sexual Misconduct and Retaliation." (Complaint, at Ex. H, at 22). Those

carved-out areas of student governance are covered by the Sexual Misconduct Policy. In fact, the Student Handbook itself even expresses that the carved-out areas are "described and addressed in the *separate* Interim Sexual Harassment and Misconduct Policy." (*Id.*) (emphasis added). In these circumstances, the holding in *Brown* speaks to a different factual situation.[5]

Having published the procedural rules in its Sexual Misconduct Policy and then made them available to the entire student body, W&L has established the rules and standards which students could fairly expect to be applied. W&L's breaches of these established rules, pleaded extensively in the Complaint, resulted in a finding of rape against Plaintiff. (*Id.*, at *passim*). The Complaint plainly alleges that W&L's deviation from these rules and procedures is a breach of contract. (*See id.*, at ¶¶ 202-214).

W&L next argues that that no contract can exist between a university and a student. (W&L's Brief., at 20-22). In support, W&L cites to cases addressing academic issues and disciplinary issues far less severe than an allegation of rape. For instance, those cases concern: (1) a penalty imposed against a student who failed a candidacy exam for a

---

[5] There are yet further differences in *Brown* worth mentioning. As noted in the appellate decision in *Brown*, in contradistinction to the facts in this case, the contract claim was based on mere conclusory allegations of the existence of a contract and was, additionally, undermined by the language of the documents at issue. *Brown v. Rector & Visitors of the Univ. of Va.*, 360 F. App'x. 531, 534 (4th Cir. 2010) ("[t]he district court did not err because Brown's complaint contained only conclusory allegations that the Graduate Student Handbook constituted a contract between himself and UVA, and that assertion was unsupported by the terms of the Handbook and expressly contradicted by the Graduate Record incorporated there"). Here, Plaintiff's factual allegations include, among others, the clear terms of the Sexual Misconduct Policy, the absence of any disclaimer and the significant steps taken by W&L to elevate the importance of its new Sexual Misconduct Policy in response to federal regulators and to its students.

graduate program and failed to timely submit a thesis,[6] (2) a student unable to withdraw from a class he had failed,[7] (3) a student who falsely claimed discrimination on law school faculty evaluation forms,[8] (4) a student expelled for failing to satisfy the school's academic process,[9] and (5) the firing of an at-will employee.[10] These cases, however, are simply not appropriate to the facts presented here. The ramifications of a finding of sexual misconduct in the nature of rape are stark and far-reaching. *See, e.g., Gomes v. Univ. of Maine*, 365 F. Supp.2d 6, at *19 (D. Me. 2004) (holding a sexual assault charge against a student could have a "major immediate and life-long impact on [student's] personal life, education, employment and public engagement") (citing *Goss v. Lopez*, 419 U.S. 565, 575 (1975)). In these circumstances, especially where the charges are unsubstantiated by anything other than the say-so of the Complainant, Plaintiff must, at a minimum, have the ability to rely on the university's own established policies for addressing such a claim.

Plaintiff's payment of tuition, moreover, provides the mutuality by which W&L's deviation from its own rules and procedures is actionable. Even so, courts have recognized that in certain situations the general principle that Virginia Law requires absolutely mutuality of engagement has been necessarily limited in the interests of justice. *See, e.g., Thompson v. American Motor Inns, Inc.*, 623 F. Supp. 409 (W.D. Va. 1985). For

---

[6] *See Brown*, 2008 U.S. Dist. LEXIS 36427.

[7] *See Davis v. George Mason Univ.*, 395 F. Supp. 2d 331 (E.D. Va. 2005).

[8] *See Truell v. Regent Univ. School of Law*, No. 2:04-cv-716, 2006 U.S. Dist. LEXIS 54294 (E.D. Va. July 21, 2006).

[9] *See Abbas v. Woleben*, No. 3:13-cv-147, 2013 U.S. Dist. LEXIS 134446 (E.D. Va. Sept. 19, 2013).

[10] *See Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446 (4th Cir. 2004)

instance, this Court has previously held that when an employer goes beyond merely agreeing not to fire an employee without cause, but sets forth specific provisions that govern a termination they create a binding agreement with an employee. *Id.* at 416-17. Here, Plaintiff has alleged specific provisions governing alleged sexual misconduct and penalties that W&L disregarded to his detriment. (Complaint, at *passim.*) At a minimum, by promising to offer fair treatment in the adjudication of complaints lodged under the Sexual Misconduct Policy, W&L has created an implied unilateral contract.

Virginia courts have further held that when plaintiffs "specifically allege that their terminations were in direct violation of practices and policies set forth in Defendant's Employee Policy Manual, a factual issue, not addressable by demurrer, is present." *Byer v. Virginia Elec. & Power Co.*, 11 Va. Cir. 171, 180 (Va. Cir. Ct. 1988) (internal quotation omitted). Moreover, then, to the extent that W&L argues that it is not contractually obligated to the statements made in the Sexual Misconduct Policy because the promises set forth therein are not mutual, it fails to recognize that "mutual obligation is not required when there is a binding and enforceable unilateral agreement." *Thompson*, 623 F. Supp. at 416-417; *Byer*, 11 Va. Cir at 180. There is just such an agreement here. *See also Larkman v. Dynalectron Corp.*, No. 86-3172, 1987 U.S. App. LEXIS 18728, at *5 (4th Cir. Oct. 7, 1987) ("relinquishment of right to terminate an employee at will may, in some circumstances, be implied from an employer's policy statement or handbook").

Additionally, Courts have widely recognized that universities operate under an implied-in-fact contract with its students. "It is held generally in the United States that the 'basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made

available to the matriculant become a part of the contract.'" *Ross v. Creighton*, 957 F.2d 410 (7th Cir. 1992) (quoting *Zumbrun v. Univ. of Southern California*, 25 Cal. App. 3d 1, 101 Cal Rptr. 499, 504 (Cal. Ct. App. 1972)). This has been held in the Fourth Circuit. *See McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887 (M.D.N.C. 2011) (allowed breach of contract claim when disciplinary procedures not followed by University), *rev'd in part, aff'd in part, sub nom. Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012). This is true both of private and public institutions. *See, e.g.*, *Peretti v. State of Montana*, 464 F. Supp. 784, 786 (D. Mont. 1979), *rev'd on other grounds*, 661 F.2d 756 (9th Cir. 1981) ("[t]here seems to be almost no dissent from the proposition that the relationship is contractual in nature." "Since a formal contract is rarely prepared, the general nature and terms of the agreement [between a student and university] are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication"); *Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1998); *Havlik v. Johnson & Wales Univ.*, 490 F. Supp. 250 (D. R.I. 2007), *aff'd*, 509 F.2d 25 (1st Cir. 2007)(holding a student's relationship to a University is based in contract law); *Kloth-Zanard v. Ambridge Univ.*, No. 3:09-cv-606, 2012 U.S. Dist. LEXIS 87560 (D. Conn. June 22, 2012); *Giles v. Howard Univ.*, 428 F. Supp. 603 (D. D.C. 1977) (treating an academic Student Promotions Policy as a contract); *Atria v. Vanderbilt*, 142 F. App'x 246 (6th Cir. 2005) (holding a jury could find harm to plaintiff and breach based on implementation of sexual assault policy).

W&L argues that, even if it had entered into an enforceable contract, Plaintiff has failed to allege sufficient facts to show a breach of that agreement. On its face, W&L's argument raises multiple issues of fact. Moreover, the cases cited by W&L acknowledge that contracts between students and universities can be implied in the appropriate

circumstances and thus support Plaintiff's point. *See Ruegsegger v. Bd of Regents of Western New Mexico Univ.,* 141 N.M. 306 (N.M. Ct. App. 2006); *Mosby-Nickens v. Howard Univ.,* 864 F. Supp. 2d 93 (D.D.C. 2012). Additionally, recent litigation in the district holding that Student Handbooks are contractual documents render inapposite *Giuliani v. Duke Univ.,* No. 1:08-cv-502, 2009 U.S. Dist. LEXIS 44412 (M.D.N.C. May 19, 2009). *See McFadyen*, 786 F. Supp. 2d at 983 (permitting, as here, breach of contract claim against university to proceed past a motion to dismiss on allegations that the university failed to follow "promised procedures in the disciplinary process"). *Cook v. Talladega Coll.* is unhelpful to W&L because, unlike here, that plaintiff was unable to articulate how the defendant university had violated the terms of a Student Handbook and thus could not establish a breach. 908 F. Supp. 2d 1214 (N.D. Ala. 2012). Finally, *Gerald v. Locksley*, while arguably supportive, deals with a dispute between employees and is therefore sufficiently different and removed from the issues presented here so as to be inapplicable. 785 F. Supp. 2d 1074 (D.N.M. 2011).

Defendant further argues that W&L procedures "meet and exceed traditional notions of fundamental fairness." (W&L Brief, at 24-25). Nevertheless, their arguments all fly in the face of the Complaint's allegations, which are accepted as true on this motion, and are further uniformly predicated on cases decided on a full record on summary judgment. Additionally, by way of example, W&L argues that *Gomes* precludes admission of complainant's prior sexual history. (W&L's Brief, at 24). Yet, Plaintiff properly pleaded that the failure to admit *subsequent* sexual history of the complainant with Plaintiff himself was a procedural defect. (Complaint at ¶¶ 127-128). Furthermore, while W&L cites *Yu v. Vassar Coll.*, No. 13-cv-4373, 2015 U.S. Dist. LEXIS 43253 (S.D.N.Y. March 31, 2015),

*Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987) and *Craig v. Selma School Bd.*, 801 F. Supp. 585 (S.D. Ala. 1992) for the premise that direct cross-examination is not a right in student hearings, (W&L's Brief, at 24-25), Plaintiff's allegations are that he was denied the barest effective cross examination in this hearing owing to the paucity of questions presented by the moderator and the moderator's choice not to follow up. ( Complaint at ¶¶ 105-106, 110). This presents an issue of fact relating to Plaintiff's particular hearing. Each of W&L's additional procedural contentions, including the efficacy of pre-hearing discovery, use of a partition, representation by counsel, entitlement to an explanation of a panel's reasoning and appeal, are either not in contention or are fact specific and therefore inappropriate to consider on a motion to dismiss.

Fundamentally, the existence of an implied contract is a question of fact. *See, e.g.*, *Assoc. Aluminum Prods. v. Elvira-Menez*, No. 2301-13-2, 2014 Va. App. LEXIS 317, at *7-8 (Va. Ct. App. Sep. 16, 2014) ("whether an implied contract exists is a question of fact"); *Barger v. General Electric. Co.*, 599 F. Supp. 1154, 1164 (W.D. Va. 1984) ("[t]he existence *vel*

*non* of a contract and the terms thereof are triable issues of fact"). Plaintiff's Complaint has aptly pleaded the existence of a contract between Plaintiff and W&L.[11]

### *Conclusion*

For the reasons given, Defendant W&L's motion to dismiss should be denied.

Dated:      New York, New York
             April 28, 2015

/s/    G. Robert Gage, Jr.
G. Robert Gage, Jr. (NY Bar No. 1901412)
Joseph B. Evans (NY Bar No. 5221775)
Gage Spencer & Fleming LLP
410 Park Avenue, Suite 900
New York, New York 10022
Tel:    (212) 768-4900
Fax:    (212) 768-3629
grgage@gagespencer.com
jevans@gagespencer.com

(Admitted *Pro Hac Vice*)

---

[11] Finally, W&L argues that Plaintiff's Declaratory Judgment claim must be dismissed. Its argument is predicated on the dismissal of all other claims. Yet, its case support actually holds to the contrary, saying that because the motion to dismiss the other claims has been denied, the motion to dismiss the Declaratory Judgment claim will also be denied as a consequence. *1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc.*, 235 F. Supp. 2d 458, 464 (D. Md. 2002) ("Defendant argues that Plaintiff has failed to articulate any basis for such declaratory judgment because, Defendant alleges, Plaintiff has failed to state a claim under either [Count I] or [Count II]. Because the court will deny Defendant's motion to dismiss for failure to state a claim with respect to Counts I or II, Defendant's motion to dismiss Count III [Declaratory Judgment] will also be denied"). Furthermore, the Declaratory Judgment statute on which the claim is based states, in relevant part, that a court may "declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought.*" *See* 28 U.S.C. § 2201 (emphasis added). In these circumstances, W&L's argument is meritless and its motion should be denied.

/s/ _____

David G. Harrison (VSB 17590)
The Harrison Firm, PC
5305 Medmont Circle, SW
Roanoke, VA 24018-1120
Tel:    (540) 777-7100
Fax:    (540) 777-7101
david@harrisonfirm.us

*Attorneys for Plaintiff John Doe*

*Certificate of Service*

I, G. Robert Gage, Jr., certify that on April 28, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to W&L by electronically serving his counsel of record, and also by electronic mail.

/s/     G. Robert Gage, Jr.