IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

JOHN DOE,
    Plaintiff,

v.                                      Case No.:  6:14-cv-00052-NKM

WASHINGTON AND LEE UNIVERSITY,
    Defendant.

## DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

As an initial matter, Defendant strenuously objects to the length of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss. Blatantly disregarding this Court's pretrial order, and without first obtaining leave of court as required, Plaintiff's brief totals thirty-nine (39) pages, which nearly doubles the limit set by the Court. (See Pretrial Order [ECF No. 27] at ¶ 8 ("[A] brief may not exceed 25 pages in length . . . unless the filing party first obtains leave of court after showing good cause why a longer brief is necessary.")). Given the obvious prejudice to Defendant—which took great caution to limit its initial brief to the twenty-five (25) pages allowed—Defendant asks this Court to strictly enforce its pretrial order and to disregard any portions of or arguments in Plaintiff's brief on the pages that exceed the clear page limits set by the Court. Without waiving its objection, Defendant responds as follows:

## I.    INTRODUCTION

Despite Plaintiff's thirty-nine page (39) brief, Plaintiff has failed to allege any facts to show that Washington and Lee University ("W&L") operated under or with a gender bias when it investigated and adjudicated the sexual assault allegations against him. Without plausible facts, Plaintiff instead resorts to hyperbole and speculative inferences to support his Title IX

1

claim. Although this Court must accept Plaintiff's facts as true, Plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [its] claims across the line from conceivable to plausible"—something Plaintiff has failed to do. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). Plaintiff's obvious tactic to attach the phrase "gender bias" and/or "discrimination" after every fact does not transform these innocuous facts into acts of illegal discrimination. Rather, Plaintiff's allegations—at most— show that W&L took seriously its mission to foster a campus environment where sexual assault would not be tolerated. While Plaintiff might disagree with W&L's procedures—which he claims favor sexual assault victims over their alleged assailants—these gender neutral procedures fail to evidence gender bias and do not lay the foundation of a Title IX claim.

Without a discernible or articulable gender bias, Plaintiff attempts to bring a contract claim where no contract exists. Specifically, W&L's Student Handbook contains an express disclaimer that speaks directly to the parties' intent and conclusively forecloses the formation of a binding contract. Plaintiff's argument that this disclaimer was not incorporated into the attendant Interim Sexual Harassment and Misconduct Policy ignores the plain language of the disclaimer itself and amounts to nothing more than a red herring. Given W&L's clear statement that the Handbook and attendant policies were not binding agreements, Plaintiff has failed to state a claim for breach of contract.

Without a plausible gender bias or enforceable contract, Plaintiff turns to the United States Constitution as his final basis for relief. It is well-settled, however, that the Constitution only binds governmental actors and does not govern private entities. Although Plaintiff claims that the Constitutional inquiry is "fact intensive" and asks this Court to endorse his wait-and-see approach, Plaintiff cannot escape the fact that even he has not cited a single case where a private

university has been found to be a government actor. Rather, Plaintiff asks this Court to disregard well-settled jurisprudence based on his theory that the Office for Civil Rights' ("OCR") increased efforts to combat sexual assault on college campuses somehow changes the Constitutional analysis. The implications of Plaintiff's theory cannot be overstated, however. Under his logic, virtually every private university across the country would be transformed into a government actor. Plaintiff must come forward with some legal authority to support this sweeping change, which he has failed to do.

    A.    **Plaintiff Fails To Allege Any Facts Showing That W&L Operated With a Gender Bias**

Plaintiff pleads three separate theories for his Title IX claim: "erroneous outcome," "archaic assumptions," and "deliberate indifference." All three iterations of Plaintiff's Title IX claim, however, suffer from the same fatal flaw: Plaintiff has failed to allege *any* facts to show that W&L operated under a gender bias. Despite devoting nearly ten pages of his Memorandum of Law in Opposition to W&L's Motion to Dismiss to this argument, Plaintiff's allegations boil down to the simple contention that he—as an accused student—was not afforded the same protections as his accuser. (See Pl.'s Br. at 5-13). Plaintiff's allegations assert at most that W&L might favor sexual assault victims over their alleged assailants. That preference, even if it in fact existed, does not constitute "gender bias" and cannot form the basis of a Title IX claim. Although the Court must accept Plaintiff's well-plead facts, the Court should not blindly accept Plaintiff's non-factual, conclusory argument that these facts lead to the *legal conclusion* that W&L operated with a gender bias, even though Plaintiff affixes "gender bias" and "discrimination" after every one of those facts. See e.g., Doe v. Columbia Univ., No. 14-cv-3573 (KJMF), 2015 WL 1840402, at *8-15 (S.D.N.Y. Apr. 21, 2015); Sterrett v. Cowan, No. 14–cv–11619, 2015 WL 470601, at *15-16 (E.D. Mich. Feb. 4, 2015).

The court's discussion in Doe v. Columbia Univ. highlights the weaknesses in Plaintiff's case. See Columbia Univ., 2015 WL 1840402, at *8-15. In Columbia Univ., the court rejected similar allegations that a biased Title IX coordinator and one-sided procedures were sufficient to state a claim under Title IX. Strikingly similar to the present case, the plaintiff in Columbia Univ. alleged that the Title IX coordinator's investigation was "rife with procedural errors, including her failure to investigate the identities of potential witnesses; her failure to reconcile conflicting narratives of what happened on the evening of [the alleged misconduct] in her investigative report; and her failure to advise Plaintiff of his rights during the investigative process, including the right to submit his own written statement . . . ." Id. at *10 (internal citations omitted). Moreover, the plaintiff in Columbia Univ. also alleged that the university treated the victim "with more sensitivity during the investigation; that [the Title IX coordinator] employed a line of questioning akin to cross-examination in interviewing him but did not do so in interviewing Jane Doe, that Jane Doe received thorough advisements of the resources available to her during the conduct process, while he was not informed of his rights and the resources available to him; and that, during the hearing, the panelists freely allowed Jane Doe to escape critical questioning by crying on the witness stand." Id. at *10 (internal citations omitted).

Despite being inundated with a laundry list of allegedly "flawed" procedures, the court ultimately held that these facts did not lead to the reasonable inference that the university acted with a gender bias. Rather, the court noted that these victim-friendly procedures "more plausibly" reflected the university's desire to take sexual assault complaints seriously.[1] In no uncertain terms, the court held that:

---

[1] The court also held that the Title IX coordinator's limited role in the hearing precluded a claim under the "erroneous outcome" theory. Similar to the present case, the court highlighted that the Title IX coordinator did not take part in the final decision to expel the plaintiff. See id. at *11; see also Yu v. Vassar Coll., 2015 WL

4

> And while Columbia may well have treated Jane Doe more favorably than Plaintiff during the disciplinary process, the mere fact that Plaintiff is male and Jane Doe is female does not suggest that the disparate treatment was because of Plaintiff's sex. **Indeed, the alleged treatment could equally have been—and more plausibly was—prompted by lawful, independent goals, such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity.**

Id. at *12 (internal citations omitted and emphasis added).[2]

The court in Sterrett reached a similar conclusion. There, the court dismissed a Title IX claim because the student failed to allege that he was "treated differently from a similarly situated female student." Sterrett, 2015 WL 470601, at *15. Similar to Plaintiff in the present case, the student in Sterrett alleged that, "[b]ased on Plaintiff's gender there was a rush to judgment against him, in spite of the evidence and facts, leading to an erroneous outcome[;] that [d]efendants were predisposed to discriminate against Plaintiff in a sexual misconduct investigation on the basis of his sex; [that] [d]efendants treated Plaintiff differently and less favorably with respect to his rights during the investigation on the basis of his sex, as compared to his female accuser[;] [and] . . . that [d]efendants intentionally ignored the requirement that the Complainant carried the burden of proof and instead shifted it to [p]laintiff, on the basis of his gender." Id. at *15. The court, however, held that the "allegations regarding gender bias under Title IX [without a female comparator]. . . are conclusory and do not allege specific factual allegations which would state a claim of discriminatory animus by the University or its agents." Id. at *16.

---

1499408, at *14 (failing to find an erroneous outcome where the Title IX investigator "had no decision making role in the outcome of the hearing").

[2] Plaintiff's reliance on Wells v. Xavier Univ., 7 F. Supp. 3d 746 (S.D. Ohio 2014) is unpersuasive. Specifically, the Wells court applied the wrong standard for evaluating the 12(b)(6) motion. See e.g., Columbia Univ., 2015 WL 1840402, at *14-15.

Again, the court in King v. DePauw Univ. reached the same conclusion at the preliminary injunction stage. There, the court held that victim-friendly procedures failed to evidence gender bias absent some evidence that the school would have treated a female defendant differently. Specifically, the court held that, "[i]n the absence of any evidence that [the college] has, or would, treat a female student accused of sexual misconduct less favorably than it has treated its male students in that position, it is unclear how [the plaintiff] could prevail on his Title IX claims." King, Civil Action No. 2:14-cv-70, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) see also Haley v. Virginia Commonwealth Univ., 948 F. Supp. 573, 579 (E.D. Va. 1996) (holding that a "practice of railroading accused students"—fails to show gender bias because accused students, male and female alike, are subjected to the same procedures.)[3]

Plaintiff's allegations in the present case suffer from the same fatal flaw. Despite Plaintiff's dramatic fashion of affixing the label of "gender bias" or "discrimination" after every fact, Plaintiff cannot escape the inevitable conclusion that W&L employs the same procedures against all students accused of sexual assault, regardless of their gender. Although Plaintiff implicitly argues that the higher volume of male students accused of sexual assault makes these procedures inherently biased against males, courts have consistently rejected the notion that this fact transforms gender-neutral procedures into a form of gender discrimination. See e.g., King, 2014 WL 4197507, at *10 ("[The University] is not responsible for the gender makeup of those who are accused by other students of sexual misconduct, and the fact that a vast majority of those accused were found liable might suggest a bias against accused students, but says nothing about

---

[3] Plaintiff's complaints about Professor David Novack's involvement are equally unavailing. Specifically, Plaintiff fails to make a plausible allegation that his academic publications precluded him being objective during the hearing. See Gomes v. Univ. of Maine, 365 F. Supp. 2d 6, 31-32 (D. Me. 2005) ("[I]t is difficult to take seriously Plaintiffs' claims of bias . . . There is not exactly a constituency in favor of sexual assault, and it is difficult to imagine a proper member of the Hearing Committee not firmly against it. It is another matter altogether to assert that, because someone is against sexual assault, she would be unable to be a fair and neutral judge as to whether a sexual assault had happened in the first place.")

gender."); see also Dempsey v. Bucknell Univ., 2012 WL 1569826 (M.D. Pa. May 3, 2012) (holding that higher levels of male prosecutions for sexual misconduct fails to support a claim for gender bias under Title IX). Because Plaintiff fails to allege that female students are treated differently under W&L Interim Sexual Harassment and Misconduct Policy, this policy remain gender neutral and fails to support an inference that W&L acted under a gender bias.

Plaintiff's allegation that W&L acted under "pressure from OCR" is equally unavailing. As an initial matter, W&L's efforts to comply with OCR's guidance constitutes an independent, lawful purpose—not a form of sex discrimination. See Columbia Univ., 2015 WL 1840402, at *11-12; see also Sterrett, 2015 WL 470601, at *15 ("[The plaintiff's] conclusory allegation that Defendants were induced by the "Dear Colleague" letter to discriminate against him because of his gender fails to state a claim under Title IX.") Moreover, it remains unclear how W&L's commitment to following federal guidance—which is designed to protect *all* students from sex discrimination, regardless of their gender—somehow evidences an improper animus toward male students. See OCR Questions and Answers on Title IX and Sexual Violence, at pg. 5 (Apr. 29, 2014) ("Title IX protects ***all students*** at recipient institutions from sex discrimination, including sexual violence. Any student can experience sexual violence: from elementary to professional school students; ***male and female students***; straight, gay, lesbian, bisexual and transgender students; part-time and full-time students; students with and without disabilities; and students of different races and national origins." (emphasis added)).

To that effect, Plaintiff's "equitable resolution" claim necessarily falls with his other Title IX theories. As the court held in Columbia Univ.,

> Plaintiff appears to allege also that Columbia violated his right to statutory due process—namely, the process due to him under Title IX and related regulations and guidance. To the extent he does, the Court need not address the claim separately, as a plaintiff does not

> state a cause of action under Title IX by alleging a procedural infirmity, absent a particularized allegation of a causal connection between gender discrimination and the wrongful outcome of the flawed proceeding. **In other words, even if Plaintiff alleged that the disciplinary proceeding was procedurally flawed and led to an erroneous outcome—whether based on a failure to comply with Title IX regulations or otherwise—he would still have to plausibly allege that the outcome was motivated by his sex.**

Columbia Univ., 2015 WL 1840402, at *9 n.5 (emphasis added).

For the reasons stated above, Plaintiff has failed to allege any facts to show that W&L was motivated by gender bias. Therefore, his Title IX claims fail as a matter of law.

### B. Plaintiff's Constitutional Claims Fails As A Matter of Law

Plaintiff's Constitutional claim faces a similar fate. Specifically, W&L is a private university and not subject to Constitutional constraints. Although Plaintiff asks this Court to delay the inevitable by arguing that the inquiry is "fact intensive," Plaintiff has failed to cite a single case where a private university has been found to be a government actor. Instead, Plaintiff asks this Court to wade into unchartered waters based on an unsupported and illogical theory that OCR's increased efforts to combat sexual assault on college campuses has as a result transformed all private universities into government entities. Plaintiff's theory, however, marks a stark departure from the relevant jurisprudence and lacks any legal support.

The implication of Plaintiff's argument cannot be overstated. Under his logic, virtually every private university would be transformed into a government actor. The most recent OCR guidance makes clear that "[a]ll public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance . . . must comply with Title IX." (See OCR Questions and Answers on Title IX and Sexual Violence, at pg. 1 (Apr. 29, 2014)). Thus, if OCR's recent efforts to encourage colleges and universities to better prevent sexual violence and to protect the victims of sexual misconduct turn private schools into

8

government actors, then almost every college and university would have new constitutional obligations thrust upon them. That result, however, runs counter to the well-settled case law on this issue.

As detailed in W&L's original memorandum, courts have consistently held that private universities are not governmental actors under any version of the "state actor" test. See e.g., Columbia Univ., 2015 WL 1840402, at *9 n.5; Yu v. Vassar Coll., No. 13–CV–4373, 2015 WL 1499408, at *11 (S.D.N.Y. Mar. 31, 2015); Bleiler v. Coll. of Holy Cross, No. 11–CV–11541–DJC, 2013 WL 4714340, at *4 (D. Mass. Aug. 26, 2013); Kelley v. Univ. of Richmond, No. 3:06-cv-203-JRD, 2006 WL 1555933, at *3 (E.D. Va. June 2, 2006); Langadinos v. Appalachian Sch. of Law, No. 1:05-cv-00039, 2005 WL 2333460, at *13 n.17 (W.D. Va. Sept. 25, 2005) (collecting cases); Scott v. Northwestern Univ. School of Law, No. 98 C 6614, 1999 WL 134059, at *2 (N.D. Ill. Mar. 8, 1999).

OCR's recent guidance and increased efforts to combat sexual violence on college campuses does not alter this Constitutional calculus. As an initial matter, courts have found that private entities retain their private status even in the face of extensive federal regulation and oversight. The court's discussion in Halzack Watkins v. Educational Credit Mgm't Corp. is instructive on this point. See Halzack, Civil Action No. 2:10-cv-540, 2011 WL 2015479, at *8 (E.D. Va. May 12, 2011). In Halzack, despite the fact that a student loan provider had to comply with binding federal regulations to receive government subsidies on defaulted student loans, the court held that the entity was not a government actor for Constitutional purposes. See id. at *4 (noting that the Department of Education required the agency to "exercise due diligence in collection of the loan pursuant to procedures specified in federal statute and regulations . . . [t]o that end, the guaranty agency is authorized—indeed, required—by federal law to commence

9

collection efforts specified by federal regulations against the borrower, including garnishment of the borrower's wages.")

Even assuming that OCR's guidance is different in kind from the detailed regulations discussed above, W&L adherence to OCR's guidance is completely voluntary. Moreover, OCR's guidance—as it names suggests—is merely "guidance," and the federal government did not compel a particular result in Plaintiff's hearing. See e.g., Albert v. Carovano, 851 F.2d 561 (2d Cir. 1988) (en banc) (finding that a private university was not a state actor even though it adopted disciplinary procedures to comply with state law, reasoning that "[t]he state neither drafted the disciplinary code, nor participated in determining what sentence was to be handed out under it.") Although OCR encourages schools to adopt certain procedures and follow certain rules, schools and universities—including W&L—formulate their own policies and administer their hearings without direct government involvement. Therefore, Plaintiff has failed to allege sufficient facts to show that W&L was a government actor.[4]

### C. Plaintiff's Breach of Contract Claims Fails As A Matter of Law

Plaintiff has failed to plead the existence of an enforceable contract between the parties, and, therefore, his breach of contract claim fails as a matter of law. Although Plaintiff relies on W&L's Student Handbook, the Handbook expressly states that it is not a contract. As this Court has held before, such a disclaimer speaks directly to the parties' intent and precludes the formation of a contract under Virginia law. See e.g., Brown v. Rectors & Visitors of the Univ. of Va., No. 3:07-cv-00030, 2008 WL 1943956 (W.D. Va. May 2, 2008) (collecting cases); see also Carr v. Bd. of Regents of Univ. Sys. of Ga., 249 Fed. Appx. 146, 150–51 (11th Cir. 2007);

---

[4] Plaintiff's claim that W&L performed an exclusive, governmental function is completely foreclosed by the relevant case law. See Langadinos v. Appalachian Sch. of Law, No. 1:05-cv-00039, 2005 WL 2333460, at *13 n.17 (W.D. Va. Sept. 25, 2005). Plaintiff does not allege any facts that distinguish W&L from any other private university. Therefore, Plaintiff's claim fails as a matter of law.

10

Gibson v. Walden Univ., LLC, No. 1:14-cv-00817, 2014 WL 6085783, at *2 (D. Or. Nov. 13, 2014).

Although Plaintiff argues that W&L's Interim Sexual Harassment and Misconduct Policy somehow eludes the conspicuous disclaimer, Plaintiff's argument amounts to nothing more than a red herring. The W&L Handbook—which is distributed in an on-line form—states, in bolded terms, that:

> **The policies of Washington and Lee University are under continual examination and revision. This Student Handbook is not a contract; it merely presents the policies in effect at the time of publication and in no way guarantees that the policies will not change.**[5]

Plaintiff's attempts to separate this disclaimer from the Sexual Harassment Policy fall flat. Specifically, the disclaimer—by its very terms—applies to the "***policies*** of Washington and Lee University"—which necessarily includes the attendant Interim Sexual Harassment and Misconduct Policy. In fact, the Handbook expressly incorporates and links to the Sexual Harassment Policy on page twenty-two (22). Since the Handbook is provided in an electronic format, providing a link to the Sexual Harassment Policy is the modern-day equivalent of physically attaching the policies to the Handbook itself. Therefore, Plaintiff's efforts to parse the two documents fall flat.[6]

Realizing the conclusive effect of this disclaimer, Plaintiff tries to argue that the "interests of justice" warrant against enforcing the disclaimer. (See Pl.'s Br. at 33-34.)

---

[5] http://www.wlu.edu/document/student-handbook

[6] Moreover, Plaintiff's claim that W&L "published the procedural rules" and "made them available to the entire student body" does not change the conclusive effect of the waiver. (See Pl.'s Br. at 30.) Although not explicitly mentioned by the Court in Brown, it is common sense that student handbooks—as their name suggests—are distributed and made available to students. Otherwise, they would not be called student handbooks. If that were sufficient to render them enforceable contracts, then every handbook would form a binding agreement. As this Court cogently reasoned, however, a disclaimer conclusively destroys any formation of a binding agreement, and the fact that W&L provided the Handbook to its students fails to alter that conclusion.

Plaintiff's argument, however, ignores that the "interests of justice" present in this case—*i.e.* Plaintiff's continued education and tuition payments—are indistinguishable from the students' interests in Brown. In Brown, this Court gave full effect to the disclaimer despite the fact that the student paid tuition and remained in UVA's graduate program for six years. See id. at *2. Thus, it remains unclear how Plaintiff can escapes Brown's holding

Although Plaintiff's relies on several employment law cases, these cases fail to appreciate that courts have repeatedly and with great care and restraint avoided second guessing a university's decision to impose discipline. Specifically, courts have recognized that, "courts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline," and should not "second guess the professional judgment of academic decision makers." Lucey v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ., No. 2:07-cv-00658, 2009 WL 971667, at *6 (D. Nev. Apr. 9, 2009) (quoting Gukenberger v. Boston Univ., 974 F. Supp. 106, 150 (D. Mass. 1997)); Tigrett v. Rector & Visitors of the Univ. Of Va., 290 F.3d 620, 629-30 (4th Cir. 2002) ("In the absence of a constitutional or statutory deprivation, the federal courts should be loathe to interfere with the organization and operation of an institution of higher learning."); Hill v. Madison Cnty. Sch. Bd., 957 F. Supp. 2d 1320, 1332 (N.D. Ala. 2012) ("Courts are hesitant to second-guess the decisions of school administrators in the area of student discipline and control . . . ."); Gutzwiller v. Fenik, 860 F. 2d 1317, 1 (6th Cir. 1988) ("[C]ourts and juries must be extremely reluctant to second guess the professional judgment of the academic decisionmakers."). In fact, Plaintiff admits as much in his brief when he states that a case that "deals with a dispute between employees" is "sufficiently different and removed from the issues presented here." (See Pl.'s Br. at 36.)

Even assuming that the policy creates a binding agreement, Plaintiff has failed to allege sufficient facts to show that W&L acted in an arbitrary or capricious manner. See Lucey, 2009 WL 971667, at *6; see also   Although Plaintiff uses in conclusory fashion the terms "arbitrary and capricious," this Court should disregard Plaintiff's unsupported, boilerplate legal conclusions. Far from being arbitrary, W&L's procedures reflect a deliberate, detailed, and principled decision-making process that mirrors the procedures upheld in similar cases. See e.g., Yu, 2015 WL 1499408; Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 642 (6th Cir. 2005); Gomes, 365 F. Supp. 2d at 25-26.

In the end, Plaintiff simply disagrees with W&L's decision and seeks a third bite at the apple. As courts have repeatedly held, however, it is not the proper role of the court to "make an independent determination as to what happened between Plaintiff [] and the Complainant" or opine "whether a sexual assault occurred, whether such acts were consensual, or who . . . is credible." Doe v. Univ. of the South, 687 F. Supp.2d 744, 755 (E.D. Tenn. 2009). Instead, this Court need only determine whether W&L provided Plaintiff a reasonable process. Despite Plaintiff's laundry list of W&L's alleged missteps, Plaintiff cannot escape the inevitable conclusion that Plaintiff was afforded a procedurally and substantively sound opportunity to explain his side of the story, present evidence in his defense, and appeal the decision. The fact that the members of the Student-Faculty Hearing Board panel ultimately disagreed with Plaintiff does not amount to a breach of contract.

## III.   CONCLUSION

For the reasons stated above, Defendant respectfully requests this Court to dismiss Plaintiff's claims with prejudice.

> Respectfully submitted,
>
> Washington and Lee University

By counsel:

*s/ Robert Craig Wood*
Robert Craig Wood
McGuireWoods LLP
Court Square Building
310 Fourth Street, N.E., Suite 300
Charlottesville, VA 22903-1288
434-977-2558 (direct line)
434-980-2274 (fax)
cwood@mcguirewoods.com

CERTIFICATE OF SERVICE

    I, R. Craig Wood, certify that on this 5th day of May, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Plaintiff by electronically serving his counsel of record, and also by electronic mail.

*/s/ Robert Craig Wood*
Robert Craig Wood