2015 WL 4306521
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

John Doe, Plaintiff,
v.
University of Massachusetts–Amherst, Defendant.

Civil Action No. 14-30143-MGM | Signed 07/14/2015

*MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS* (Dkt. No. 17)

MASTROIANNI, District Judge

*1 Plaintiff, a resident of Connecticut and a former student at Defendant, University of Massachusetts – Amherst ("the University"), has brought this action against the University alleging it violated Title IX of the Education Amendments of 1972, 86 Stat. 373, 20 U.S.C. § 1681(a) (2012) ("Title IX") by applying disciplinary guidelines and regulations to Plaintiff in a discriminatory manner on the basis of Plaintiff's sex. In addition to this federal claim, Plaintiff asserts several claims pursuant to Massachusetts law.[1] Before the court is Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. No. 17). For the reasons set forth below, the motion is ALLOWED.

### I. Background

Plaintiff, an individual proceeding under the pseudonym "John Doe," was a student at the University during the fall of 2013. (Dkt.1, Compl.¶ 1.) The University is a recipient of federal funds. *(Id.* ¶ 108.) On the evening of September 13, 2013 Plaintiff attended a party at a University residence hall. *(Id.* ¶ 24.) While at that party he met a woman, referred to throughout as "Jane Doe." *(Id.* ¶ 26.) John Doe and the University have presented very different versions of the events that followed. As the court is considering a motion to dismiss, it accepts as true the version presented by John Doe. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009).

#### A. *Events of September 13–14, 2013*

Jane Doe approached Plaintiff around midnight. (Dkt.1, Compl.¶ 26.) Plaintiff and Jane Doe engaged in conversation with one another, both spoken and via text message; they watched videos together; and Plaintiff noticed that as he moved from one location to another, Jane Doe pursued him. *(Id.* ¶ 27.) Plaintiff consumed alcohol at the party, but he did not notice whether Jane Doe was also consuming alcohol. *(Id.* ¶ 26.) At no point during the evening did Plaintiff observe Jane Doe showing signs of intoxication. *(Id.* ¶ 28.) Plaintiff observed her speech to be coherent and intelligible and her text messages to include correct spelling, grammar, and punctuation. *(Id.* ¶ 28.)

*2 At approximately 2:00 a.m., Jane Doe texted her roommate, who was not attending the party, to request the private use of their shared room. *(Id.* ¶ 29.) When her roommate texted back to ask whether Jane Doe intended to spend the night with someone she had just met, Jane Doe responded with texts stating " 'it's all good,' that she was 'fine,' and that she was not 'drunk that much anymore.' " *(Id.)* Jane Doe and Plaintiff then made their way to Jane Doe's dorm room. *(Id.* ¶ 30.) With the agreement of Jane Doe, Plaintiff first stopped by his dorm room to get a condom. *(Id.)* He then met Jane Doe in her dorm room and the two became intimate. *(Id.* ¶¶ 32–33.) Plaintiff asked and obtained permission prior to each new act, such as removing an article of clothing or touching a part of Jane Doe's body. *(Id.* ¶ 34.) Around 4:40 a.m. Plaintiff and Jane Doe finished engaging in sexual activity. *(Id.* ¶ 36.) Jane Doe excused herself to use the shower and Plaintiff returned to his dorm room. *(Id.* ¶¶ 37–39.) As he considered the extent of his sexual contact with Jane Doe, Plaintiff became concerned they had not been as careful as they should have been. *(Id.* ¶ 39.) He texted Jane Doe to suggest she consider taking medication to prevent pregnancy. *(Id.)* Plaintiff then went to sleep. *(Id.* ¶ 40.) When he woke up he saw Plaintiff had not responded to his text and so he sent her another text. *(Id.* ¶ 41.) Plaintiff had hoped that his night with Jane Doe might have been the beginning of a dating relationship and was disappointed when the responses he received from Jane Doe indicated she was not interested in pursuing a relationship with him. *(Id.)*

#### B. *The Complaint Against Plaintiff and the Immediate Impact on Plaintiff*

When Jane Doe awoke on September 14, she began texting with some friends, claiming she could not recall the events of the prior night. *(Id.* ¶¶ 42–43.) At the urging of her friends, Jane Doe went to the University Health Services on September 14,

2013 and on September 15, 2013 she made a report to the Dean of Students Office. *(Id.* ¶ 43.) In that report, Jane Doe did not use the words "harassment," "assault," or "rape" to describe her encounter with Plaintiff and indicated that she did not know how to classify what had happened. *(Id.* ¶ 44.)

On September 18, 2013, the University notified Plaintiff that he had been charged with four violations of the University's Code of Student Conduct (the "Code"): Threatening Behavior, Sexual Harassment, Sexual Misconduct, and Community Living Standards. *(Id.* ¶ 45.) The University's Code sets out community standards and procedures governing the enforcement of those community standards. *(Id.* ¶¶ 17–21.) Among its many provisions, the Code provides that a student's responsibility for the consequences of his or her actions shall not be limited because the actions were consequences of voluntary consumption of alcohol or drugs. *(Id.* ¶ 18.) The Code, which is updated annually, also defines "sexual misconduct" to include sexual contact with a person who is (1) so intoxicated as to be incapable of understanding or unaware of the sexual contact or (2) otherwise physically incapable of resisting or communicating consent. *(Id.* ¶ 21.)

In addition to learning about the charges against him, Plaintiff also learned the University had determined he was a threat. *(Id.* ¶ 47.) He was ordered to have no contact with Jane Doe and he was banned from campus for all purposes other than attending classes. *(Id.)* The University gave him less than eight hours to leave campus. *(Id.)* In order to continue attending class, Plaintiff had to drive two hours, each way, from his family's home in Connecticut. *(Id.* ¶ 54.) Plaintiff was also notified that he was entitled to access the on-campus Counseling & Psychological Services, but he was not initially advised that he could access the University Student Legal Services for assistance with his disciplinary matter. *(Id.* ¶ 49.) Additionally, he was never informed the University employed a Title IX Coordinator from whom he could seek assistance. *(Id.* ¶ 50.)

Upon learning of the charges against him, Plaintiff tried to obtain a physical exam and STD testing at University Health Services and was denied care. *(Id.* ¶ 52.) Plaintiff was told University Health Services "had never been in this situation before and 'were not equipped to handle this.'" *(Id.)* The complaint does not include what, if any, explanation was given as to the nature of the situation that prevented the University Health Services from providing care.

### C. *The University's Initial Handling of the Complaint Against Plaintiff*

\*3 Plaintiff asserts the University did not undertake "any material investigation" into the charges made against him and did not even interview witnesses or investigate Jane Doe's level of intoxication on the night of September, 13–14, 2013. *(Id.* ¶ 53.) The University did not assign a specially trained Title IX investigator to conduct the investigation, which Plaintiff characterizes as disorganized and chaotic. *(Id.* ¶ ) Information was gathered by several different University officials, none of whom had proper training to deal with sexual misconduct or the effects of alcohol consumption. *(Id.)*

On September 26, 2013, Plaintiff received a packet of documents from the University which he understood to be the investigation file. *(Id.* ¶ 57.) The documents included statements by Plaintiff and Jane Doe, copies of text messages between Plaintiff and Jane Doe, notes from meetings between Plaintiff and two University administrators, and emails from Plaintiff to the University regarding the incident. *(Id.)* As the time for Plaintiff's Student Conduct Hearing Board approached, Plaintiff came to believe there were other documents relevant to the charges. *(Id.* ¶ 58.) He requested the University provide him with all relevant documents by email on October 31, 2013, less than a week before the hearing was scheduled to take place. *(Id.)* That same day, in response to his email, he received copies of text messages between Jane Doe and her roommate and email statements from Jane Doe's roommate and two others, including the host of the party where Plaintiff met Jane Doe, all of which were dated October 31, 2013. *(Id.)* Plaintiff continues to believe the University had not provided him with all the relevant documents it had related to his case and which could have assisted his defense. *(Id.* ¶ 59.)

While preparing for his hearing, Plaintiff also prepared a list of questions for the Student Conduct Hearing Board to ask Jane Doe. *(Id.* ¶ 55.) He was required to submit those questions to a dean for preapproval. *(Id.)* When he did so, some of his questions, including questions about how much alcohol Jane Doe consumed on the night of the party and whether she remembered texting with John Doe, were not approved. *(Id.)*

### D. *Plaintiff's Disciplinary Hearing*

A Student Conduct Hearing Board proceeding was held on November 5, 2013 and an audio recording was made. *(Id.* ¶¶ 60–69.) The Student Conduct Hearing Board included

a chairperson and three members, one of whom was a student. *(Id.* ¶ 61.) Plaintiff alleges the chairperson was rude to him throughout the proceeding, asking him confusing questions and then becoming frustrated with him when he sought clarification of the questions, interrupting him, and alternating between belittling his answers and appearing to not listen to those answers. *(Id.* ¶ 63.) In contrast, Plaintiff asserts the chairperson questioned Jane Doe in a supportive manner. *(Id.* ¶ 64.)

Additionally, some of the questions Plaintiff wished to have asked of Jane Doe were not asked and the Student Conduct Hearing Board did not ask other questions of Jane Doe and her witnesses that Plaintiff believes were essential for the Student Conduct Hearing Board to fully understand what had happened. *(Id.* ¶ 65.) For example, Jane Doe was not questioned about the information she provided during the hearing, her use of anti-depressants, or any possible side-effects she might have experienced as a result of mixing alcohol and anti-depressants. *(Id.)* Additionally, Jane Doe's roommate testified about Jane Doe's level of intoxication, but was not asked questions about the basis for her knowledge, even though she had not attended the party or seen Jane Doe until the following morning. *(Id.* ¶ 66.) Plaintiff was also prevented from presenting documentary evidence regarding typical effects of blood alcohol content, which he believed contradicted Jane Doe's testimony. *(Id.* ¶ 64.)

*4 Two days after the hearing, the Student Conduct Hearing Board issued its report and concluded Plaintiff was responsible for three violations of the Code. *(Id.* ¶ 74.) The sanction imposed was expulsion. *(Id.* ¶ 82.) Plaintiff appealed the decision. *(Id.* ¶ 84.) In preparation for filing his appeal, Plaintiff reviewed the hearing board's report and made arrangements to listen to the recording of the hearing. *(Id.* ¶ 85.) When he listened to the recording, Plaintiff discovered the portion of the hearing during which Jane Doe's roommate had testified had not been recorded. *(Id.)*

### E. Post–Hearing Proceedings

Plaintiff appealed the Student Conduct Hearing Board's decision on November 18, 2013, giving at least six grounds. *(Id.* ¶ 88.) First, he asserted the University had failed to fully and fairly conflict check the members of the Student Conduct Hearing Board and one student member had a conflict because she had previous exposure to criminal prosecution as a student intern in the office of the Suffolk District Attorney. *(Id.)* Next, Plaintiff argued the members of the Student Conduct Hearing Board had not all received proper training for deciding cases involving allegations of sexual misconduct and the effects of alcohol. *(Id.)* His third basis for his appeal was the incomplete audio recording of the hearing. *(Id.)* The fourth ground identified by Plaintiff was the hearing board's failure to ask Jane Doe questions about the extent of her alcohol use and any use of antidepressants. *(Id.)* Fifth, Plaintiff argued the hearing board had inaccurately characterized witness statements concerning details from the evening preceding the contested sexual encounter. *(Id.)* Sixth, and finally, Plaintiff asserted the Student Conduct Hearing Board had inappropriately relied on testimony from Jane Doe's roommate because it had been established she lacked personal knowledge concerning the events preceding the contested sexual encounter. *(Id.)*

Plaintiff's appeal was denied approximately one month after the initial hearing took place. *(Id.* ¶ 89.) Both the Student Conduct Hearing Board's finding he was responsible for violations of the Code and its sanction of expulsion were upheld. He received a short letter informing him of the outcome of the appeal, but not providing an explanation of, or any details about, the basis for the decision. *(Id.)*

### F. Plaintiff's Post–Appeal Efforts

After his appeal was denied, Plaintiff came to believe he had not been given all of the documents in the possession of the University related to his disciplinary proceeding. *(Id.* ¶ 91.) Between December 2013 and May 2014, he made five formal public records requests seeking additional documents from the University. *(Id.* ¶ 92.) In response to his first request, the University sent a statement affirming everything in Plaintiff's student conduct file had already been provided to him. *(Id.* ¶ 93.) Plaintiff claims this answer was nonresponsive because he had clearly requested all relevant materials, whether or not they were in his conduct file. *(Id.)* The University ultimately responded to Plaintiff's requests over a period of, at least, nine months, but as of the date of his complaint, Plaintiff still believed the University had not provided all relevant documents to him. *(Id.* ¶ 96.)

Several days after his appeal was denied, Plaintiff filed his own complaint against Jane Doe accusing her of harassing him. *(Id.* ¶ 70.) Without specifying the factual basis for his harassment complaint, Plaintiff asserts the University did not adequately respond to his complaint. *(Id.* ¶ 71.) Specifically, he says the University did not contact him about his complaint and, even after he requested status updates, he did not receive any information. *(Id.)* Eventually, Plaintiff submitted a public records request for documents related to the University's

response to his complaint. *(Id.* ¶ 72.) About two months later, the University provided him with information about the fees for staff time and photocopying associated with obtaining the documents he had requested. *(Id.* ¶ 73.) Plaintiff does not indicate whether he ever obtained any related documents from the University.

*5 In addition to describing the lack of information provided to him with respect to his harassment complaint against Jane Doe, Plaintiff notes that Jane Doe was never charged with a violation of the Code of Student Conduct in connection with her consumption of alcohol on the night of September 13–14, 2013. *(Id.* ¶ 74.) He characterizes the University's treatment of Jane Doe's complaint and its failure to charge her with a violation due to her consumption of alcohol as "preferential treatment" when compared to the way his complaint of harassment was treated and the fact that he was charged and disciplined with misconduct in connection with Jane Doe's report. *(Id.* ¶ 75.) Based on this characterization, Plaintiff asserts the "preferential treatment" was "undeniably linked" to Jane Doe's gender. *(Id.)* Though the court accepts as true the factual allegations set forth by Plaintiff, it does not accord the same weight to these conclusory statements. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009).

## II. Legal Standard

A party moving to dismiss an action pursuant to Rule 12(b)(6) has the burden of demonstrating the complaint lacks "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); Fed.R.Civ.P. 12(b)(6). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of a plaintiff, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a plausible claim for relief. *Id.* The moving party must show that the other party's assertions fall short of establishing "each material element necessary to sustain recovery under some actionable legal theory." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir.2005) (internal citation omitted). Where jurisdiction is based on diversity, the court must look to Massachusetts law for the elements of Plaintiff's claims. *See Edlow v. RBW, LLC,* 688 F.3d 26 (1st Cir.2012).

## III. Analysis

### A. *Eleventh Amendment – Counts II–VII*

Each of the seven counts in Plaintiff's complaint is brought solely against the University. The first count alleges violations of Title IX, while the other counts allege violations of state law. Defendant argues the Eleventh Amendment deprives this court of jurisdiction to consider all of Plaintiff's state-law claims because the University is an agency of a state. Pursuant to the Eleventh Amendment, citizens cannot normally sue a state or an arm of a state in federal court. *Neo Gen Screening, Inc. v. New England Newborn Screening Program,* 187 F.3d 24, 26 (1st Cir.1999). Suits are permitted if the state has waived its immunity or Congress has acted to override immunity, but the burden is on the plaintiff to demonstrate one of these exceptions applies. *Id.* "[A] state can waive its immunity by clear declaration that it intends to submit itself to the jurisdiction of a federal court, by participating in a federal program that requires waiver of immunity as an express condition, or by affirmative litigation conduct." *Davidson v. Howe,* 749 F.3d 21, 28 (1st Cir.2014). Plaintiff argues that various actions of the University indicate it has consented to suit in federal court on state law claims to the extent the state law claims are related to Title IX claims, but these actions fall short of the type of express language or overwhelming implication that signals a state's consent to waive its immunity. *Id.*

"Judges in this District have consistently held that [the University] and its departments and agencies are arms of the state entitled to Eleventh Amendment immunity." *BT INS, Inc. v. Univ. of Mass.,* No. 10–11068, 2010 WL 4179678 (D.Mass. Oct. 19, 2010) (citing cases). The First Circuit has not ruled on the issue, but has declined the opportunity to reach a different conclusion. *Neo Gen. Screening, Inc.,* 187 F.3d at 27. Plaintiff has not presented the court with contrary authority, and the court has found no reason not to adopt the approach taken by the other courts in this district which have found the University to be an arm of the state. Therefore, this court concludes the Eleventh Amendment bars all of Plaintiff's state-law claims against the University. Having concluded this court lacks jurisdiction over those claims, the court dismisses all of Plaintiff state law claims asserted in Counts II through VII of the complaint.

### B. *Title IX – Count I*

\*6 Congress validly abrogated "States' Eleventh Amendment immunity under Title IX," as to entities receiving federal funds. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998) (citing 42 U.S. § 2000d–7). As a recipient of federal funds, the University is thus subject to suit under Title IX. Plaintiff alleges the University violated Title IX by denying him, on account of his sex, a "prompt and equitable" resolution to Jane Doe's complaint. (Dkt.1, Compl.¶¶ 111–124.) Specifically, he asserts the University's adjudication of the allegations was biased against him because of his sex and, as a result, the process reached an incorrect conclusion. *(Id.* ¶ 122.) Additionally, he asserts that regardless of whether he should have been found responsible for violations of the Code, bias due to his male sex caused him to receive a disproportionately harsh sanction. *(Id.* ¶ 120.)

"Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions."[2] *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir.2002). In relevant part, Title IX provides that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is a broadly applicable civil rights statute that bars discrimination on the basis of sex and is "patterned after Title VI of the Civil Rights Act of 1964," which barred racial discrimination by employers and educational institutions. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979). When Congress passed Title IX, it had "two principal objectives in mind: '[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.' " *Gebser*, 524 U.S. at 286 (quoting *Cannon*, 441 U.S. at 704).

Within the context of Title IX, prohibited discrimination occurs when an individual is "subjected to differential treatment ... on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). There is a long line of Title IX cases in which plaintiffs have alleged they received different treatment as a member of a "disadvantaged gender" or in retaliation for advocating on behalf of members of a disadvantaged gender. *See, e.g., id.* (ruling male coach of high school girls' basketball team could bring retaliation claim under Title IX because he was allegedly retaliated against on the "basis of sex" where he had complained the girls' team was not receiving resources equal to those provided to the boys' team); *Cannon*, 441 U.S. 677 (ruling plaintiff had adequately pled that defendant's decision to deny her admission violated Title IX); *Cohen v. Brown Univ.*, 991 F.2d 888 (1st Cir.1993) (affirming preliminary injunction to prevent cuts to athletics program that would preserve and slightly increase the disproportion between athletic opportunities for female students and their representation in the student body). A plaintiff seeking to establish a Title IX violation based on this type of discrimination must allege that members of the disadvantaged gender were disparately impacted and also must present "some further evidence of discrimination." *Cohen*, 991 F.2d at 895.

\*7 In a separate line of cases, courts have ruled, because sexual harassment by teachers or other students can create a sexually hostile educational environment, Title IX also provides a remedy in cases where a school responds to allegations of sexual harassment with deliberate indifference. In these cases, the plaintiff need not assert they are a member of a disadvantaged gender, or even that there is a disadvantaged gender. Instead, Title IX provides a remedy in cases where a school's response to sexual harassment demonstrates deliberate indifference, regardless of the sex or gender of any student or teacher involved. *See Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629 (1999); *see also Frazier*, 276 F.3d 52. Thus, one line of Title IX cases concerns itself with differential treatment of individuals based on their status as a member of a disadvantaged gender, while another line of cases concerns itself with the efforts schools take to ensure that all students, regardless of gender, are fairly protected from sexual harassment.

The Department of Education (the "Department"), through its Office of Civil Rights, has published guidance for schools regarding the actions schools should take in response to allegations of sexual harassment., a phrase the Department defines to include acts of sexual violence.[3] Russlyn Ali, Dear Colleague Letter, U.S. Dept. of Educ. at 1 (Apr. 4, 2011), *available at* http:// www2.ed.gov /about/offices/list/ ocr/letters/colleague–201104.pdf. Sexual violence includes "physical sexual acts ... where a person is incapable of giving consent due to a victim's use of ... alcohol." *Id.* Pursuant to this guidance, a school is required to respond when it "knows, or reasonably should know, about possible harassment" of a student, regardless of whether the harassed student actually makes a complaint. *Id.* This obligation does not arise because of the student's gender, but because the school has notice that the student may have been subjected to sexual contact to which the student did not or could not consent.

In responding to claims of sexual harassment, the University, like all schools, is directed by the Department to use the "preponderance of the evidence" standard of proof, requiring a finding that an accused is responsible if "it is more likely than not that sexual harassment or violence occurred." *Id.* at 11. The Department cautions that use of a higher standard of proof such as "clear and convincing," under which a party would be found responsible only if the evidence demonstrated it was "highly probable or reasonably certain that the sexual harassment or violence occurred," is "inconsistent with the standard of proof established for violations of ... civil rights laws" like Title IX. *Id.* The choice of standard in the case of Title IX and other civil rights statutes reflects a policy decision that impacts both the complainant and alleged perpetrator. As a practical matter, the choice of standard may tip the scale in favor of the complainant in cases where testimony from both parties is credible.

Plaintiff does not dispute Title IX required the University to respond to Jane Doe's complaint, but he asserts that as to him, the response did not comply with the Department's guidance and was biased against him as a male, thereby violating Title IX. Although the Department's guidance "requires schools to provide equitable grievance procedures" when responding to possible sexual harassment, the purpose of this requirement is to protect those students who may have been subjected to sexual harassment in order to prevent schools from acting with deliberate indifference to allegations of sexual harassment. *See e.g., Id.* ("[A] school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's statement without also allowing the complainant to review the alleged perpetrator's statement."). A school that fails to provide equitable grievance procedures to a complainant may violate Title IX if its failure is part of a larger pattern of "deliberate indifference." The question raised by Plaintiff's complaint is when, if ever, a student disciplined after being found responsible for sexual harassment sufficiently asserts a Title IX claim based on alleged deficiencies with the school's disciplinary proceeding against that student.

*8 Though Plaintiff's case is one of many similar cases[4] in which male students assert that a school's response to a sexual harassment complaint was biased against the alleged perpetrator because of his gender, the First Circuit has not yet had occasion to analyze the sufficiency of a complaint in this type of case. Lacking guidance from the First Circuit, this court turns to the analytic framework set forth by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir.1994). The plaintiff in *Yusuf*, like Plaintiff here, was a male college student who was disciplined after a college hearing board found him guilty of sexually harassing a female student. Looking to the "analogous bodies of law" interpreting Title VI and Title VII, the Second Circuit concluded "that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf* at 715.

The Second Circuit identified the plaintiff's complaint as attacking his disciplinary proceeding in two ways: (1) asserting the outcome was erroneous due to "evidentiary weaknesses" or "particular procedural flaws" and (2) alleging selective enforcement evidenced either by the severity of the penalty imposed or the fact that the disciplinary process was initiated at all. *Id.* at 715. As to the first theory, the Second Circuit examined the complaint for allegations of "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* In addition, the Second Circuit required "a particularized allegation relating to a causal connection between the flawed outcome and gender bias."[5] *Id.* Similarly, with respect to the second theory, the Second Circuit looked for both factual allegations demonstrating an inconsistency in enforcement and a causal connection to gender bias. *Id.*

Turning to Plaintiff's complaint, the court finds claims fitting within both of the categories set out in *Yusuf*, but insufficient factual allegations that would entitle Plaintiff to relief with respect to either of them. As to "erroneous outcome," Plaintiff has set forth a version of the events of September 13–14 and the disciplinary proceeding which is inconsistent with the hearing board's ruling against him. On the night in question, Plaintiff asserts he received affirmative consent from Jane Doe as to all sexual contact and there were no clues in her conduct indicating she was so intoxicated as to be unable to give consent. With respect to the disciplinary proceeding, Plaintiff points to difficulties getting information, deficiencies in the investigation, limits placed on his ability to cross-examine witnesses, the exclusion of some documentary evidence he wished to introduce, and the misuse of witness testimony by the hearing board. He also asserts the student member of the hearing board had a conflict due to an earlier internship within a criminal prosecutor's office. Taken together, the facts alleged by Plaintiff are sufficient to raise

at least some questions about the outcome of his disciplinary proceeding. They may even accurately reflect that the University "treated Jane Doe more favorably than Plaintiff during the disciplinary process," but they are insufficient to suggest "that the disparate treatment was *because of* Plaintiff's sex." *Doe v. Columbia Univ.*, No. 14–cv–3773, 2015 WL 1840402 at *12 (S.D.N.Y. Apr. 21, 2015) (applying the *Yusuf* analysis). Plaintiff has not cited examples of any comments that targeted him based on his gender–as opposed to his status as a student accused of sexual assault–or any conduct suggestive of gender bias. "Indeed the alleged treatment could equally have been – and more plausibly was – prompted by lawful independent goals, such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity." *Id.* (internal quotations omitted) (citing *Twombly*).

*9 Though he asserts that "male respondents in sexual misconduct cases at [the University] are discriminated against solely on the basis of sex" and are "invariably found guilty, regardless of the evidence, or lack thereof[,]" these statements are unsupported by even minimal data or credible anecdotal references; they are the type of conclusory statements that *Iqbal* and *Twombly* do not allow the court to consider. (Dkt. No. 1, Compl.¶ 122.) Plaintiff's suggestion that bias is evidenced because the Student Conduct Hearing Board credited Jane Doe's testimony rather than his own ignores the fact that the standard of proof used was the "preponderance of the evidence" standard. In the absence of specific factual allegations from which a factfinder could plausibly infer the influence of gender bias on the outcome of Plaintiff's disciplinary proceeding, that portion of his Title IX claim is dismissed.

The portion of Plaintiff's claim asserting selective enforcement must also be dismissed for similar reasons. As discussed above, Plaintiff has not pled facts from which a plausible inference of gender bias can be drawn. In addition, with respect to the selective enforcement claim, Plaintiff has not alleged any facts indicating male and female students accused of sexual harassment are treated differently by the university in terms of the way complaints are pursued or discipline is imposed.[6] Therefore, the court also dismisses that portion of Plaintiff's Title IX claim asserting selective enforcement based on his gender.

### IV. Conclusion

"Plaintiff's subjective belief that he was the victim of discrimination–however strongly felt–is insufficient to satisfy his burden at the pleading stage." *Doe v. Columbia Univ.* at *11. At this stage of the litigation, having accepted the assertions pled as true, the court recognizes Plaintiff's perception that the disciplinary process was stacked against him. On the other hand, none of the facts pled in his complaint indicate his disciplinary proceeding was tainted by gender bias, as opposed to bias against those accused of sexual harassment in violation of the University's Code. Even if there was that type of regrettable bias against any person merely accused, causing the disciplinary process to deviate from the Department's guidelines, it would not, on its own, violate Title IX. Plaintiff's allegations are simply not sufficiently detailed or specific; conclusory, threadbare assertions will not survive a dismissal challenge. Here, Plaintiffs allegations are not articulated in a way to support a plausible inference that the University's actions with respect to Plaintiff violated Title IX.

For the Foregoing reasons, Defendant's Motion to Dismiss is hereby ALLOWED.

It is So Ordered.

**All Citations**

Slip Copy, 2015 WL 4306521

Footnotes

1 Plaintiff also asserts, for the first time, in his Memorandum of Law in Opposition to Defendant's Second Motion to Dismiss (Dkt. No. 47), that his due process rights protected by the Fourteenth Amendment were violated by the University. Pursuant to Fed.R.Civ.P. 8(a), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of this requirement is to "give the defendant fair notice of what the ... claim is and the grounds on which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This requirement is not satisfied when a legal theory is advanced for the first time in an opposition to a defendant's motion to dismiss. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984) ("[I]t

    is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). In ruling on Defendant's motion to dismiss, the court considers only those legal theories set forth in Plaintiff's complaint.

2   Though Title IX prohibits discrimination "on the basis of sex," the First Circuit's substitution of the word gender indicates its understanding that Title IX, like Title VII, prohibits discrimination on the basis of either a person's biological sex or the person's gender identity. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir.2002) (using gender and sex interchangeably in the context of Title IX); *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 239 (1989) (using gender and sex interchangeably in the context of Title VII); *Miller v. New York Univ.,* 979 F.Supp. 248 (S.D.N.Y.1997) (ruling Title IX prohibition on discrimination on the basis of sex applied in case where plaintiff's biological sex and gender identity differed).

3   This court "must accord [the Department's] interpretation of Title IX appreciable deference." *Cohen v. Brown Univ.,* 991 F.2d 888, 895 (1st Cir.1993).

4   *See, e.g., Bleiler v. Coll. of the Holy Cross,* No. 11–11541, 2013 WL 4714340 (D.Mass. Aug. 26, 2013) (addressing complaint of male student disciplined for sexual harassment asserting college disciplinary proceeding against him was motivated by gender bias in violation of Title IX); *Doe v. Columbia Univ.,* No. 14–cv–3573, 2015 WL 1840402 (S.D.N.Y. Apr. 21, 2015) (same); *Yu v. Vassar Coll.,* No. 13–cv–4373, 2015 WL 1499408 (S.D.N.Y. Mar. 31, 2015) (same).

5   The court notes that *Yusuf* was decided prior to the Supreme Court's *Iqbal* and *Twombly* decisions and so when the Second Circuit examined the sufficiency of the complaint in *Yusuf* it applied the prior, more relaxed, standard with respect to the sufficiency of the factual allegations.

6   Plaintiff alleges he filed a harassment complaint against Jane Doe, but he does not describe the complaint as alleging sexual harassment.

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.