# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| JOHN DOE,<br>        *Plaintiff,*<br><br>  v.<br><br>WASHINGTON AND LEE UNIVERSITY,<br>        *Defendant.* | CASE NO. 6:14-cv-00052<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

## I. INTRODUCTION

John Doe ("Plaintiff"), proceeding pseudonymously, initiated this action on December 13, 2014. Plaintiff's Amended Complaint asserts five causes of action against Washington and Lee University ("Defendant," or "W&L"), all arising out of the school's decision to expel Plaintiff over allegations that he engaged in nonconsensual sexual intercourse with fellow W&L student Jane Doe. Plaintiff alleges that W&L's decision to discipline him amounts to a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), a deprivation of due process as guaranteed by the Fifth Amendment of the United States Constitution, and a breach of contract. Plaintiff also asks for declaratory judgment under 28 U.S.C. § 2201. The matter is now before the Court upon Defendant's April 7, 2015, Motion to Dismiss. While some of Plaintiff's legal arguments are without merit, I determine that he has pleaded factual allegations sufficient to support a Title IX claim. Accordingly, Defendant's motion will be granted in part and denied in part.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North*

*Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, (2007) (internal citations omitted). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *Chao v. Rivendell Woods, Inc.,* 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).

### III. FACTUAL ALLEGATIONS

Plaintiff alleges the following. On Saturday, February 8, 2014, Plaintiff and Jane Doe encountered one another at a party held off campus, whereupon they talked, danced, and "made out." Jane Doe drank alcohol at the event, and claimed that while her memory of that night was "fuzzy," she was not incapacitated or "blacked out." Am. Compl., Ex. B., at 18. Plaintiff also drank at the party. After the party concluded, the two spent half an hour together, talking on the porch of the house where the party had occurred. At Plaintiff's invitation, Jane Doe accompanied him back to his room via a campus transportation service.

– 2 –

Upon arrival at his bedroom, the couple sat on separate chairs and conversed without engaging in any physical contact. After they had spoken for an hour or so, Jane Doe approached Plaintiff in his chair and remarked "I usually don't have sex with someone I meet on the first night, but you are a really interesting guy." Am. Compl. ¶ 19. After making this statement, Jane Doe began kissing Plaintiff while he remained seated. She then took off all her clothing except her underwear and led plaintiff to his bed, at which point she took Plaintiff's clothes off. Once in bed, the two engaged in oral sex on each other. Plaintiff then advised Jane Doe that he did not have a condom available, and she responded by pulling Plaintiff closer to her and continuing to "make out." Jane Doe and Plaintiff began to engage in sexual intercourse, and at one point Jane Doe switched positions so that she was "on top." During this time, Jane Doe never asked Plaintiff to stop or advise him that she did not want to have sex. After they concluded, Jane Doe and Plaintiff again "made out" and talked for a while before falling sleep. Jane Doe spent the night with Plaintiff in his room.

The next morning, Plaintiff asked Jane Doe if she would like to go out for brunch, but because she had no clean clothes, she declined. Following this exchange, Plaintiff drove Jane Doe home, and they exchanged phone numbers as she got out of the car. The next day, Plaintiff sent Jane Doe a cellular text message but received no response. That same day, Jane Doe spoke to a friend about the encounter, indicated that she had sex with Plaintiff, stated she "had a good time last night," and did not suggest that anything nonconsensual happened.

After their encounter, Plaintiff and Jane Doe became "friends" on the social media website Facebook. On March 9, 2014, Plaintiff sent Jane Doe a message on that site reading: "Hey ummm I don't how to approach this but idk if I have your right cell phone number because I've texted you but got no response but I felt like we had a pretty good connection. [(---) --- ----]

is that you?" *Id*. ¶ 30.  Jane Doe responded: "haha I thought we did as well. it is actually [(---) --------]. also, I lost my phone at Das Klub so when I get it back feel free to text me if you like. thanks for reaching out."  *Id*. ¶ 31.  In March of 2014, roughly one month after the encounter, Jane Doe met with Plaintiff and they engaged in sexual intercourse that Jane Doe characterized later as consensual.

In the Winter Term of 2014, which lasted from January 6, 2014 to April 15, 2014, a witness saw Jane Doe and Plaintiff interact at various parties held at Plaintiff's fraternity house, but did not observe any indication that anything uncomfortable had occurred between the two; rather, he remarked that things looked very "normal."  On March 15, 2014, at a party held at the house, Jane Doe saw Plaintiff kissing another female and left the party early, upset.  By August 1, 2014 it was "public knowledge" that Plaintiff and this other female were an exclusive couple.

Jane Doe spent her 2014 summer break working at a women's clinic that dealt with sexual assault issues.  Over the next several months, Jane Doe engaged in discussions with various individuals about her first sexual encounter with Plaintiff in February 2014.  In July 2014, Jane Doe told a friend that she had been sexually assaulted.  Around the same time, Jane Doe applied to be a Peer Counselor at W&L.  In a section of her application labeled "life experiences or personal anecdotes you have that you think may help make you qualified to be a Peer Counselor" she presented experience and research done in connection with "grey rape," stating that she had performed a "Google search" and found "grey rape" and that she was happy to know that there was "some tangible definition" for what she claimed to have experienced. She presented her desire to "voice [her] story."

In September 2014, Jane Doe applied for a study abroad program in Nepal.  When she saw the list of applicants, she noticed that Plaintiff had applied as well.  Shortly thereafter, she

– 4 –

Case 6:14-cv-00052-NKM-RSB   Document 54   Filed 08/05/15   Page 4 of 20   Pageid#: 1143

visited a therapist and described to her "an evolution about how she felt about" her initial sexual encounter with Plaintiff, and that she had "a strong physical reaction" to seeing Plaintiff's name on the Nepal program's acceptance list. On October 5, 2014, Jane Doe attended a presentation put on by W&L's Title IX Officer, Lauren Kozak ("Ms. Kozak"). During Ms. Kozak's presentation, she introduced an article, *Is it Possible That There Is Something In Between Consensual Sex And Rape . . . And That It Happens To Almost Every Girl Out There?*, and discussed it with the members of SPEAK, a W&L student organization, to make her point that "regret equals rape," and went on to state her belief that this point was a new idea everyone, herself included, is starting to agree with.

On October 12, 2014, both Jane Doe and Plaintiff attended an informational session about the Nepal program. On October 13, 2014, Jane Doe contacted Ms. Kozak to report that she had been sexually assaulted eight months earlier, but indicated that she did not want W&L to take any action. On October 30, 2014, the list of students attending the semester abroad in Nepal program was made public; both Plaintiff and Jane Doe were selected. The next day Jane Doe decided that she wanted to proceed with an investigation of Plaintiff and she contacted Ms. Kozak to request as much.

Thereafter, Ms. Kozak, with the help of Associate Dean of Students Jason L. Rodocker ("Mr. Rodocker"), initiated an investigation of Plaintiff. On or about November 3, 2014, Ms. Kozak notified Plaintiff that he would need to meet with her and Mr. Rodocker within six hours. Ms. Kozak did not provide any explanation for this demand, and Plaintiff's request that he be advised on the subject-matter of the meeting went unanswered. That same day, Plaintiff met with Ms. Kozak, who interviewed him about his February 8, 2014 encounter with Jane Doe. Ms.

Kozak explained to Plaintiff that he was accused of sexual misconduct by Jane Doe and was now under investigation. She did not show him a copy of Jane Doe's complaint.

When Plaintiff asked if he could consult a lawyer, Ms. Kozak replied, "a lawyer can't help you here. We won't talk to them. This matter stays strictly within the school." Am. Compl. ¶ 66. Ms. Kozak and Mr. Rodocker required Plaintiff to come back and meet with them again the next day. At this meeting, Plaintiff again requested legal representation but Ms. Kozak rebuffed his demand, stating that a representative would not be allowed to participate during the investigation. When Plaintiff responded that another student who had gone through this same process was afforded representation, Ms. Kozak stated that the previous investigation of that student had occurred under the "old policy," but that Plaintiff's investigation was under the "new policy" and that, under the "new policy," the accused are not allowed to have representation during the investigation. Plaintiff asked Ms. Kozak and Mr. Rodocker if he could postpone the meeting, but they indicated a desire to move forward quickly and began to question him. Plaintiff responded that he did not want to be interviewed without representation, to which Ms. Kozak replied "that's fine we'll just submit the investigation report without your side of the story." *Id*. ¶ 69.

In response to this statement, Plaintiff abandoned his resistance and allowed Ms. Kozak to question him about his encounter with Jane Doe. Plaintiff asked Ms. Kozak if she wanted to hear about the first or the second time he had sexual intercourse with Jane Doe. Ms. Kozak appeared surprised, but asked Plaintiff to tell her whatever he felt was necessary. Plaintiff described both incidents as Ms. Kozak took notes. At the conclusion of the interview, Ms. Kozak insisted that Plaintiff sign a form agreeing not to discuss the investigation with anyone

– 6 –

and not to retaliate against Jane Doe. Ms. Kozak also asked Plaintiff for a list of people whom she should interview, and Plaintiff provided her with the names of four students.

In the course of the investigation, Ms. Kozak and Mr. Rodocker ultimately interviewed at least nine people. These witnesses included two of Plaintiff's four recommended witnesses and at least eight witnesses recommended by Jane Doe, although it is unclear from the pleadings if Jane Doe recommended additional individuals who were not interviewed. When Plaintiff questioned why two of his suggested witnesses were not interviewed, Ms. Kozak stated that the interviews would not be necessary, as they already had enough facts. In any event, Ms. Kozak and Mr. Rodocker summarized each interview in writing as "witness statements" which would later be presented to the Student Faculty Hearing Board ("SFHB"). During the interviews, the following witnesses observed Plaintiff and/or Jane Doe immediately after the encounter during the Winter Term 2014:

- Plaintiff's roommate . . . stated that he was in the room shortly after the sexual intercourse ended and "nothing seemed abnormal," the next morning he woke up to hear them talking and the "tone of voices was normal and nothing indicated to [him] that anything strange had occurred between them," and he recalls that he "got a positive vibe from [Plaintiff] about the encounter" afterward;

- Plaintiff's acquaintance . . . stated that he saw Plaintiff and Jane Doe talking on the night of the Incident, learned that Plaintiff thought Jane Doe seemed really cool, was aware that Plaintiff and Jane Doe "hooked up again in March," and that Jane Doe has since attended parties at the fraternity house and been in the presence of Plaintiff where "there never seemed to be anything wrong. It seemed to be two people who got along well";

- Jane Doe's friend . . . stated that the next day after the Incident, Jane Doe said she had sex with Plaintiff but "didn't insinuate that anything was wrong and she made it seem as if it was consensual" and said she had a "good time last night," but that five months later, Jane Doe claimed that she had been "assaulted by Plaintiff during winter term," but that "at first she didn't see it as sexual misconduct and had been really confused"; and

- Jane Doe's old roommate . . . stated the next morning after the Incident, Jane Doe "seemed confused whether something was wrong about what had happened" and

– 7 –

> claimed she didn't want to have sex, but remarked that [Jane Doe's old roommate] was surprised to learn of the sexual misconduct allegations because Jane Doe "never told her that she thought of it as a sexual assault," and it was not until after Jane Doe had "worked at a women's clinic that dealt with the sexual assault issues" over the summer that Jane Doe said she was sexually assaulted.

Am. Compl. ¶ 76. Two witnesses who purported to be Jane Doe's therapists also spoke with the investigators and gave the following accounts:

- The first therapist . . . stated that Jane Doe visited her twice in the Winter Term 2014 and described that she "had feelings for Plaintiff" and she "enjoyed the sexual intercourse with Plaintiff," but the therapist, "walked her through those feelings to discuss how her actions and feelings didn't negate that it was a sexual assault," and

- The second therapist . . . stated that Jane Doe came to visit her in September 2014 and described "an evolution about how she felt about the incident," that she "felt confused" and that "she had a strong physical reaction" to seeing Plaintiff's name on the Nepal trip acceptance list, which prompted her to "proceed to a [disciplinary] hearing."

*Id.* ¶ 78.

Ms. Kozak and Mr. Rodocker prepared an investigative report based on their summaries of the interviews and the Facebook messages passed along to them from Plaintiff. On November 10, 2014, they called Plaintiff into Mr. Rodocker's office and presented him with the report, requiring him to review it in their presence and present them with any comments he had on it. Plaintiff believed that Ms. Kozak's summary of his verbal account of the events was incomplete and did not include all the facts. He took particular issue with the fact that Ms. Kozak had included the first part of Jane Doe's remark to Plaintiff, that she usually does not have sex with someone the first time she meets them, but omitted the second clause of that statement, "but you are a really interesting guy."[1] On November 11, 2014, Ms. Kozak and Mr. Rodocker concluded

---

[1] The investigative report explained that Jane Doe denied making any part of this statement: "[Jane Doe] doesn't think that she would have ever said that she doesn't normally sleep with someone that she just met. She had slept with people that she had just met. In fact, she didn't want to sleep with [John Doe] that night because she had decided she didn't want to do that anymore." Am. Compl., Ex. B., at 10.

– 8 –

the investigation and forwarded their report to Dean Tammi Simpson ("Ms. Simpson"). This report was amended on November 18, 2014 to include some, but not all, of Plaintiff's suggested corrections. For example, the report was not amended to reflect Jane Doe's alleged statement "but you are a really interesting guy."

On November 12, 2014, Ms. Simpson required Plaintiff to attend a meeting in her office. Plaintiff was not permitted to have legal representation at this meeting but was permitted, for the first time, to be assisted by student-Honor Advocates. Ms. Simpson told Plaintiff that he could opt to transfer rather than be formally charged, thus keeping his record "clean." When Plaintiff rejected this offer, Ms. Simpson urged him to reconsider. On November 13, 2014, Plaintiff was informed in writing that he would be charged with sexual misconduct and that a hearing would be held within fourteen days. The notice indicated that Plaintiff was not to discuss the case with anyone other than family and those necessary to obtain support, and it expressly prohibited communication with any witnesses. On or about November 17, 2014, Ms. Simpson contacted one of Plaintiff's Honor Advocates and asked the advocate to convince Plaintiff to withdraw from W&L. The next day, Ms. Simpson met with Plaintiff, who again rejected her offer to avoid a formal charge by withdrawing or transferring from the university. During this meeting Plaintiff was presented with a list of possible members for the SFHB and was required to make any objections to them on the spot. Plaintiff maintains that he was not given any information regarding the background or potential biases of these members, and that he would have objected to the inclusion of Professor David Novack, later selected as a SFHB member, on the basis of his academic work.[2] Plaintiff contends that this procedure was in contravention of W&L's Interim Sexual Harassment and Misconduct Policy, which required that

---

[2] Mr. Novack has produced works such as "The Gender Conundrum and Date Rape: The Potential Significance of Dimensions of Power" and "Rape Nullification in the United States: A Cultural Conspiracy."

– 9 –

> [e]ach member of the Panel must be neutral and impartial. The complainant and respondent shall be informed of the Panel's composition at least 48 hours in advance of the hearing. Either party may object to the appointment of any member of the Panel, directing that objection to the Chair, and stating the basis for the objection. The Chair will make the final determination on a member's ability to serve on the Panel. Additionally, any Panel member who has reason to believe he or she cannot make an objective determination must recuse himself or herself from the process."

Am. Compl., Ex. A., at 41.

A hearing was set for November 20, 2014, before a panel of four SFHB members, two W&L professors and two W&L students, all selected by Ms. Simpson, who acted as SFHB Chairperson. On November 19, 2014, Plaintiff's Honor Advocate made a written request to Ms. Simpson, asking that the hearing be recorded for purposes of making a record. Ms. Simpson denied this request, and no record of any kind was compiled for the hearing. At the hearing, there was no direct testimony of witnesses or presentation of the statements made by witnesses, rather, the SFHB relied entirely on the summaries of witness statements prepared by Ms. Kozak and Mr. Rodocker, which had been memorialized in the Investigation Report. Jane Doe was physically separated from Plaintiff by a partition, and Plaintiff was not allowed to question her directly or even to see her. Instead, Plaintiff was required to submit written questions to Mr. Simpson, who would review them for relevancy before passing them on to the members of the SFHB for further review of their relevancy. The SFHB panel would proceed to ask the questions only if they deemed them to be appropriate, and when they did so, they would often paraphrase the questions and ask them in an order different than what was requested by Plaintiff. The SFHB refused to ask Jane Doe questions when it calculated that doing so would cause her emotional distress. Both before and after the hearing, Plaintiff's Honor Advocates asked Ms. Simpson for a record of the questions that were asked and those that the SFHB refused to ask, but Ms. Simpson rebuffed this request.

Plaintiff draws attention to several alleged inconsistencies in Jane Doe's testimony. For instance, during the investigation Jane Doe claimed that although she drank at the party, she was not incapacitated; at the hearing, however, she stated that she was "considerably intoxicated." In the investigative report, Jane Doe claimed that she had no recollection of talking to Plaintiff on the porch after the party, whereas at the hearing, she remembered that conversation in detail. Moreover, early in the hearing, Jane Doe described Plaintiff as disrespectful, dishonorable, and having treated her as though she was worthless, but when asked later in the proceedings about what kind of connection she had with Plaintiff, she said that it was great and that Plaintiff was smart, interesting, sweet, and genuinely interested in her. The SFHB generally did not question Jane Doe about these inconsistencies. One panelist, however, did ask Jane Doe why she could recall her statements purporting to object to sexual intercourse so clearly, while she was unable to recall other parts of the evening with the same clarity. In response, Jane Doe stated, "I know I said it because I know I said it," which ended that line of questioning. Am. Compl. ¶ 107. The SFHB also did not consider any evidence relating to the second instance of sexual intercourse between Plaintiff and Jane Doe, which both individuals agreed was consensual.

On November 21, 2014, Plaintiff received a letter informing him that by a vote of 3-1, the SFHB had found him responsible for non-consensual sexual intercourse and that he would be expelled from W&L. There was no explanation for this decision, aside from a statement that the SFHB had evaluated the case and "determined by a preponderance of the evidence that the Respondent did not have effective consent, and engaged in non-consensual sexual intercourse in violation of the Interim Sexual Misconduct Policy." *Id*. ¶ 121. The letter further indicated that Plaintiff had three days to file an appeal.

– 11 –

Upon learning of this decision, Plaintiff timely filed an appeal. The W&L Student Handbook lists several factors which are to be considered by the University Board of Appeals ("UBA") in the event of an appeal:

> The UBA may grant or reject a request for appeal based on one or more of the following grounds if it reasonably determines the ground(s) would more likely than not impact the underlying decision: (1) no reasonable basis/reasonable basis for sanction; (2) new relevant information/no new relevant information; (3) procedural defect or error/no procedural defect or error; or (4) extraordinary circumstances/no extraordinary circumstances. If the UBA decides to grant an appeal, it may decide the case based solely upon the record of the conduct body, the written appeal and other documents it deems relevant, or the UBA may determine to hold a hearing and seek additional information from: i) any person who provided first-hand information to the student conduct body; ii) any person who may have new, relevant information; and/or iii) the Chair of the conduct body, before reaching its final decision.

Am. Compl., Ex. H., at 55. On December 3, 2014, the UBA denied Plaintiff's appeal by a 2-1 vote. The basis for the denial of the appeal was also not explained in any level of detail.

Plaintiff alleges that W&L's investigation and hearing occurred in an environment that created pressure for the university to punish male students for sexual misconduct. The letter from W&L's president announcing the appointment of Ms. Kozak as Title IX Officer prominently mentioned the fact that many universities were under currently under investigation for violating Title IX. This letter followed a May 1, 2014 press release from the United States Department of Education's Office of Civil Rights, which stated that colleges and universities could lose federal funding or face other consequences if they failed to address problems with sexual violence on campus. Further, just one day prior to W&L's November 20, 2014, decision finding Plaintiff responsible for sexual misconduct, *Rolling Stone* published the article, *A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA*, which described the now-debunked tale of a female student who was a victim of gang rape at the University of Virginia. That article painted the University of Virginia as unresponsive to complaints of campus sexual

– 12 –

assault and led to a surge of negative publicity for the university. Plaintiff contends that W&L was motivated to find him responsible for sexual assault in order to avoid a similar backlash. Plaintiff notes that on December 1, 2014, less than two weeks after the SFHB panel voted to expel him, W&L issued a press release, "A Time to Examine, Affirm Our Commitments," in response to the Rolling Stone article.

## IV. Discussion

### *a. Due Process*

Plaintiff argues that W&L's actions violated his Fifth Amendment right to due process. Had Plaintiff been enrolled at a public university, he would have been entitled to due process and the proceedings against him might have unfolded quite differently. Unfortunately for Plaintiff, W&L is a private university, and as such, is generally not subject to the constitutional protections of the Fifth Amendment. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 (1987). There are, however, limited circumstances wherein the Fifth Amendment applies to a private university, namely when the conduct at issue is "[governmental] action," that is where it "can fairly be attributed to the [federal government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Although "[t]here is no precise formula to determine whether otherwise private conduct constitutes [governmental] action," courts have developed several tests to guide this inquiry in the Fourteenth Amendment context, and these tests are equally applicable to the Fifth Amendment. *Arlosoroff v. Nat'l Collegiate Athletic Ass'n*, 746 F.2d 1019, 1021 (4th Cir. 1984); *see also Geneva Towers Tenants Org. v. Federated Mortg. Investors*, 504 F.2d 483, 487 (9th Cir. 1974) ("The standards utilized to find federal action for purposes of the Fifth Amendment are identical to those employed to detect state action subject to the strictures of the Fourteenth Amendment."). The United States Court of Appeals for the Fourth

Circuit has identified three situations in which a private party's conduct can be considered governmental action: "(1) when there is either a sufficiently close nexus, or joint action between the [government] and the private party; (2) when the [government] has, through extensive regulation, exercised coercive power over, or provided significant encouragement to, the private actor; or (3) when the function performed by the private party has traditionally been an exclusive public function." *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 269 (4th Cir. 1998)

Plaintiff argues that W&L's disciplinary proceedings can be attributed to the government because the decision to discipline him was motivated by guidance received from the United States Department of Education's Office of Civil Rights (the "OCR"). Plaintiff's position rests largely on the 2011 "Dear Colleague" letter that the OCR sent to universities across the country, including W&L. That letter provided guidance as to how schools should conduct sexual misconduct investigations and warned them that if they did not adequately address sexual assault on campus, then they could face loss of federal funding, investigation by the OCR, and referral to the Department of Justice for civil or criminal action. While it is plausible that W&L was under pressure to convict students accused of sexual assault in order to demonstrate that the school was in compliance with the OCR's guidance, for Fifth Amendment protections to apply, "[t]he government must have compelled the act of which [Plaintiff] complains." *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 218 (4th Cir. 1993). Responding to the OCR's guidance, W&L made changes that one could infer were designed to secure more convictions. W&L removed protections that had previously been afforded to the accused, such as the right to counsel, and adopted a low burden of proof, preponderance of the evidence, rather than the beyond a reasonable doubt standard used for honor code violations. Plaintiff does not, however allege that the government deprived W&L of its autonomy to investigate and adjudicate charges,

– 14 –

nor does he contend that the government participated in the decision-making process at any stage of the proceedings, factors crucial to the determination of whether a school's actions are attributable to the government. *See Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1028 (2d Cir. 1995) (finding no state action where the state "neither drafted the disciplinary code, nor participated in determining what sentence was to be handed out under it."); *accord Stefanowicz v. Bucknell Univ.*, No. 10-CV-2040, 2010 WL 3938243, at *3 (M.D. Pa. Oct. 5, 2010) (determining that university was not a state actor when the "hearing at issue appear[ed] to be strictly an internal investigation, conducted freely from state intervention."). On these allegations, W&L cannot be considered a governmental actor subject to the due process requirements of the Fifth Amendment.

### b. Title IX

Title IX prohibits any school which receives federal funds from discriminating on the basis of sex. 20 U.S.C. § 1681. A student discriminated against on this basis may enforce Title IX through an implied private right of action. *See Cannon v. University of Chicago,* 441 U.S. 677, 688-89 (1979). When, as here, a student challenges the outcome of a school disciplinary proceeding under Title IX, courts have generally followed the framework developed in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). In *Yusuf*, the United States Court of Appeals for the Second Circuit looked to the body of law surrounding Title VI of the Civil Rights Act of 1964, which prohibits race discrimination in all programs receiving federal funds, and articulated two theories of Title IX liability: "erroneous outcome" and "selective enforcement." *Id.* at 714-15; *see also Cannon,* 441 U.S. at 704 (explaining that Title IX was modeled after Title VI, as both "sought to accomplish two related, but nevertheless somewhat different, objectives.").[3] The erroneous outcome standard applies when a plaintiff claims that a university disciplinary

---

[3] Plaintiff has not argued that a "selective enforcement" violation occurred, so I will not evaluate such a claim here.

– 15 –

proceeding wrongly found him responsible for an offense. *Yusuf*, 35 F.3d at 715. A plaintiff seeking relief under this standard must allege facts which establish a causal link between the erroneous outcome and gender bias. *Id*.; *see also Sahm v. Miami Univ.*, No. 1:14-CV-698, 2015 WL 93631, at *5 (S.D. Ohio Jan. 7, 2015) ("A plaintiff bringing an erroneous outcome claim must plead two elements: (1) facts sufficient to cast doubt as to the accuracy of the outcome of the disciplinary proceeding and (2) causation [by gender bias]."). "Allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf*, 35 F.3d at 715. Rather, a plaintiff must "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. For example, plaintiff might point to the existence of "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender," or "statements reflecting bias by members of the tribunal." *Id*.

Plaintiff has pleaded sufficient facts to cast doubt on the accuracy of the outcome reached in the proceeding against him. Plaintiff's allegations, taken as true, suggest that W&L's disciplinary procedures, at least when it comes to charges of sexual misconduct, amount to "a practice of railroading accused students." *Haley v. Virginia Com. Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996). Plaintiff alleges a host of flaws in W&L's handling of his case, ranging from critical omissions in what Ms. Kozak and Mr. Rodocker included in the witness summaries, to the SFHB's failure to consider evidence of Plaintiff and Jane Doe's post-incident consensual sexual encounter.[4]

---

[4] W&L's policies state that the school will not consider a complainant's *prior* sexual history with the accused student; however, the policies do not state that consideration of the complainant's *post-incident* sexual history with the accused student is precluded. *See* Am. Compl., Ex. A., at 46-47

– 16 –

To be sure, "[t]he mere fact that sexual harassment proceedings have as their subject sexual behavior and speech does not itself implicate sex discrimination," and thus these flaws are not in and of themselves evidence of gender bias. *Id.* at 579. Even if accused students are inevitably found guilty, and their accusers are not subject to any real skepticism or scrutiny, such a bias against the accused may well reflect "lawful, independent goals, such as a desire . . . to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity." *Doe v. Columbia University*, No. 14-cv-3573, 2015 WL 1840402, at *12 (S.D.N.Y. Apr. 21, 2015). Although Plaintiff has carried his burden with respect to the accuracy of the proceedings, he must also demonstrate that the erroneous outcome was caused by gender bias.

Given the totality of the circumstances, including the alleged flaws in the proceedings and statements made by W&L officials, Plaintiff has plausibly established a causal link between his expulsion and gender bias. For example, gender bias could be inferred from Ms. Kozak's alleged October 5, 2014 presentation, wherein she introduced and endorsed the article, *Is It Possible That There Is Something In Between Consensual Sex And Rape . . . And That It Happens To Almost Every Girl Out There?* That article, written for the female-focused website *Total Sorority Move*, details a consensual sexual encounter between a man and the female author of the article, who comes to regret the incident when she awakens the next morning. As Plaintiff describes it, the article posits that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly

– 17 –

express.[5] This presentation is particularly significant because of the parallels of the situation it describes and the circumstances under which Plaintiff was found responsible for sexual misconduct.[6] Bias on the part of Ms. Kozak is material to the outcome of John Doe's disciplinary hearing due to the considerable influence she appears to have wielded in those proceedings. *Cf. Mallory*, 76 F. App'x at 640 (determining that gender-biased statements made by the university's Director of Judiciaries did not taint the proceedings because the plaintiff did not show how the Director could have influenced tribunal's decision). Given these allegations, as well as Plaintiff's charge that W&L was under pressure from the government to convict male students of sexual assault, a reasonable fact finder could plausibly determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias.

### c. Breach of Contract

Plaintiff contends that he entered into a contractual relationship with W&L upon enrollment, the terms of which are governed by the Student Handbook and the Interim Sexual Harassment and Misconduct Policy. He argues that W&L violated the implied covenant of good

---

[5] The content of the article supports Plaintiff's characterization. Opining on her experience, the author writes:
> There is not a word for my experience. The fact that there's not a word for it makes us feel like it doesn't exist. Or maybe there's not a word for it because we're pretending it doesn't exist. But this weird place in between consensual sex and rape? It's there. It *does* exist. And it's happening all the time. As it turns out, almost every woman I spoke to had been there at some point or another:
> "To be honest, it would have been awkward to say no, so I just did it."
> "I don't feel like it was a huge deal. Sometimes you have to have lunch with girls you don't want to have lunch with, and sometimes you have to have sex with boys you don't want to have sex with. Maybe you're pissy about it right after, but it doesn't affect you long-term, you know?"
> "He was really drunk. He had no way of knowing I didn't want it."
> It happens to us with consistent hookups, first dates, boyfriends, and one-night stands alike. We have sex with guys, because sometimes it's just easier to do it than to have the argument about not doing it.

Am. Compl., Ex. I., at 2-3.

[6] This article, offered by Ms. Kozak as educational material to a W&L student organization, is inherently different from the training materials considered in *Bleiler v. Coll. of Holy Cross*, No. CIV.A. 11-11541-DJC, 2013 WL 4714340 (D. Mass. Aug. 26, 2013), which the court determined not to be evidence of gender bias. Those materials were allegedly slanted in favor of the accuser, but unlike the article at issue here, used completely neutral language with respect to gender. *Id*. at *12.

faith and fair dealing by finding him culpable of sexual misconduct in spite of the evidence weighing against this conclusion.

In order to have a contract with enforceable obligations, Virginia law requires an "absolute mutuality of engagement, so that each party has the right to hold the other to a positive engagement." *Smokeless Fuel Co. v. W.E. Seaton & Sons*, 52 S.E. 829, 830 (Va. 1906). If both parties are not bound to perform, then the contract is illusory and unenforceable. *Id.* Courts applying Virginia law routinely reject the notion that a "Student Handbook" creates a mutuality of engagement where the terms of the handbook are subject to change. *See, e.g., Abbas v. Woleben*, No. 3:13-cv-00147, 2013 WL 5295672, at *4 (E.D. Va. Sept. 19, 2013) ("The handbook states that 'it is a useful guide ... [and] proposed modifications are always welcome.' These terms do not bind [the Medical College of Virginia] because they can change them at any time. Thus, the handbook does not establish a contract."); *Davis v. George Mason University*, 395 F. Supp. 2d 331, 337 (E.D. Va. 2005) ("Here, the [George Mason University] Catalog amounts to an unenforceable illusory contract because it purports to promise specified performance, but the performance by GMU, the promissor, is entirely optional."). The Student Handbook states, "[t]he policies of Washington and Lee University are under continual examination and revision. This Student Handbook is not a contract; it merely presents the policies in effect at the time of publication and in no way guarantees that the policies will not change." Am. Compl., Ex. H., at 4. Accordingly, the Student Handbook does not form a mutuality of engagement between W&L and Plaintiff, and therefore does not create a contract.

Likewise, this reasoning applies to the terms of the Interim Sexual Harassment and Misconduct Policy, which also does not create a contract between W&L and Plaintiff. While Plaintiff contends that the abovementioned legal doctrines do not apply to the Interim Sexual

– 19 –

Harassment and Misconduct Policy because it is contained in a separate document, rather than in the Student Handbook itself, I find this argument unpersuasive. The Student Handbook was distributed digitally and the sections of it which explicitly refer to the Interim Sexual Harassment and Misconduct Policy are hyperlinked directly to the Interim Policy. Therefore the Interim Sexual Harassment and Misconduct Policy is incorporated by reference into the Student Handbook, which is not a contract. *See Power Paragon, Inc. v. Precision Tech. USA, Inc.*, No. CIV. A. 7:08CV00542, 2009 WL 700169, at *9 (W.D. Va. Mar. 17, 2009) (explaining that "Virginia courts have recognized that parties may incorporate extrinsic documents into their agreement. The doctrine of incorporation by reference will apply when the primary document explicitly identifies the secondary document to be incorporated.") (citing *NB Mortgage Corp. v. Lone Star Indus., Inc.,* 215 Va. 366, 369 (1974)). Moreover, the terms of the Interim Sexual Harassment and Misconduct Policy cannot plausibly be considered anything other than "policies," which, as explained above, are not contractual in nature because they are subject to "continual examination and revision." Am. Compl., Ex. H., at 4.

## V. CONCLUSION

As set forth above, Plaintiff's allegations plausibly support a Title IX claim, and because his request for declaratory relief is subsumed in his other claims, it too survives the motion to dismiss. His claims for constitutional due process and breach of contract, however, fail as a matter of law. Accordingly, Defendant's motion to dismiss will be granted in part and denied in part. An appropriate order accompanies this memorandum opinion.

Entered this __5th__ day of August, 2015

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE