IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

JOHN DOE,
        Plaintiff,

v.                                 Case No.: 6:14-cv-00052-NKM

WASHINGTON AND LEE UNIVERSITY,
        Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

In his Motion to Compel (the "Motion"), Plaintiff improperly seeks confidential attorney-client communications between Washington & Lee University's ("W&L") in-house counsel and W&L's employees who were acting within the scope of their employment as agents of W&L in carrying out executive functions of the University. Plaintiff's Motion contravenes well-settled law and is devoid of factual or legal support. Moreover, the Motion appears to be based upon Plaintiff's mistaken assumption that W&L has purposefully and maliciously withheld and/or misrepresented the nature of certain "gotcha" documents that Plaintiff believes will win his case. This is simply not the case. As a result, W&L respectfully requests this Court deny Plaintiff's Motion to Compel.

### SUMMARY OF RELEVANT FACTS AND DOCUMENTS AT ISSUE

In accordance with the Federal Rules of Civil Procedure, W&L produced to Plaintiff a privilege log compliant with F.R.C.P. 26(b)(5), a copy of which is attached hereto at Exhibit A (the "Privilege Log"). The Privilege Log lists 252 documents, by Bates Number, which were either produced with portions redacted or withheld entirely based upon an assertion of attorney client privilege or the work product doctrine. Counsel for the parties engaged in discussions

1

regarding the documents listed in the privilege log. Although some of these discussions were verbal in nature, they were also summarized in writing in the e-mail chain attached hereto at Exhibit B. As this e-mail chain memorializes, in response to plaintiff's concerns about items included on the privilege log, W&L revisited those documents, and made some changes to the privilege log, resulting in the Privilege Log attached hereto.[1] W&L's counsel also provided an explanation for some of the issues raised by Plaintiff's counsel. Thus, W&L has attempted to confer with Plaintiff to resolve these issues, but the Plaintiff was apparently unsatisfied with the explanations and reasoning provided.

Curiously, Plaintiff's Motion to Compel fails to produce or even refer with specificity to any of the documents with which it takes issue, instead attempting to remove the ability of W&L to claim any privilege whatsoever. It is important, however, for the Court to understand the true, and, ultimately, narrow scope of the documents for which W&L has claimed a privilege.

Of the 252 documents listed in the Privilege Log, 97 of those documents concern the drafting and adoption of interim and revised policies regarding sexual misconduct that W&L was considering during the relevant time period. To Defendant's knowledge, Plaintiff has not taken any issue with the designation of those items as privileged and/or work product; as a result, they will not be discussed herein.[2]

The remaining 155 documents are easily divided into six specific topic areas, as follows:

1. E-mails regarding a request by one of John Doe's honor advocates that the SFHB hearing be recorded;

---

[1] These changes included changes to the redactions to include certain portions of text which had been inadvertently or incorrectly redacted, as well as providing redacted versions of some documents which had been previously withheld altogether.
[2] Should Plaintiff's dispute the redaction and or withholding of any of those documents, W&L requests the opportunity to respond.

2. E-mails and documents in which the SFHB report to the UBA was discussed and revised;

3. E-mails and documents in which draft letters to John Doe and Jane Doe documenting the result of the SFHB hearing were discussed and revised;

4. E-mails discussing the deadline by which John Doe had to file any request for an appeal;

5. E-mails discussing Jane Doe's request for certain remedial action (prior to any formal charge being filed), and whether W&L had the ability and/or duty to provide such action; and

6. E-mails and documents seeking review and providing feedback on the charge form explaining the charge against John Doe.

Plaintiff's Motion to Compel attempts to undermine the privileged nature of these documents by arguing that (1) W&L's in-house counsel could not have established the requisite attorney client relationship with W&L's Title IX Coordinator, SFHB, or UBA; (2) W&L has wrongfully claimed privilege over communications in which in-house counsel was one of multiple recipients; and (3) W&L willfully destroyed relevant documents, erasing any attorney client privilege that might have existed. Each of these arguments is wrong, both legally and factually.

**ARGUMENT**

Plaintiff's Motion to Compel reads as though it is from a completely different lawsuit. In his Motion, he argues that W&L remained wholly detached from its Title IX Coordinator, Student Faculty Hearing Board ("SFHB"), and Board of Appeals ("UBA") and that W&L had no legitimate interest in advising them of their legal obligations. Plaintiff's argument, however,

contradicts his own Complaint, in which the causes of action are predicated upon the actions of these entities as agents of W&L, and every procedural decision by these entities serves as the basis for a federal claim. This Court does not need to look any further than Plaintiff's own lawsuit to see the need for in-house counsel's advice regarding W&L's policies and its overarching obligations under federal law.

As explained below, the Title IX Coordinator, SFHB, and UBA were functional parts of W&L's overall response to Jane Doe's sexual misconduct allegations, and in-house counsel's communications with these entities constituted legal advice on how to interpret and adhere to W&L's internal policies and Title IX. Plaintiff's view of the role of the university's in-house counsel not only undermines his own case, but is simply not supportable given the nature of the role of in-house counsel at a university. As a result, W&L respectfully requests this Court deny Plaintiff's Motion to Compel.

## I. Emails Between W&L's In-house Counsel, Chairs of the SFHB and UBA, and Title IX Coordinator Are Protected By Attorney Client Privilege.

The attorney client privilege "is the oldest privilege for confidential communications known to the common law." Deel v. Bank of Am., N.A., 227 F.R.D. 456, 457-58 (W.D. Va. 2005) (citing Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981)). The Fourth Circuit has endorsed the "classic test" for attorney client privilege:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar or court, or his subordinate and (b) in connection with this communication is acting in his capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purposes of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed (b) and not waived by the client.

In re Grand Jury Subpoena, 341 F.3d 331, 335 (4th Cir. 2003). When the privilege applies, it "affords confidential communications between lawyer and client complete protection from disclosure." Deel, 227 F.R.D. at 457-58.

**A. The SFHB Chair, UBA Chair, and Title IX Coordinator Maintained An "Attorney Client Relationship" With W&L's In-house Counsel**

It is well-established that "employees of a corporate client can be considered 'clients'" for the purposes of attorney client privilege. Carter v. Cornell Univ., 173 F.R.D. 92, 94 (S.D.N.Y. 1997); see also Deel, 227 F.D.R. at 460. Specifically, "[c]ommunications between an attorney and a corporate client's employees are privileged so long as they are made to an attorney for the purpose of securing legal advice and concern matters within the scope of the employees' corporate duties." Id.; see also Long v. Anderson Univ., 204 F.R.D. 129, 134 (S.D. Ind. 2001) (noting that university employees "should be able to discuss amongst themselves legal advice given to them as agents of the corporation with an expectation of privilege"); Jonathan Corp. v. Prime Computer Inc., 114 F.R.D. 693, 696 (E.D. Va. 1987) ("[C]ommunications between a corporation's in-house counsel and employees of that corporation may be protected by attorney-client privilege.")[3]

The chairs of the SFHB and UBA, as well as the Title IX Coordinator, are employees of W&L, and they properly looked to W&L's in-house counsel for legal advice. Plaintiff's arguments to the contrary are circular and untenable. In his Motion, Plaintiff argues that the SFHB and UBA were "independent" and that their actions were detached from the University's

---

[3] Although Plaintiff argues that the Title IX Coordinator, Lauren Kozak, was not in the "control group," see Pl.'s Br. at 7, the United States Supreme Court has expressly rejected the "control group" test. See In re Perrigo Co., 128 F.3d 430, 437 (6th Cir. 1997) ("In Upjohn v. United States, 449 U.S. 383 (1981), the Supreme Court addressed the issue of the proper scope of the attorney-client privilege in the corporate setting. Rejecting the "control group" test, the Court held that the privilege applies to communications by any corporate employee regardless of position when the communications concern matters within the scope of the employee's corporate duties and the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation."); see also Cornell Univ., 173 F.R.D. at 94-95 (discussing Upjohn).

5

interests, yet his entire lawsuit against W&L is based on the actions of those Boards, and seeks to impute their actions to the University. Plaintiff cannot have it both ways. If the Boards were not agents or employees of the University, then there would be no basis to impute liability to W&L.

Plaintiff ultimately conflates the Boards' impartial structure with their legal status. Similar to divisions or departments in a corporation, these Boards and the Title IX Coordinator – which were created and defined by W&L's own policies – were functional divisions of the university and remained parts of W&L's overall, coordinated response to an allegation of sexual misconduct involving two students. As such, these entities were agents of W&L and clients of W&L's in-house counsel. To hold otherwise would require the chair of the SFHB, chair of the UBA, and Title IX Coordinator – all of whom were designed to perform separate functions – to secure independent legal counsel. Plaintiff, not surprisingly, has failed to come forward with any legal support for this position. As employees and agents of W&L, these people appropriately sought and received legal counsel from W&L's in-house counsel. Therefore, the attorney client privilege is appropriately asserted when the additional elements of the test for attorney client privilege are met.

**B. Communications with In-house Counsel Constituted Legal Advice**

"No doubt exists that under normal circumstances, an attorney's advice provided to a client, and communications between attorney and client are protected by attorney-client privilege." In re Grand Jury Proceedings, 102 F.3d 748, 750 (4th Cir. 1996). Importantly, "the attorney-client privilege protects not only the attorney-client relationship in imminent or ongoing litigation but also the broader attorney-client relationship outside the litigation context." *T.E. v. So. Berwyn Sch. Dist.*, 600 F.3d 612, 621 (7th Cir. 2009). Relevant here, the role of an in-house

counsel is broad and "not demarcated by a bright line." In re Cnty. of Erie, 473 F.3d 413, 419–20 (2d. Cir. 2007). As the Second Circuit explained:

> The complete lawyer may well promote and reinforce the legal advice given, weigh it, and lay out its ramifications by explaining: how the advice is feasible and can be implemented; the legal downsides, risks and costs of taking advice or doing otherwise; what other persons are doing and thinking about the matter; or the collateral benefits, risks or costs in terms of expense, politics, insurance, commerce, morals, and appearances. So long as the predominant purpose of the communication is legal advice, these considerations and caveats are not other than legal advice or severable from it.

Id. at 420. On that point, legal advice necessarily includes reviewing drafts of documents that were "prepared or circulated for the purpose of giving or obtaining legal advice and contain information or comment not included in the final version." *Dempsey v. Bucknell Univ.*, 296 F.R.D. 323, 331 (M.D. Pa. 2013).

Counsel's communications with the SFHB, UBA, and the Title IX Coordinator constitute legal advice and are shielded by attorney client privilege. Although Plaintiff tries to pick apart emails arguing that counsel was merely one of several people copied on an e-mail, that argument ignores counsel's overarching role in this case, and the fact that it was entirely appropriate for in-house counsel to collaborate and provide advice to multiple employees and agents of the university. Long v. Anderson Univ., 204 F.R.D. at 134 (university employees "should be able to discuss amongst themselves legal advice given to them as agents of the corporation with an expectation of privilege"). W&L's counsel coordinated and oversaw the investigation into Jane Doe's allegations – weighing in at appropriate times – to ensure that the Boards and the Title IX Coordinator complied with both internal W&L policies and the requirements of Title IX.[4] See

---

[4] To be clear, however, at no time did W&L's in-house counsel direct or advise the SFHB, UBA, or Title IX Coordinator with respect to the *outcome* of the proceedings. Instead, in-house counsel provided advice and drafting regarding the implementation of procedures and the communication of the outcomes to the involved parties. Such

7

e.g., In re Allen, 106 F.3d 582, 601 (4th Cir. 1997) (holding that attorney led investigation into corporate misconduct retained privilege). The mere fact that the present matter is pending before this Court underscores the need for the individuals and entities responsible for implementing the protections afforded by Title IX to have access to legal counsel.

This Court does not need to look beyond Plaintiff's own allegations to see the need for in-house counsel's involvement in this case. Plaintiff bases his entire Title IX claim on allegations that the Board failed to follow W&L's own policies, and he describes these alleged procedural deficiencies throughout his Complaint.[5] As these allegations make clear, W&L's employees properly looked to in-house counsel at various points to determine whether their actions complied with both W&L's policies and Title IX. Although Plaintiff might disagree with counsel's interpretation of what W&L's policies required, this lawsuit highlights the very reason why these individuals sought and had need of legal advice.

The examples listed in Plaintiff's Motion to Compel reinforce this conclusion. In his Motion, for example, Plaintiff alleges that emails regarding his appeal are not protected because "the University had no discernible legitimate interest in the appealability of the Hearing Board's determination;" see Pls.' Br. at 6; yet Plaintiff expressly claims in his Complaint that the failure to afford him an appeal violated Title IX, see Compl. at ¶¶ 129-132. In similar fashion, Plaintiff

---

involvement does not impugn the independence of the investigation, hearing, and appeals process. Each of these entities or individuals had complete and independent control over the merits of the case.

[5] See Compl. at ¶ 5 ("W&L failed to adhere to its own policies, guidelines, and regulations."); ¶ 50 ("Each step in the investigation against Plaintiff was flawed . . . The procedures employed by W&L deprived him means to defend himself . . . W&L's process, as applied, was designed to find that Plaintiff engaged in non-consensual sex."); ¶ 56-57 (alleging that Kozak violated W&L's "unequivocal policy"); ¶ 86 (alleging that notice to Plaintiff to not discuss the case with anyone prevented Plaintiff "from obtaining information necessary to disprove the . . . allegations against him"); ¶ 90-91 (alleging that Plaintiff was denied the right under W&L's policy to "object to the appointment of any member of the Panel"); ¶ 94 (alleging that there were no written transcripts or notes); ¶ 105 (alleging that the Panel's questioning was improper); ¶ 111 (alleging that the hearing was not recorded and no witnesses called); ¶ 129-131 (alleging that W&L violated Handbook by denying right to meaningful appeal); ¶ 155 ("W&L [v]iolated Title IX of the Education Amendments of 1972" by "failing to follow their own policies."); ¶ 162 ("W&L had no intention of following its own policies and procedures . . . ."); ¶ 163 ("W&L failed to follow W&L's Policy as set forth in the Student Handbook and the Interim Sexual Harassment and Misconduct Policy . . . .").

argues that emails sent to in-house counsel about whether to record the hearing were not legal advice, yet, in the same paragraph, he argues that the failure to record the hearing violated federal regulations. (See Pl.'s Br. at 8-9.) Finally, he claims that draft emails to Jane Doe regarding her potential remedies were not legal advice because they predated her complaint. Plaintiff ignores, however, the fact that Jane Doe also had rights under Title IX separate and apart from the Plaintiff's, regardless of whether she ultimately filed a complaint. See e.g., Butters v. James Madison Univ., 5:15–cv–00015, 2015 WL 6825420 (W.D. Va. Nov. 6, 2015) (holding that a university has an obligation under Title IX to respond to claims of sexual misconduct, even when the victim does not proceed with filing a formal complaint). The employees and agents of W&L had a right to seek legal counsel regarding their obligations, and those communications are subject to the attorney client privilege.

Ultimately, Plaintiff's Motion to Compel amounts to nothing more than a fishing expedition in support of his theory that W&L's in-house counsel was part of a conspiracy against him. Plaintiff, however, should not be permitted to invade the sanctity of attorney client privilege to search for evidence that does not exist. W&L's in-house counsel properly provided legal advice to the Title IX Coordinator, chair of the SFHB, and chair of the UBA, as employees of the university acting within the scope of their respective positions, regarding their various responsibilities and obligations under both W&L's policies and Title IX, and these communications deserve protection. W&L has provided the Plaintiff with a reasonable and truthful explanation regarding the documents over which privilege is asserted, an explanation which is readily discernable from a reading of the privilege log. As a result, the Motion to Compel should be denied.

## II. Plaintiff's Spoliation Claim Lacks Legal or Factual Support

Plaintiff's spoliation claim is equally unavailing. The term "spoliation" has been narrowly defined as "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). A party seeking sanctions based on the spoliation of evidence must establish three elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence. Thompson v. United States Dep't of Hous. & Urban Dev., 219 F.R.D. 93, 101 (D. Md. 2003) (citing Zubulake v. UBS Warburg LLC (Zubulake IV), 220 F.R.D. 212, 220 (S.D.N.Y.2003)).

First, even if Plaintiff's allegations that W&L destroyed evidence were true, Plaintiff's argument falls flat as W&L was not under any obligation to preserve evidence on the dates that Plaintiff cites in the Motion. The timeline of events in this case is simple: At the conclusion of the SFHB hearing on November 20, 2014, Tammi Simpson directed the SFHB members, parties, and their representatives to give her all documents. The Plaintiff requested an appeal, and the UBA denied that request on December 3. That same day, David Leonard instructed UBA members to delete their e-mails.[6] On December 13, 2014, W&L received the first of any

---

[6] Plaintiff makes much of the fact that the day before sending this instruction to the UBA member, Leonard received an e-mail (withheld from production as privileged) from Leanne Shank, W&L's in-house counsel. He jumps to the remarkable conclusion that the "evidence suggests" that Shank's e-mail must have directed Leonard to destroy the documents. See Pl.'s Br. at 11-12. This could not be farther from the truth. The document in question is cataloged in the privilege log at Bates Number WL0000937-WL0000938, and is described therein as "E-mail regarding draft letter to UBA." See Exhibit A. In this e-mail, Shank responded to an e-mail from David Leonard forwarding a letter for her review with a comment regarding the letter. It says nothing whatsoever about collecting or destroying documents. This concocted dishonesty that the Plaintiff wants to impute to Leanne Shank is inappropriate, uncalled

10

indication that litigation might ensue, an e-mailed copy of the Complaint. Until that time, W&L was not aware that any litigation would occur. On December 13, the same day that W&L received the Complaint, in-house counsel immediately directed employees to preserve all relevant documents and discontinued the standard policy. In fact, Tammi Simpson did not even have a chance to discard the documents she had collected prior to the filing of the suit.

W&L had no reason or obligation to preserve these documents until it had notice that litigation might occur. Plaintiff did not, for example, send a demand letter or otherwise suggest that Plaintiff intended to sue W&L prior to filing his Complaint. To the extent that Plaintiff suggests that W&L had some obligation prior to receiving notice that he had filed a lawsuit simply because of the existence of the sexual misconduct charge, his argument falls flat. As an institution of higher education with over 1,400 students, W&L investigates and adjudicates allegations of student misconduct on a regular basis, and it is not reasonable for W&L to anticipate that every student complaint will turn into a federal lawsuit. See e.g., Long v. Anderson Univ., 204 F.R.D. 129, 131 (N.D. Ind. 2001) (noting that university did not reasonably anticipate litigation from its investigation of sexual harassment). Contrary to Plaintiff's argument, the presence or absence of an attorney representative of a party to a disciplinary proceeding does not put the university on notice of the potential for litigation, because W&L's policies anticipate and allow for the potential participation of a lawyer. The presence or absence of an attorney bears no relation to the foreseeability of litigation. Furthermore, the lawyer who attended the hearing as a representative of John Doe had no further involvement in his case, supporting the notion that her presence alone should not have served as any sort of trigger to preserve documents. Thus, absent any indication from Plaintiff that he intended to file a lawsuit,

---

for, and contrary to plaintiff's statement, not "suggested" by the evidence. W&L asserts that it has done nothing to merit such distrust by Plaintiff, and such statements are unnecessarily inflammatory and inappropriate.

W&L had no obligation to preserve the documents until it received notice of his lawsuit, and is not responsible for the spoliation of evidence.

Additionally, even if Plaintiff's allegations that W&L destroyed evidence were true, W&L did not act with a "culpable state of mind" or otherwise act improperly in this case. As explained in the affidavits of Tammi Simpson and David Leonard, attached hereto as Exhibits C and D, W&L has a standard procedure to create a single file, and, after each investigation is concluded, Simpson and Leonard instruct their Board members to purge extraneous emails and documents that are not part of the official record maintained by the school.[7] As with any case, however, W&L suspends this process when it receives notice of pending litigation, or when litigation is reasonably foreseeable.

The court's discussion in Hill v. Madison Cnty. Sch. Bd., 957 F. Supp. 2d 1320, 1327 n.2 (N.D. Ala. 2013), is instructive on this point. There, the school destroyed a student's disciplinary records at the end of the school year pursuant to their standard operating procedure. On the plaintiff's motion for spoliation, the court held that the "documentation supporting a student disciplinary action is routinely destroyed by the school system the summer after the school year ends" and the court found no basis to find spoliation. See id. On appeal, the Eleventh Circuit agreed, holding that the district court did not abuse its discretion in deciding not to impose sanctions. See Hill, 797 F.3d 948, 967 n.10 (11th Cir. 2015) (reasoning that "the Board continued to follow the customary document retention policy by which disciplinary files were shredded each summer"). Similar to the school in Hill, W&L followed its standard

---

[7] W&L implemented this policy to alleviate the administrative burden with respect to compliance reviews by the Department of Education's Office of Civil Rights. OCR's regulations require funding recipients to submit "copies of all grievance filed by students alleging sexual harassment or violence, and provide[] OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals." OCR, Dear Colleague Letter, pg. 19 (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.)

procedures until it received notice of pending litigation, at which point it immediately suspended the purge and preserved all potentially relevant documents. As such, Plaintiff's spoliation claim does not hold water, and W&L respectfully requests that the Court deny Plaintiff's Motion to Compel.

## CONCLUSION

The Plaintiff's Motion to Compel seeks to unfairly vilify and undermine the credibility of W&L and its counsel, with nothing more than unfounded and paranoid suspicions in support thereof. W&L appropriately withheld or redacted documents for which the attorney client privilege and/or work product doctrine were correctly asserted. For these reasons, and those set forth above, W&L respectfully requests that this Court deny Plaintiff's Motion to Compel.

Respectfully submitted,

WASHINGTON AND LEE UNIVERSITY

By counsel:

__/s/ Melissa Wolf Riley_____
Robert Craig Wood (VSB #24264)
Melissa Wolf Riley (VSB #43316)
McGuireWoods LLP
Court Square Building
310 Fourth Street, N.E., Suite 300
Charlottesville, VA 22903-1288
434-977-2598 (direct line)
434-980-2275 (fax)
cwood@mcguirewoods.com
mriley@mcguirewoods.com

CERTIFICATE OF SERVICE

I, Melissa Wolf Riley, certify that on this 13th day of January, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Plaintiff by electronically serving his counsel of record, and also by electronic mail to:

>David G. Harrison, Esq. (VSB # 17590)
>The Harrison Firm, PC
>5305 Medmont Circle, SW
>Roanoke, VA 24018-1120
>(540)777-7100
>david@harrisonfirm.us
>
>G. Robert Gage, Jr., Esq.
>New York Bar No. 1901412
>Joseph B. Evans
>New York Bar No. 5221775
>William B. Fleming
>New York Bar No. 2514651
>Gage, Spencer & Fleming LLP
>410 Park Ave., Ste. 900
>New York, NY 10022-9492.
>grgage@gagespencer.com
>jevans@gagespencer.com

                /s/ Melissa Wolf Riley
                Melissa Wolf Riley